IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

Fed. Cl. Nos. 06-30 T and 06-35 T
(Senior Judge Eric G. Bruggink)

_____

RUSSIAN RECOVERY FUND LIMITED, RUSSIAN RECOVERY ADVISORS, L.L.C.,
Tax Matters Partner,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

_____

DEFENDANT'S PROPOSED TRIAL FINDINGS OF FACT

_____

Pursuant to the Court's order (Tr. at 3434:6-20),[1] defendant proposes that the Court make

the following findings of fact from the trial record. Defendant's proposed trial findings of fact

are referred to herein and in defendant's brief as "DPTF."

---

[1] All references to the trial transcript (filed as docs. ##349-372) are to "Tr. at [insert
pages]." References to Joint Exhibits are to "JX", Plaintiff's Exhibits "PX", and Defendant's
Exhibits "DX."

# Table of Contents

| Section | Findings |
|---|---|

**I.    THE FPAA DISALLOWED LOSSES THAT ONLY TIGER SUFFERED**

A.    The Tiger Funds (Jaguar and Ocelot) lost $220 million but were not U.S. taxpayers ................................................................................... 1–3

B.    Tiger Management's catastrophic 1998 investments in Russian bonds ........... 4–15

C.    August 1998 Russian Government Default ................................................... 16–20

D.    After the default, Tiger decides to liquidate its Russian bond holdings ........ 21–23

E.    The Russian default inspires the formation of Russian Recovery Fund ........ 24–36

      a)    Marketing: Deutsche Bank

      b)    Additional marketing efforts

      c)    Limited success in acquiring shareholders

F.    Acquiring tax losses ("built-in" or "BIL") were always key for RRF ............ 37–44

G.    RRF's conduct emphasized obtaining and preserving tax losses more than following guidance and non-tax provisions of its Offering Memoranda ........ 45–55

H.    Deutsche Bank and its central role in the acquisition and disposition of the Tiger Securities ........................................................................................ 56–76

I.    Tiger Management rejected keys terms in RRF's Subscription Agreement ... 77–98

J.    RRF changed its Subscription Agreement to obtain the Tiger Securities .... 99–112

      a)    Investment purpose

      b)    Special Redemption Rights

      c)    Disclosure of Conflict of Interest

K.    Tiger executes plan to obtain cash in less than two weeks ........................ 113–125

L.    RRF accepted Jaguar and Ocelot as shareholders on May 25,1999 .......... 126–150

      a)    Subscription Agreements

      b)    Assignment and Assumption Agreements

      c)    Side letters executed May 25, 1999

# Table of Contents
(continued)

| Section | | | Findings |
|---|---|---|---|

M.  Tiger absorbed a substantial loss on RRF share sale to FFIP to exit RRF early for cash ............................................................................... 151–157

N.  Russian Recovery Fund erroneously claimed Tiger's cost ($230 million) as its tax basis in the Tiger Securities rather than the $14.96 value it assigned to the RRF shares issued to Jaguar and Ocelot in exchange for the securities .......................................................................................... 158–166

O.  In June 1999, shortly after acquiring the Tiger Securities, RRF executed a Deutsche Bank registered tax shelter transaction which sent 77.18% of the Tiger Securities to General Cigar .................................................... 167–200

P.  Summary of RRF's disposition of Tiger Securities and tax loss claims..... 201–226

**II.  RRF HAS NO VALID DEFENSES TO THE FPAA PENALTY DETERMINATIONS**

A.  The IRS penalty determinations for 2000 .................................................. 227–228

B.  Plaintiff failed to obtain any written opinion to justify the tax losses claimed ........................................................................................ 229–242

C.  Ernst & Young prepared RRF's tax returns and financial statements but did not issue any written opinions explaining or justifying (1) RRF's using a carryover basis for the Tiger Securities or (2) for RRF's claiming losses upon their sale or exchange in 1999, 2000 or 2004 .......................................................................... 243–252

D.  Ernst & Young's purported "advice" is unsubstantiated by any written workpapers or analysis, factual or legal, and could not have been based on all pertinent facts and circumstances as Ernst & Young was not aware of key facts and unreasonably relied on RRF's representations ...... 253–271

E.  Ernst & Young did not conduct an independent review of RRF's transaction............................................................................................ 272–330

F.  Covenants with Deutsche Bank indicate a lack of good faith and reasonable cause................................................................................. 331–333

G.  Penalties are appropriate when taxpayers claim huge tax losses unrelated to economic losses ................................................................. 334–335

# Table of Contents

(continued)

| Section | | Findings |
|---|---|---|

H.     Mr. DiBiase, Ms. Zimmerman, and Mr. Grenzke occupy the highest level of taxpayer sophistication, including Mr. DiBiase's extensive experience, savvy, and expertise in the area of taxation ............................ 336–347

I.     RRF failed to file a Sec. 351 disclosure statement with its 1999 tax return ............................................................................................ 348

**III.**   **PROPOSED FINDINGS ON EXPERTS**

A.     Plaintiff's Expert Dr. Hanke was not credible ........................................... 349–362

B.     Dr. DeRosa testimony was valuable and insightful ................................... 363–382

C.     Dr. DeRosa demonstrated the uselessness of Dr. Hanke's simulation ....... 383–401

D.     Mr. Lucas demonstrated that the Deutshe Bank option was undervalued ......................................................................................... 402–433

E.     Dr. Nathalie Moyen's valuation of the call option that RRF sold to Deutsche Bank is flawed, and therefore lacks credibility...................... 434–348

F.     Apart from confirming that the market for the Tiger Securities was highly-illiquid in May 1999, and that such assets usually sold at "fire sale" prices, Mr. Metzger's opinions and testimony were uninformative. .................................................................................. 439–450

# I.  THE FPAA DISALLOWED LOSSES THAT ONLY TIGER SUFFERED

## A.  The Tiger Funds (Jaguar and Ocelot) lost $220 million but were not U.S. taxpayers

1.  Two foreign entities, Jaguar Fund N.V. ("Jaguar") and Ocelot Cayman Limited

    ("Ocelot") (or "the Tiger Funds), hedge funds managed by Tiger Management LLC

    ("Tiger"), incurred real economic losses with respect to certain interests in Russian

    government bonds known as OFZs (the "Tiger Securities") as result of a 1998 default on

    such bonds by the Russian government. The Tiger Securities had a maturity date of

    September 12, 2001.

    DX-204 at 36:13-38:19, 40:17-44:3, 44:13-46:5, 48:9-49:5, 52:12-54:15 and errata at p. 2

    and DX-204 depo. ex. 7 (TIGERPROD00000002-5); Compl. (doc. #1) ¶ 8.a.; JX-121;

    JX-139 at A1-000169, A1-000173.

2.  The total economic loss suffered by the foreign entities was approximately $220 million.

    DX-204 at 36:13-38:19, 40:17-44:3, 44:13-46:5, 48:9-49:5, 52:12-54:15 and errata at p. 2

    and DX-204 depo. ex. 7 (TIGERPROD00000002-5); Compl. (doc. #1) ¶ 8.a.; JX-121;

    JX-139 at A1-000169, A1-000173.

3.  The foreign entities Jaguar and Ocelot never claimed their $220 million of economic

    losses as tax losses, because they were foreign entities that did not pay United States

    taxes and did not file United States tax returns.

    DX-204 at 39:4-20.

## B.  Tiger Management's catastrophic 1998 investments in Russian bonds

4.  During the period beginning in June 1998 and ending in mid-August, 1998, Jaguar and

    Ocelot invested approximately $230 million in the Tiger Securities, as well as additional

monies in other Russian government bonds. Specifically, Jaguar acquired (netting purchases and sales) 2,937,434,000 titles of the Tiger Securities for approximately $222 million dollars; and Ocelot acquired (netting purchases and sales) 107,454,000 titles of the Tiger Securities for approximately $8 million dollars.

DX-204 at 36:13-38:19, 40:17-44:3, 44:13-46:5, 48:9-49:5 and errata at p. 2 and DX-depo. ex. 7 (TIGERPROD00000002-5).

5.      The leader of Tiger at all relevant times was Julian Robertson. He owned Tiger in 1998 and 1999 and had management control over Ocelot and Jaguar. Thus, he had control over all investment decisions for Tiger and the funds it managed, including Jaguar and Ocelot.

DX-206 at 31:16-32:5; DX-204 at 18:22-19:4, 19:21-20:2, 20:9-22, 21:4-27:5, 32:9-33:4, 35:1-24, 46:17-48:6, and errata at p. 1 and DX-204 depo. exs. 2 (TIGERPROD00000335-373), 3 (TIGERPROD00000374), 4 (TIGERPROD00000427), 6 (TIGERPROD00000037-38).

6.      Tiger Management, LLC testified at trial by deposition. Its deposition testimony was through its designee Michael B. Treisman.

DX-204 at 5:1-7:23, 13:25-17:24 and errata at p. 1 and DX-204 at depo. Ex. 1.

7.      During 1998, William Goodell was Tiger Management's general counsel. He joined Tiger Management LLC in 1995 as general counsel and remained with Tiger until Tiger closed its public funds in approximately July of 2000. He rejoined Tiger in 2002/2003 as general counsel, as well as president of Julian Robertson's family foundation, and remained with Tiger until approximately April of 2008.

DX-206 at 12:5-13:9.

8.      In 1995, when Mr. Goodell joined Tiger, Tiger had approximately six and a half billion

        dollars of capital under management, but did not have a general counsel. Over the

        ensuing five years, Mr. Goodell was a member of the management committee, watched

        what occurred on the investment side of Tiger, and tried to head off legal difficulties

        where he identified them.

        DX-206 at 13:10-14:6.

9.      In 1998 and 1999, Tiger's assistant general counsel was Laurel Fitzpatrick and thus Tiger

        had two lawyers - Mr. Goodell and Mr. Fitzpatrick. The two were extensively involved

        with trading and Mr. Goodell did his best to ensure that he knew what was going on

        before something was executed on behalf of Tiger.

        DX-206 at 14:7-22.

10.     Mr. Goodell was succeeded as general counsel at Tiger by Michael Treisman.

        DX-206 at 15:19-22.

11.     Mr. Goodell provided information to Mr. Treisman ahead of Tiger's 30(b)(6) deposition.

        Mr. Goodell reviewed Mr. Treisman's deposition / trial testimony and confirmed that it

        was accurate, with one exception, namely, that Tiger was established in the early 1980s.

        DX-206 at 16:1-18:5; 46:6-47:11.

12.     Tiger was established in the early 1980s. In the mid to late 1990s, including 1998 and

        1999, Tiger was the investment manager to a number of collective investment accounts,

        i.e., funds, that it managed on behalf of third-party investors.

        DX-204 at 18:22-19:4, 19:21-20:2, 20:9-22, 21:4-27:5, 32:9-33:4, 35:1-24, 46:17-48:6,

        and errata at p. 1 and DX-204 depo. exs. 2 (TIGERPROD00000335-373), 3

(TIGERPROD00000374), 4 (TIGERPROD00000427), 6 (TIGERPROD00000037-38);
DX-206 at 46:6-47:11.

13.  Three of the funds for which Tiger was the investment manager in 1998 and 1999 were
     (1) Tiger Fund (a fund distinct from its investment manager Tiger Management LLC and
     thus Tiger fund is always referred to herein as "Tiger Fund"), (2) Jaguar, and (3) Ocelot.

     DX-204 at 18:22-19:4, 19:21-20:2, 20:9-22, 21:4-27:5, 32:9-33:4, 35:1-24, 46:17-48:6,
     and errata at p. 1 and DX-204 depo. exs. 2 (TIGERPROD00000335-373), 3
     (TIGERPROD00000374), 4 (TIGERPROD00000427), 6 (TIGERPROD00000037-38).

14.  Tiger Fund, Jaguar, Ocelot, Puma, and Lion L.P., were funds managed by Tiger
     Management, LLC, that invested in Russian government bonds in 1998.
     DX-204 at 18:22-19:4, 19:21-20:2, 20:9-22, 21:4-27:5, 32:9-33:4, 35:1-24, 46:17-48:6,
     and errata at p. 1 and DX-204 depo. exs. 2 (TIGERPROD00000335-373), 3
     (TIGERPROD00000374), 4 (TIGERPROD00000427), 6 (TIGERPROD00000037-38).

15.  The Russian Bonds - OFZ 25023s - that Tiger transferred to RRF in exchange for shares
     in RRF were held by Deutsche Bank in an S-account. S-accounts were established for
     certain banks to hold Russian bonds directly. Foreigners interested in investing in
     Russian Bonds could then enter into contracts with those banks, called credit linked
     notes, that entitled them to the economic performance of the underlying bonds held by
     the bank. Tiger entered credit linked notes that entitled them to the economic
     performance of those bonds. What Tiger transferred to RRF, therefore, were actually
     OFZ-linked notes/contracts, not the bonds themselves. For simplicity, we refer to these
     contracts as the bonds or OFZ 25023s.

Tr. at 618:21-619:25, 628:12-629:14.

**C.**   **August 1998 Russian Government Default**

16.   The Russian government announced on August 17, 1998, that it had suspended payments

on its outstanding bonds, which constituted a default.

DX-194 at ¶¶ 127-155.

17.   The Russian government's default on its bond obligations resulted in a near-total collapse

of the value of bonds (or, more precisely, interests in those bonds via credit linked notes)

held by foreign investors, such as the bonds held by Jaguar and Ocelot, including the

Tiger Securities.

DX-204 at 52:12-54:15 and DX-204 depo. ex. 7 (TIGERPROD00000002-5); Compl.

(doc. #1) ¶ 8.a.

18.   Nancy Zimmerman's fund, FFIP, also held Russian bonds at this time, and suffered the

same near-total collapse of value as did the Tiger Management Funds' Russian bonds.

Tr. at 119:25-126:25; 135:23-136:7; 137:1-18; 159:2-10; 297:3-298:6; 623:6-9; 628:6-11;

641:13-642:8.

19.   FFIP was founded in 1994 and still exists today. It was originally called Farallon Fixed

Income Partners, LP. The name changed in 1999 to FFIP, LP. FFIP has had different

general partners, but at all relevant times has been controlled by Nancy Zimmerman.

Tr. at 297:3-298:6.

20.   In late 1998, FFIP was situated within Bracebridge Capital's master-feeder fund structure

as follows: The master fund essentially holds the investments that are being made on

behalf of clients. The clients do not invest in the master fund directly, but invest in feeder

funds. The feeder funds in turn invest in the master fund. This allows feeder funds to be

tailored to particular types of investors. For example, one feeder can be set up as a

partnership for U.S. taxable investors. In Bracebridge's case, there was a master fund

(FFI Fund Limited) with three feeder funds. One of the feeders was a U.S. partnership

that had U.S. taxable investors - FFIP, one was a foreign corporation that had U.S.

tax-exempt investors - Bracebridge Institutional Ltd., and one was a fund for non-U.S.

investors - New FFIO.

Tr. 127:8-128:12, 137:1-14, 147:23-148:14, 149:8-152:19

**D.**    **After the default, Tiger decides to liquidate its Russian bond holdings**

21.    After the 1998 Russian government default, Tiger decided to liquidate (sell for cash) all

of the Russian government bonds held by its managed funds, including Jaguar and

Ocelot.

DX-206 at 23:12-24:17 and DX-206 depo. ex. 2 at TIGERPROD00000484; DX-204 at

136:6-16; DX-205 at 115:7-19.

22.    Tiger's domestic funds (i.e., located or incorporated in the United States), for example,

Tiger Fund and Lion L.P., sold off their interests in defaulted Russian bonds in December

1998.

DX-204 at 40:7-16, 57:11-60:8 and DX-204 depo. ex. 9 (TIGERPROD00000185).

23.    Tiger's plan to sell off Russian bond investments included the sale of such investments

held by its managed funds, including the Tiger Securities held by Jaguar and Ocelot.

DX-206 at 23:12-24:17 and DX-206 depo. ex. 2 at TIGERPROD00000484; DX-204 at

136:6-16; DX-205 at 115:7-19.

**E.**     **The Russian default inspires the formation of Russian Recovery Fund**

24.     RRF was formed in December 1998, as a Cayman Island corporate entity.

   Tr. at 159:19-21; Compl. (doc. #1) ¶¶ 3, 8.b.

   **a)**     **Marketing: Deutsche Bank**

25.     The Russian government, in 1998, used currency controls and designated foreign entities

   to act as brokers in order to exert some control over investors in its bonds. Deutsche

   Bank, a German financial institution, was one such designated foreign entity.

   DX-204 at 18:22-19:4, 19:21-20:2, 20:9-22, 21:4-27:5, 32:9-33:4, 35:1-24, 46:17-48:6,

   and errata at p. 1 and DX-204 depo. exs. 2 (TIGERPROD00000335-373), 3

   (TIGERPROD00000374), 4 (TIGERPROD00000427), 6 (TIGERPROD00000037-38).

26.     Deutsche Bank served as Tiger's broker for the acquisition of Russian government bonds

   for Tiger's funds, including Jaguar and Ocelot.

   DX-204 at 18:22-19:4, 19:21-20:2, 20:9-22, 21:4-27:5, 32:9-33:4, 35:1-24, 46:17-48:6,

   and errata at p. 1 and DX-204 depo. exs. 2 (TIGERPROD00000335-373), 3

   (TIGERPROD00000374), 4 (TIGERPROD00000427), 6 (TIGERPROD00000037-38).

27.     In December 1998, RRF sent preliminary drafts of documents, including a subscription

   agreement and an offering memorandum for RRF, to Deutsche Bank personnel Jay

   Johnston and Laurence Schreiber. In the ensuing months, Deutsche Bank participated in

   the marketing of RRF and the seeking of potential investors.

   JX-5; JX-8; JX-16 at B2-001064; JX-22 at B2-001357 and Tr. at 3296:20-3297:16.

   **b)**     **Additional marketing efforts**

28.     Also in December of 1998 and January of 1999, RRF engaged in substantial marketing

efforts, widely seeking potential investors, primarily those holding distressed Russian

government bonds that had lost value after the August 1998 default. Additional

marketing efforts were made in March and April of 1999. Thereafter, marketing efforts

were quite limited.

PX-4-10, 12-13, 16-22; JX-5, 7-13; Tr. at 1569:7-1570:3; JX-16, 22, 23, 26; JX-89 and

Tr. at 1589:11-23; PX-49 and Tr. at 1590:15-1591:6; DX-131 at B2-009356 ("[RRF] had

an extraordinarily limited marketing run.").

29.     Between January 1, 1999, and March 31, 1999, Ms. Zimmerman made over 50 inquiries

in seeking contributors to RRF.

Tr. at 851:25-852:20.

30.     On January 25, 1999, Ms. Zimmerman and Mr. Grenzke discussed a potential investor

named Bo Thiara. Mr. Thiara had concerns about investing in RRF. Among other things,

he was concerned that, absent special circumstances, investors could not redeem shares in

RRF until after three years had passed. According to Mr. Grenzke, RRF's general

three-year lockup period was a "long lockup."

DX-2 and DX-3 and DX-4 and Tr. at 1760:9-1765:10, 1771:19-1772:3; JX-13 and Tr. at

1773:16-1774:9.

31.     Mr. Thiara was also concerned about being the first investor in RRF, and wanted to know

whether others had made firm commitments to invest in RRF. Jonathan Grenzke was

aware that other potential investors had similar concerns about being the first to invest in

RRF. Mr. Thiara did not ultimately invest in RRF.

DX-2 and DX-3 and DX-4 and Tr. at 1760:9-1765:10, 1771:19-1772:3; JX-13 and Tr. at 1773:16-1774:9.

    **c)**    <u>**Limited success in acquiring shareholders**</u>

32.    Prior to April 1999, RRF had no participating shareholders (i.e., investors in the fund). Tr. at 168:7-11 and JX-121.

33.    In April 1999, FFIP (a fund also managed by Nancy Zimmerman) became the first investor / participating shareholder in RRF by contributing Russian assets worth approximately $2 million.
Tr. at 159:11-18, 168:7-11 and JX-121.

34.    The next five participating shareholders purportedly joined RRF around the same time in late May 1999—Jaguar, Ocelot, Nancy Zimmerman, Gabriel Sunshine, and Russian Recovery Advisers (RRF's investment adviser, also managed by Nancy Zimmerman). Jaguar and Ocelot contributed the Tiger Securities, and the other three shareholders contributed a total of $200,000 cash.
Tr. at 168:7-11 and JX-121.

35.    The Tiger Securities represented over 90% of RRF's non-cash holdings at the time they were transferred.
PX-63 Ex. 10.

36.    On June 3, 1999, RRF was still in the process of setting up its accounting system and completing the booking of transactions that had already occurred.
JX-80 and Tr. at 541:21-18.

**F.** **Acquiring tax losses ("built-in" or "BIL") were always key for RRF**

37.     RRF sought to acquire high basis, low value Russian bond interests and recognized that

assets with such "built in losses" were "one of our most valuable assets."

DX-29 and Tr. at 205:22-207:6, 310:24-311:23.

38.     In late 1998 and early 1999, RRF was hearing that there were opportunities to transfer

depreciated Russian assets to persons who wanted to acquire the built in losses in the

assets.

Tr. at 208:11-25; DX-29 and Tr. at 312:12-24; Tr. at 319:7-11.

39.     More specifically, in that time frame, RRF had been hearing from market participants

that there may be people in the market interested in buying deeply depreciated assets in

Bracebridge funds via a transaction structure that would allow them to take advantage of

the tax characteristics of such assets, including their built-in-losses. In an e-mail written

in July 1999, RRF referred to this market as a "tax loss market" and "people interested in

buying tax losses."

DX-111 at B2-003590 and Tr. at 489:12-491:13.

40.     In the last six months of 1998, Bracebridge-managed funds lost approximately one-third

of their value.

Tr. 135:23-136:7

41.     Just prior to Tiger's transfer of the Tiger Securities to RRF, on Friday, May 14, 1999, at

9:54a.m., Jim DiBiase sent an e-mail to Nancy Zimmerman, with a copy to Jon Grenzke.

The first line of the e-mail is "Nothing in the docs prevents us from putting in corps but it

could possibly impair one of our most valuable assets." The phrase "one of our most

valuable assets" in the May 14, 1999 e-mail, referred to the built-in losses in Russian

depreciated assets (i.e. assets whose market value is significantly less than original

purchase price) that might end up in the RRF. The assets that Jaguar and Ocelot

subsequently transferred to RRF - i.e. the Tiger Securities - were deeply depreciated

Russian assets.

DX-29 and Tr. at 205:22-207:6, 310:24-311:23.

42.     Mr. DiBiase was hired at the Farallon entities / Bracebridge in October of 1998 as the

chief financial officer and chief operating officer. As CFO and COO, Mr. DiBiase was

responsible for accounting, operational, and administrative aspects of the business in

which Bracebridge engaged. He made sure that the books and records of the funds

Bracebridge managed were accurate, that the books and records properly reflected

transactions executed by traders, he communicated with investors regarding their

balances in the funds, he worked with outside accountants, he supervised audits, and he

prepared financial statements.

Tr. at 112:6-12, 113:25-114:2, 289:24-290:12, 291:7-292:1.

43.     After his role as CFO and COO ended in late 2007, Mr. DiBiase took on a role that had

no title but functionally may be described as a senior advisor role. In this role, he worked

on projects and other things that Ms. Zimmerman and Mr. Sunshine assigned to him. This

case is one of those projects, including attendance at almost all of the depositions in this

case.

Tr. at 295:14-296:1.

44.     RRF wanted to preserve the tax basis in the Tiger Securities. Preserving the tax basis was

a driver for RRF.

Tr. at 3322:9-22 (and DX-35 and Tr. at 3320:18-3322:22).

**G.      RRF's conduct emphasized obtaining and preserving tax losses more than following guidance and non-tax provisions of its Offering Memoranda**

45.     Ms. Zimmerman testified that an offering memorandum describes a fund's investment

objectives, as well as risks of an investment strategy and fees charged by the fund.

Tr. at 645:6-15.

46.     RRF's Offering Memoranda sought investors for long-term investments, investors who

did not have liquidity (cash) needs, and investors who were willing to pay high hedge

fund fees (1%/20%). (RRF also required an upfront cash payment by the transferor of 2%

of the value of the in-kind assets transferred to the fund.)

(1) Long-Term Investment: JX-32 at TIGERPROD00000213-214, 227 (para. 3.), 235;

JX-42 at TIGERPROD00000492-493, 506 (para. 3.), 514-515; JX-60 at

A1-000828 - 829, 842 (para. 3.), 850 - 851; DX-142 at A1-000921-922, 938 (para. 5.),

948-949; DX-204 depo. ex. 39 (TIGERPROD00000597-640) at

TIGERPROD00000606-607, 620 (para. 3.), 628-629; (2) Liquidity: JX-32 at

TIGERPROD00000219, TIGERPROD00000221, TIGERPROD00000227; JX-42 at

TIGERPROD00000498, TIGERPROD00000499, TIGERPROD00000506; JX-60 at

A1-000834, A1-000835, A1-000842; DX-142 at A1-000927, A1-000928, A1-000938

(para. 5. instead of 3.); see also DX-204 depo. ex. 39 (TIGERPROD00000597-640) at

TIGERPROD00000612, 613, 620 (para. 3.); (3) Fees: See e.g. JX-60 at A1-000828-829

and A1-000826; Tr. at 488:5-489:2, 646:2-7, 682:8-683:9.

47.    RRF's Offering Memoranda restricted share transfer rights, warned about the unstable

political and economic environment in Russian, and the obstacles to repatriating US

dollar profits from Russia.

(1) Transfer Rights: JX-32 at TIGERPROD00000227 (para. 2.); see also id. at

TIGERPROD00000214, 236; JX-42 at TIGERPROD00000506 (para. 2.); see also id. at

TIGERPROD00000493, 515; JX-60 at A1-000842; see also id. at A1-000829, 851-852;

DX-142 at A1-000937; see also id. at A1-000922, 949; see also DX-204 depo. ex. 39

(TIGERPROD00000597-640) at TIGERPROD00000620, 607, 630; and (2) Unstable

Environment / Obstacles: JX-32 at TIGERPROD00000219-225; JX-42 at

TIGERPROD00000498-504; JX-60 at A1-000834-840; DX-142 at A1-000927-933; see

also DX-204 depo. ex. 39 (TIGERPROD00000597-640) at TIGERPROD00000612-618.

48.    In its Offering Memoranda dated April 30, 1999, May 14, 1999, May 20, 1999, and

February 2005, Russian Recovery Fund stated that its investment objective was to

"maximize the value of the restructured assets of the Russian Federation and to capture

opportunities that could arise from the fluid economic and political environment in the

Russian Federation" and that it "presently intends to concentrate investments in the

Russian Federation and its related securities, including GKOs, OFZs and other Russian

assets."

JX-32 at TIGERPROD00000216; see also id. at TIGERPROD00000209,

TIGERPROD00000225; JX-42 at TIGERPROD00000495; see also id. at

TIGERPROD00000488, TIGERPROD00000504 (para. 21); JX-60 at A1-000831; see

also id. at A1-000824, A1-000840 (para. 21); DX-142 at A1-000924; see also id. at

– 17 –

A1-000917, A1-000933 (para. 1); see also DX-204 depo. ex. 39

(TIGERPROD00000597-640) at TIGERPROD00000609, 602, 618.

49.    The April 30, 1999, May 14, 1999, May 20, 1999, and February 2005 Offering

Memoranda further demonstrated that the Russian Recovery Fund required long-term

investments. Under its provisions, investors were required to make a three-year

commitment to RRF - specifically, a partner had to be invested in RRF for three years

before it could have RRF redeem all its shares for cash (or payments in kind). A more

limited and contingent provision permitted a partner to have RRF redeem some (but not

all) of the partner's interest (i.e. shares) after one year.

JX-32 at TIGERPROD00000213-214, 227 (para. 3.), 235; JX-42 at

TIGERPROD00000492-493, 506 (para. 3.), 514-515; JX-60 at A1-000828 - 829, 842

(para. 3.), 850 - 851; DX-142 at A1-000921-922, 938 (para. 5.), 948-949; DX-204 depo.

ex. 39 (TIGERPROD00000597-640) at TIGERPROD00000606-607, 620 (para. 3.),

628-629.

50.    RRF was not a fund for investors who were seeking liquidity. In fact, RRF told potential

interest parties, including Tiger, not to become partners if they needed liquidity. RRF did

this in Offering Memoranda dated April 30, 1999, May 14, 1999, May 20, 1999, and

February 2005 (emphasis added):

> Accordingly, investment in the Fund is suitable only for investors
> of adequate financial means who have no need for liquidity with respect to
> their investment . . . .
>
>         . . .
>
> A large portion of the Fund's investments will be traded on
> Russian securities markets that are not subject to consistent or effective
> regulation and oversight. Because there is still no organized public market

for shares in Russian companies, it is unlikely that any Russian stock exchange will, in the foreseeable future, offer the liquidity available in other securities markets.

. . .

Fund Risks . . . 3. Liquidity. Except for a limited and contingent right of redemption following the first anniversary of a Shareholder's investment in the Fund, a Participating Shareholder generally may not redeem Participating Shares from the Fund except following the third anniversary of investment and subsequently on an annual basis upon proper notice.

JX-32 at TIGERPROD00000219, TIGERPROD00000221, TIGERPROD00000227;

JX-42 at TIGERPROD00000498, TIGERPROD00000499, TIGERPROD00000506;

JX-60 at A1-000834, A1-000835, A1-000842; DX-142 at A1-000927, A1-000928,

A1-000938 (para. 5. instead of 3.); see also DX-204 depo. ex. 39

(TIGERPROD00000597-640) at TIGERPROD00000612, 613, 620 (para. 3.).

51.   RRF charged two types of fees to their clients: (1) an asset-based management fee of 1% per year of the value of the assets under management; and (2) an incentive fee generally equal to 20% of the profits RRF made for investors. The asset-based management fee for in-kind contributions was different. It required an upfront cash payment by the transferor of 2% of the value of the in-kind assets transferred to the fund.
See e.g. JX-60 at A1-000828-829 and A1-000826; Tr. at 488:5-489:2, 646:2-7, 682:8-683:9.

52.   The April 30, 1999, May 14, 1999, May 20, 1999, and February 2005 Offering Memoranda contained the following provision about the transfer of RRF shares: "The Participating Shares may be transferred only with the consent of the Board of Directors, which consent may be withheld for any reason or for no reason."

JX-32 at TIGERPROD00000227 (para. 2.); see also id. at TIGERPROD00000214, 236;

JX-42 at TIGERPROD00000506 (para. 2.); see also id. at TIGERPROD00000493, 515;

JX-60 at A1-000842; see also id. at A1-000829, 851-852; DX-142 at A1-000937; see

also id. at A1-000922, 949; see also DX-204 depo. ex. 39 (TIGERPROD00000597-640)

at TIGERPROD00000620, 607, 630.

53.   The April 30, 1999, May 14, 1999, May 20, 1999, and February 2005 Offering

Memoranda warned of the unstable political and economic environment in Russia, and of

the obstacles in obtaining U.S. dollar returns on Russian investments.

JX-32 at TIGERPROD00000219-225; JX-42 at TIGERPROD00000498-504; JX-60 at

A1-000834-840; DX-142 at A1-000927-933; see also DX-204 depo. ex. 39

(TIGERPROD00000597-640) at TIGERPROD00000612-618.

54.   These memoranda, moreover, included several pages devoted to potential tax issues—

such as the ability to allocate income and loss, and the ability to deduct tax losses.

JX-32 at TIGERPROD00000239-244; JX-42 at TIGERPROD00000518-523; JX-60 at

A1-000854-859; DX-142 at A1-000952-958; see also DX-204 depo. ex. 39

(TIGERPROD00000597-640) at TIGERPROD00000632-640.

55.   In 1999, RRF's Russian debt holdings exceeded 90% of RRF's total holdings. Most of

the remainder was the preferred stock it obtained in the General Cigar transaction

(described below). And RRF continues to hold Russian assets to this day.

Tr. at 194:23-195:4; JX-141 at A1-000987-988; Tr. at 828:16-829:8; DX-7 and Tr. at

1744:9-1745:15.

**H.**     **Deutsche Bank and its central role in the acquisition and disposition of the**
          **Tiger Securities**

56.     Deutsche Bank was a broker-dealer in the Russian government's marketing of its bonds

        in 1998 and 1999.

        See e.g. JX-65 at A1-000525-535; JX-66 at A1-000583-594; DX-1 and Tr.

        3272:11-3273:23; JX-1, 2, 3, 4.

57.     Deutsche Bank brokered Tiger Management's acquisition of Russian government bonds

        for its managed funds in 1998, including the acquisition of the Tiger Securities.

        Tr. at 1600:3-6; see e.g. JX-65 at A1-000525-535; JX-66 at A1-000583-594; DX-1 and

        Tr. 3272:11-3273:23; JX-1, 2, 3, 4; Tr. at 3278:12-18; JX-51; JX-57.

58.     Deutsche Bank brokered the transfer of the Tiger Securities to RRF in May 1999 in

        exchange for shares in RRF, the sale of Tiger's shares to FFIP in June 1999, and RRF's

        transfer of 77.17% of the Tiger Securities to General Cigar in June 1999. Deutsche Bank

        acted as a go-between for RRF and Tiger.

        JX-31; JX-44 and Tr. at 458:19-460:4; Tr. at 1599:21-25; DX-47; DX-206 at

        40:21-41:14; Tr. at 3277:21-3278:2; JX-32 and Tr. at 3307:23-3309:9; JX-34 and Tr. at

        3312:11-3315:21; DX-35; DX-36; DX-52; DX-53; JX-73; DX-54; JX-76; JX-77 and Tr.

        at 3331:2-3332:5; DX-64; DX-65; DX-17; DX-23; DX-31; JX-85; JX-87; JX-88; DX-63;

        DX-68; DX-121 at B5-001426; DX-121 at B5-001428; JX-92; JX-93; DX-80.

59.     Laurence Schrieber, Francesco Piovanetti, and Jay Johnston were the key players in

        Deutsche Bank's tax shelter and Russian government bond transactions with Tiger, RRF,

        and General Cigar in 1998 and 1999. These three worked in different areas of Deutsche

        Bank.

Laurence Schreiber was the head of the structured group at Deutsche Bank, which group was within the emerging markets group.

Mr. Johnston was Bracebridge's (and its predecessor's) salesperson and relationship manager at Deutsche Bank. The latter role was to facilitate Bracebridge's interactions with Deutsche Bank. He was the primary contact between Deutsche Bank and RRF.

Francesco Piovanetti worked in the structured transactions group, which focused on accounting and tax-intensive transactions. He was an associate in 1998 and 1999, which was a fairly junior level position. From time to time, he worked with Laurence Schreiber in connection with the emerging markets group.

Tr. at 3252:1-3256:13, 3257:9-20, 3258:7-3260:8, 3261:24-3262:9, 3290:5-22; DX-9; JX-15; JX-19; JX-31; Tr. at 603:5-18; JX-5 and Tr. at 1553:10-25; DX-82; see also JX-16 at B2-001064; JX-22 at B2-001357; DX-47; DX-86; DX-61; DX-78.

60. Laurence Schreiber graduated from Harvard University in 1988. After graduation, he worked in consulting and investment banking, before returning to Harvard for his MBA, which he earned in 1993. He then worked at Merrill Lynch from 1993 to 1996 in emerging markets in the product categories of interest rate derivatives, currency derivatives, and credit derivatives. After Merrill Lynch, he worked at Lehman Brothers from 1996 to 1998 in those same areas.

He joined Deutsche Bank in 1998 and ran an emerging markets derivatives structuring business, including the creation of structured products. His position at Deutsche Bank was Managing Director, which is a senior position, and he was the head of the emerging

markets structured products group. His position as Managing Director did not change

during his time with Deutsche Bank, which he left in 2004.

   Tr. at 3252:1-3256:13.

61.   The structured products group was within the emerging markets group. Also within the

   emerging markets group were other subgroups, including trading, sales, and capital

   markets.

   Tr. at 3257:9-20.

62.   E-mails produced by Deutsche Bank in this case have two time stamps, one on the top of

   the page and one further down below. It is the bottom one that shows when a particular

   message was sent.

   Tr. at 57:19-58:18 and DX-81.

63.   The transactions on which Mr. Piovanetti worked, including in connection with RRF,

   related to accounting and tax-intensive transaction structures. Stuart LeBlang was a tax

   lawyer at Akin, Gump with whom Mr. Piovanetti's structured transactions group worked.

   Tr. at 3261:24-3262:9; DX-8 and Tr. at 3295:3296:10.

64.   In the late 1998 to early 1999 time frame, Anu Murgai was the contact person at Tiger

   with whom Laurence Schreiber worked. The only transaction that Mr. Schreiber did with

   Tiger was in connection with RRF. Similarly, it was the only transaction that he did with

   RRF.

   Tr. at 3267:8-3268:14, 3275:14-19, 3277:15-20; DX-204 depo. ex. 24

   (TIGERPROD00000741), 29 (TIGERPROD00000186-246); JX-90.

65.     Mr. Schreiber's involvement with Tiger came about because one of Deutsche Bank's

        salespeople covering Tiger informed him in a Deutsche Bank sales meeting that Tiger

        was looking to sell Russian assets.

        Tr. at 3267:8-3268:14.

66.     Mr. Schreiber was approached by Jay Johnston on behalf of clients looking to establish a

        Russian Recovery Fund and asked if he could help identify potential investors and also

        help them source (i.e. find holders of) illiquid Russian bonds that those clients might

        want to buy. Laurence Schreiber worked with Tiger to source their bonds for RRF,

        meaning that he identified Tiger as a holder of bonds to whom he would go to try and buy

        their bonds for RRF.

        Tr. at 3273:24-3276:6; JX-8 and Tr. at 3287:11-3289:21.

67.     Deutsche Bank started conversations with Tiger and RRF at the end of 1998.

        Tr. at 3283:13-19.

68.     In late 1998, Deutsche Bank understood that, following the Russian crisis in the summer

        of 1998 and the illiquid nature of the Russian market, Tiger had decided to get rid of all

        of their Russian bonds.

        Tr. at 3276:21-3277:11.

69.     In the Spring of 1999, Deutsche Bank was still working on behalf of Tiger to find a buyer

        for Tiger's Russian assets.

        Tr. at 3401:25-3402:9, 3407:24-3408:5.

70.     Deutsche Bank brought Tiger and RRF together. At the time, Deutsche Bank understood

that Tiger was looking to liquidate its Russian bonds.

Tr. at 3277:21-3278:22.

71.     Deutsche Bank did not discuss with Tiger a straight buy-sell of their Russian bonds,

because, prior to June 1999, there were no buyers in the market who were interested in a

direct purchase of such a large block of illiquid Russian bonds as Tiger held. Tiger's only

option for implementing its plan to liquidate its Russian bonds was to do so indirectly.

Tr. at 3281:5-3286:20 and JX-90.

72.     Deutsche Bank also never discussed with RRF a direct sale of Tiger's Russian assets to

RRF. The only form of purchase that Deutsche Bank was approached about by RRF was

a transfer of Tiger's Russian assets to RRF. RRF sought a contribution of the Russian

assets from Tiger as opposed to a direct sale.

Tr. at 3304:2-21, 3307:19-22.

73.     One of the reasons RRF wanted its transaction with Tiger structured as a contribution to

RRF as opposed to a direct sale was to preserve the tax basis in the Tiger Securities.

Preserving the tax basis was a driver for RRF.

Tr. at 3322:9-22 (and DX-35 and Tr. at 3320:18-3322:22).

74.     Laurence Schreiber understood from conversations with Anu Murgai that Tiger obtained

shares in RRF (via transfer of the Tiger Securities to RRF in exchange for shares) in

order to get out of Russian investments. Tiger viewed obtaining shares in RRF as part of

the process of eventually liquidating their Russian securities (the Tiger Securities).

Tr. at 3392:16-3393:22.

– 25 –

75.     Laurence Schreiber also considered the Russian bonds that RRF acquired from Tiger to

be tax-advantaged.

Tr. at 3394:7-3396:5.

76.     Other related tax-based interactions between Deutsche Bank and RRF include:

A.      In February of 1999, Deutsche Bank forwarded advice it received from its

lawyers at Shearman & Sterling to RRF regarding the formation of RRF and

subscription agreements for RRF. Nancy Zimmerman subsequently forwarded

this advice to tax lawyer James Nix of Swidler, Berlin. The advice included the

statement that "The Fund must be a partnership for U.S. tax purposes."

DX-5.

B.      On March 10, 1999, RRF's lawyer Byron Spivack sent RRF's private offering

memorandum, subscription agreement, and articles of association, to Stuart

LeBlang, a tax attorney at Akin Gump, who worked with Francesco Piovanetti's

tax-focused group at Deutsche Bank.

DX-8 and Tr. at 3295:19-3296:13.

C.      On May 12, 1999, on behalf of tax lawyer Stuart LeBlang of Akin Gump,

Francesco Piovanetti of Deutsche Bank asked Laurence Schreiber of Deutsche

Bank to retrieve from Nancy Zimmerman an "original structure file" and any

copies she made of it. No copy of this mystery document was uncovered in

discovery and no witness was able to testify about it.

DX-27 and Tr. at 3311:9-3312:10.

I.      **Tiger Management rejected keys terms in RRF's Subscription Agreement**

77.     After the 1998 Russian government default, Tiger decided to liquidate (sell for cash) all

        of the Russian government bonds held by its managed funds, including Jaguar and

        Ocelot.

        DX-206 at 23:12-24:17 and DX-206 depo. ex. 2 at TIGERPROD00000484; DX-204 at

        136:6-16; DX-205 at 115:7-19.


78.     Tiger simply had no interest in continuing to hold investments in Russian government

        bonds when approached by Deutsche Bank and RRF in March/April 1999.

        DX-206 at 23:12-24:17 and DX-206 depo. ex. 2 at TIGERPROD00000484; DX-204 at

        136:6-16; DX-205 at 115:7-19.


79.     A document produced by plaintiff dated March 10, 1999, links RRF, Deutsche Bank, and

        Tiger, as it lists names and contact information for various individuals, including Nancy

        Zimmerman at Bracebridge Capital, Jon Grenzke at Bracebridge Capital, Jim DiBiase at

        Bracebridge Capital, Francesco Piovanetti at Deutsche Bank, Laurence Schreiber at

        Deutsche Bank, and Anu Murgai at Tiger. Other documents are to similar

        effect - showing a March 1999 link between RRF, Deutsche Bank, and/or Tiger.

        DX-9; JX-19; JX15; see also Tr. at 306:19-307:8.


80.     On April 30, 1999, Deutsche Bank provided Tiger with a Subscription Agreement and

        Offering Memorandum for RRF (referred to above as the April 30, 1999, Offering

        Memorandum). At the time Deutsche Bank provided these materials, it had been talking

        to Tiger about a potential deal for several months. It had also been speaking with RRF

        more broadly about potential deals for several months. Deutsche Bank provided these

materials to Tiger as part of its role in sourcing (i.e. finding a holder) of Russian bonds for RRF.

DX-204 at 113:2-114:18, 117:1-8 and DX-204 depo. ex. 29 (TIGERPROD00000186-246); JX-32 and Tr. at 3307:23-3309:2.

81.   Tiger Management subsequently received an Offering Memorandum from RRF dated May 14, 1999 (referred to above as the May 14, 1999, Offering Memorandum). This offering memorandum and the Subscription Agreement for RRF that Tiger had received on April 30 contained terms that were unacceptable to Tiger, because they were contrary to Tiger's plan to liquidate the Russian bond investments of Jaguar and Ocelot.

DX-204 at 122:5-123:10 and DX-204 depo. ex. 32 (TIGERPROD00000484-525); DX-206 at 18:6-24:22 and DX-206 depo. ex. 2 at TIGERPROD00000484; *see infra* DPTF 82-97.

82.   Mr. Goodell, Tiger's general counsel, reviewed the May 14 Offering Memorandum and April 30 subscription agreement and identified three terms that were unacceptable and contrary to Tiger's liquidation plans for Russian bond investments.

DX-204 at 122:5-123:10 and DX-204 depo. ex. 32 (TIGERPROD00000484-525); DX-206 at 18:6-24:22 and DX-206 depo. ex. 2 at TIGERPROD00000484; *see infra* DPTF 83-97.

83.     The three unacceptable terms identified by Mr. Goodell were:

    a)     a three-year lock-up for investments made in RRF;

    b)     that consent was required for transfer of shares;

    c)     a representation (in the subscription agreement) that required Tiger to state that it was acquiring shares in Russian Recovery Fund for investment purposes only and that it did not intend to resell them.

    DX-204 at 122:5-123:10 and DX-204 depo. ex. 32 (TIGERPROD00000484-525); DX-206 at 18:6-24:22 and DX-206 depo. ex. 2 at TIGERPROD00000484; *see infra* DPTF 84-97.

84.     All three of these unacceptable and contrary terms made an investment in Russian Recovery Fund impermissible given Jaguar's and Ocelot's own investment mandates on behalf of their own individual investors.

    DX-204 at 122:5-123:10 and DX-204 depo. ex. 32 (TIGERPROD00000484-525); DX-206 at 18:6-24:22 and DX-206 depo. ex. 2 at TIGERPROD00000484; *see infra* DPTF 85-97.

85.     On the first page of the May 14 Offering Memorandum are handwritten notes of Tiger's then general counsel Mr. Goodell. Mr. Goodell wrote the notes before Jaguar's and Ocelot's May 1999 transfer of the Tiger Securities to RRF.

    DX-204 at 122:5-123:20, 134:2-13, 139:2-5 and 139:20-140:7 and errata at p. 2 and DX-204 depo. ex. 32 (TIGERPROD00000484-525) at TIGERPROD00000484; DX-206 at 18:6-24:22 and DX-206 depo. ex. 2 at TIGERPROD00000484.

86.   Mr. Goodell's handwritten notes on the first page of the May 14 Offering Memorandum

were:

A 3YR lock-up not permissible investment for Jaguar

B Consent required for transfer of shares

C No rep. as to investment intent

DX-204 at 122:5-123:20, 134:2-13, 139:2-5, 139:20-140:7 and errata at p. 2 and DX-204

depo. ex. 32 (TIGERPROD00000484-525) at TIGERPROD00000484; DX-206 at

18:6-24:22 and DX-206 depo. ex. 2 at TIGERPROD00000484.

87.   Mr. Goodell's handwritten note C on the first page of the May 14 Offering

Memorandum—i.e. "No rep. as to investment intent", referred to the fact that Tiger did

not want to have to make a representation as to its intent to hold onto an investment for

the long term.

DX-204 at 122:5-124:9 and errata at p. 2 and DX-204 depo. ex. 32

(TIGERPROD00000484-525) at TIGERPROD00000484; DX-206 at 18:6-24:22 and

DX-206 depo. ex. 2 at TIGERPROD00000484.

88.   Tiger did not want to have to make a representation as to its intent to hold onto an

investment for the long term because Tiger was not in the business of making long-term

illiquid investments in other funds.

DX-204 at 122:5-124:9 and errata at p. 2 and DX-204 depo. ex. 32

(TIGERPROD00000484-525) at TIGERPROD00000484; DX-206 at 18:6-24:22 and

DX-206 depo. ex. 2 at TIGERPROD00000484.

89.     Mr. Goodell's handwritten note C on the first page of the May 14 Offering

Memorandum—i.e. "No rep. as to investment intent", referred to paragraph 7(b) of the

April 30 Subscription Agreement, which provided:

> The undersigned represents and warrants that:
>
> . . .
>
> (b)     the [RRF] Shares subscribed for hereby are being acquired by the undersigned for investment purposes only, for the account of the undersigned and not with the view to any resale or distribution thereof, and the undersigned is not participating, directly or indirectly, in an underwriting of such Shares and will not take, or cause to be taken, any action that would cause the undersigned to be deemed an "underwriter" of such shares as defined in Section 2(11) of the Act.

DX-204 at 122:5-125:19 and errata at p. 2 and DX-204 depo. ex. 32

(TIGERPROD00000484-525) at TIGERPROD00000484; DX-204 at 113:2-114:18 and

117:1-8 and DX-204 depo. ex. 29 (TIGERPROD00000186-246) at

TIGERPROD00000190; DX-206 at 18:6-24:22 and DX-206 depo. ex. 2 at

TIGERPROD00000484.

90.     Tiger believed that if it made this representation that it was acquiring RRF shares with

investment intent, it would be representing that it did not have an intent to be able to

dispose of the RRF shares in the foreseeable future. Such representation would have been

incompatible with Tiger's goal and thus false.

DX-206 at 18:6-24:22 and DX-206 depo. ex. 2 at TIGERPROD00000484; DX-204 at

122:5-125:19 and errata at p. 2 and DX-204 depo. ex. 32 (TIGERPROD00000484-525)

at TIGERPROD00000484; DX-204 at 113:2-114:18 and 117:1-8 and DX-204 depo.

ex. 29 (TIGERPROD00000186-246) at TIGERPROD00000190; DX-205 at 115:7-19.

91. Indeed, Tiger's goal in transferring the Tiger Securities to RRF was to liquidate its (Tiger's) Russian investments and obtain cash. Tiger was attempting to dispose of their illiquid Russian investments, because they were not core to Tiger's investment intentions in May 1999 and Tiger had moved on from Russian investment.

DX-206 at 18:6-24:22 and DX-206 depo. ex. 2 at TIGERPROD00000484; DX-204 at 122:5-125:19 and errata at p. 2 and DX-204 depo. ex. 32 (TIGERPROD00000484-525) at TIGERPROD00000484; DX-204 at 113:2-114:18 and 117:1-8 and DX-204 depo. ex. 29 (TIGERPROD00000186-246) at TIGERPROD00000190; DX-205 at 115:7-19.

92. Mr. Goodell's handwritten note B on the first page of the May 14 Offering Memorandum—i.e. "Consent required for transfer of shares", reflected the fact that under the operating documentation of the RRF, a transfer of an investor's shares in the RRF would require the consent of the fund or its management. Since Jaguar was not permitted to hold an illiquid investment, the provision that an investment in RRF require consent to transfer RRF shares created an impermissible investment for Jaguar.

DX-204 at 122:5-123:20, 134:2-20, and errata at p. 2 and DX-204 depo. ex. 32 (TIGERPROD00000484-525) at TIGERPROD00000484; DX-206 at 18:6-24:22 and DX-206 depo. ex. 2 at TIGERPROD00000484.

93. Prior to its transfer of the Tiger Securities to RRF, Tiger was already considering disposing of any shares in RRF that it might acquire, because Tiger was considering how to as quickly as possible realize cash consideration for its investments in the Tiger Securities or for any other interest it acquired in exchange for the Tiger Securities (i.e. ultimately the RRF shares).

DX-204 at 122:5-123:20, 134:2-135:22, and errata at p. 2 and DX-204 depo. ex. 32 (TIGERPROD00000484-525) at TIGERPROD00000484; DX-206 at 18:6-24:22 and DX-206 depo. ex. 2 at TIGERPROD00000484.

94.     At all relevant times, including prior to its transfer of the Tiger Securities to RRF, Tiger was looking to receive cash for the Tiger Securities (or for any other interest it acquired in exchange for the Tiger Securities)) as fast as or as in quick a possible manner as that could be provided.

DX-204 at 122:5-123:20, 134:2-135:22, and errata at p. 2 and DX-204 depo. ex. 32 (TIGERPROD00000484-525) at TIGERPROD00000484; DX-206 at 18:6-24:22 and DX-206 depo. ex. 2 at TIGERPROD00000484.

95.     Mr. Goodell's handwritten note A on the first page of the May 14 Offering Memorandum—i.e. "3YR lock-up not permissible investment for Jaguar", referred to the fact that RRF had a three-year lock-up for purposes of investments and given the liquidity profile of the Jaguar Fund, which was quarterly or semiannual liquidity, Jaguar would not be in a position to make from Mr. Goodell's perspective an investment that had a three-year lock-up - such an investment would not comport with the investment objective in a profile of the Jaguar Fund. In fact, Tiger had amended Jaguar's governing documents to preclude Jaguar from purchasing or holding illiquid investments and an investment in RRF with a three-year lock-up period would have violated the obligation to hold only liquid investments in Jaguar.

DX-204 at 122:5-123:20, 139:2-5, 139:20-140:19 and errata at pp. 2-3 and DX-204 depo. ex. 32 (TIGERPROD00000484-525) at TIGERPROD00000484; DX-206 at 18:6-24:22 and DX-206 depo. ex. 2 at TIGERPROD00000484.

96.    The same principle that made an investment with a three-year lock up period

impermissible for Jaguar in May 1999 also applied to Ocelot. The strictures (e.g. liquidity

profile) of Ocelot may have been slightly different than Jaguar, but the same general

principle of not making long-term investments, looking at long-term investments and

fund investments would have applied with equal force.

DX-204 at 122:5-123:20, 139:2-5, 139:20-141:3 and errata at pp. 2-3 and DX-204 depo.

ex. 32 (TIGERPROD00000484-525) at TIGERPROD00000484; DX-206 at 18:6-24:22

and DX-206 depo. ex. 2 at TIGERPROD00000484.

97.    Tiger's general counsel in May 1999, Mr. Goodell, would not have been comfortable

with Tiger (i.e. Jaguar and Ocelot) making a contribution to RRF that didn't provide for

some mechanism for an earlier redemption or withdrawal period.

DX-204 at 122:5-123:20, 139:2-5, 139:20-142:2 and errata at pp. 2-3 and DX-204 depo.

ex. 32 (TIGERPROD00000484-525) at TIGERPROD00000484; DX-206 at 18:6-24:22

and DX-206 depo. ex. 2 at TIGERPROD00000484.

98.    In May 1999, Jaguar had over 1000 individual investors.

DX-206 at 17-20.

**J.**    **RRF changed its Subscription Agreement to obtain the Tiger Securities**

　　**a)**    **Investment purpose**

99.    RRF's original subscription agreements required a representation that the investor was

acquiring shares in RRF for investment purposes only and had no intention to resell. For

example, the first investor in RRF, FFIP, represented in its subscription agreement, dated

April 1, 1999, that "the Shares subscribed for hereby are being acquired by the

undersigned for investment purposes only, for the account of the undersigned and not with the view to any resale or distribution thereof . . . ." Similarly, Nancy Zimmerman, in her subscription agreement dated May 14, 1999, made the same representation.

JX-24 at A1-000469 (para. 7(b)); PX-26 at A1-000690; A1-000704; see also JX-74.

100.    These same representations continued to be found in internal drafts of RRF subscription agreements exchanged between RRF personnel and RRF's lawyers until at least May 14, 1999.

JX-40 Tr. at 398:14-400:16.

101.    The Tiger funds, however, were unwilling to make these representations. As a result of Tiger's refusal, RRF changed its own subscription agreement. Thus, in the final subscription agreements for Jaguar and Ocelot, the funds were not required to represent that they were investing in RRF nor to disavow an intent to resell, but only to represent that any prior or future sale of the RRF shares complied / would comply with applicable law.

JX-65 at A1-000507 (para. 7(b)); JX-66 at A1-000566 (para. 7(b)); *see supra* DPTF 82-91, and *infra* DPTF 103-107.

102.    Mr. DiBiase testified that he does not know why Jaguar and Ocelot desired to acquire shares in RRF and cannot speak to their intentions.

Tr. at 406:12-407:6, 407:7-408:4.

103.   Paragraph 7(b) of the April 30 Subscription Agreement (that RRF gave to Tiger)

provided:

> The undersigned represents and warrants that:
>
> . . .
>
> (b)   the [RRF] Shares subscribed for hereby are being acquired by the undersigned for investment purposes only, for the account of the undersigned and not with the view to any resale or distribution thereof, and the undersigned is not participating, directly or indirectly, in an underwriting of such Shares and will not take, or cause to be taken, any action that would cause the undersigned to be deemed an "underwriter" of such shares as defined in Section 2(11) of the Act.

This provision about investment intent was eliminated in Jaguar's and Ocelot's

fully executed RRF Subscription Agreements. Paragraph 7(b) of Jaguar's and

Ocelot's fully executed RRF Subscription Agreements provided:

> The undersigned represents and warrants that:
>
> . . .
>
> (b) it has not offered, sold or delivered and it will not offer, sell or deliver any of the Shares in any jurisdiction except under circumstances that will result in compliance with the applicable laws thereof, including without limitation the Act. Each such offer or sale shall only be made to investors who are (i) "qualified eligible participants" as defined under the applicable rules of the United States Commodity Futures Trading Commission, (ii) "accredited investors" as defined in Regulation D under the Act and (iii) "qualified purchasers" as defined under the Investment Company Act of 1940 and the rules thereunder.

DX-204 at 125:20-126:14; DX-204 at 113:2-114:18, 117:1-8 and DX-204 depo. ex. 29

(TIGERPROD00000186-246) at TIGERPROD00000190 (para. 7(b)); DX-204 at

71:11-21 and DX-depo. ex. 11 (A1-000504-550) at A1-000507; DX-204 at 75:19-76:9

and DX-204 depo. ex. 14 (A1-000563-610) at A1-000566; DX-204 at 122:5-125:19 and

errata at p. 2 and DX-204 depo. ex. 32 (TIGERPROD00000484-525) at

TIGERPROD00000484; JX-65 at A1-000507 (para. 7(b)); JX-66 at A1-000566

(para. 7(b)).

104. This elimination of investment intent in the subscription agreement (a) occurred at some

point in May 1999 prior to Tiger's transfer of Russian assets to RRF and (b) was

necessary because Jaguar and Ocelot were not in the business of making long-term

investments in other funds and thus required the freedom to sell shares acquired from

RRF for cash.

DX-204 at 125:20-127:11; DX-204 at 113:2-114:18, 117:1-8 and DX-204 depo. ex. 29

(TIGERPROD00000186-246) at TIGERPROD00000190 (para. 7(b)); DX-204 at

71:11-21 and DX-depo. ex. 11 (A1-000504-550) at A1-000507; DX-204 at 75:19-76:9

and DX-204 depo. ex. 14 (A1-000563-610) at A1-000566; DX-204 at 122:5-125:19 and

errata at p. 2 and DX-204 depo. ex. 32 (TIGERPROD00000484-525) at

TIGERPROD00000484; JX-65 at A1-000507 (para. 7(b)); JX-66 at A1-000566

(para. 7(b)).

105. No later than May 18, 1999, RRF knew that Tiger wanted to change the subscription

agreement to remove the representation on investment intent. On May 18, 1999, Ms.

Zimmerman informed Mr. DiBiase that Tiger "want[ed] to remove the representation that

they are not looking to sell shares in the fund".

PX-28 and Tr. at 403:24-405:16; JX-42 and Tr. at 714:15-715:7.

106. The following day, May 19, 1999, Tiger proposed to substitute a provision that did not

require Tiger to represent that it was making an investment and to disavow an intent to

resell. Specifically, Tiger's attorneys (E. William Bates II and Lisa D. Hauptman of King

& Spalding) sent a two-page facsimile to Anu Murgai of Tiger and to RRF's attorney (Margery Neale of Swidler Berlin Shereff Friedman, LLP). The MESSAGE: section of the first page reads "Re: Russian Recovery Fund Limited Subscription Agreement". The second page contains the following text:

> Rider 4A to Russian Recovery Fund Limited Subscription Agreement
> (in lieu of Section 7(b) of the Subscription Agreement)
>
> (b)      it has not offered, sold or delivered and it will not offer, sell or deliver any of the Shares in any jurisdiction except under circumstances that will result in compliance with the applicable laws thereof, including without limitation the Act. Each such offer or sale shall only be made to investors who are (i) "qualified eligible participants" as defined under the applicable rules of the United States Commodity Futures Trading Commission, (ii) "accredited investors" as defined in Regulation D under the Act and (iii) "qualified purchasers" as defined under the Investment Company Act of 1940 and the rules thereunder.

JX-48 and Tr. at 400:19-401:22.

107.    This language from Rider 4A was agreed upon by RRF and made paragraph 7(b) of Jaguar's and Ocelot's fully executed subscription agreements.

JX-65 at A1-000507; JX-66 at A1-000566.

### b)      Special Redemption Rights

108.    The three-year commitment to RRF imposed on other partners was replaced with special redemption rights, set forth in side letter agreements, that allowed Jaguar and Ocelot to exit RRF at any time after July 1, 1999, approximately one month after transferring the Tiger Securities to RRF (and approximately two years and eleven months faster than every other partner in RRF could exit RRF).

JX-67 at A1-000551; JX-68 at A1-000623; Tr. 411:22-413:12; E.G. JX-60 at A1-000828-829.

109.   These side letter agreements were executed in late-May 1999 and addressed at least in part Mr. Goodell's concern about RRF's three-year lock-up period for investments, by providing Tiger (i.e. Jaguar and Ocelot) with a contractual right to redeem, at any time after July 1, 1999, any or all of their RRF shares in exchange for cash or in-kind payments.

DX-204 at 122:5-123:20, 139:2-5, 139:20-142:2, and errata at pp. 2-3 and DX-204 depo. ex. 32 (TIGERPROD00000484-525) at TIGERPROD00000484.

110.   In negotiating the side letter agreements, Tiger rebuffed RRF's initial offer to grant special redemption rights permitting an exit only by April 2000.

JX-45, JX-49 and Tr. at 450:15-452:16, JX50, DX204 at 152:7-25 and DX-204 depo. ex. 34 (TIGERPROD00000554-556); PX-28.

111.   Jaguar and Ocelot were the only partners unrelated to RRF management ever granted such special redemption rights by RRF. Specifically, apart from Bracebridge managed funds, during the 15-year period from 1998 to 2013, RRF did not grant special redemption rights to anyone other than Jaguar and Ocelot. In addition, between May 1999 and February 2005, Jaguar and Ocelot were the only ones granted special redemption rights by RRF.

Tr. 411:22-414:12 and JX-60 at A1-000851; Tr. 417:22-418:25 and DX-142; JX-67 at A1-000551; JX-68 at A1-000623.

c)   **Disclosure of Conflict of Interest**

112.   On May 13, 1999, RRF amended its Offering Memorandum to disclose a conflict of interest that permitted funds affiliated to RRF (e.g. FFIP) to purchase shares from other

shareholders in RRF (e.g. (ultimately) Jaguar and Ocelot). This conflict of interest

provision was not in the April 30, 1999, Offering Memorandum provided by RRF to

Tiger, but was in substantially similar form in the May 14, 1999, and May 26, 1999

Offering Memoranda that RRF provided to Tiger.

JX-39 at B2-001853 and Tr. at 435:17-437:3; JX-32 at TIGERPROD00000230; JX-42 at

TIGERPROD00000509; JX-71 at TIGERPROD00000623.

**K.    Tiger executes plan to obtain cash in less than two weeks**

113.    On May 13, 1999, Laurence Schreiber of Deutsche Bank sent RRF information about the

Tiger Securities that Tiger sought to transfer to RRF.

JX-34 and Tr. at 3312:11-3315:21.

114.    In late May 1999, Jaguar and Ocelot transferred the Tiger Securities to RRF in exchange

for shares in RRF. Jaguar received 285.50 shares and Ocelot received 10.45 shares in

RRF.

DX-204 at 57:11-22, 60:9-65:12 and DX-204 depo. ex. 9 (TIGERPROD00000185);

DX-46.

115.    Tiger's goal in transferring the Tiger Securities to RRF was to liquidate Tiger's Russian

investments and obtain cash as quickly as possible for them, including the Tiger

Securities. Tiger was attempting to dispose of all of its illiquid Russian investments,

because they were not core to Tiger's investment intentions in May 1999 and Tiger had

moved on from all Russian investment. Julian Robertson, the head of Tiger, controlled

the decision to liquidate the Tiger Securities held by Jaguar and Ocelot through the

transaction with RRF. Accordingly, Tiger planned at all relevant times to sell its shares in

RRF as quickly as possible for cash in order to effectuate its plan to obtain cash as

quickly as possible for its underlying Russian assets, the Tiger Securities.

*See e.g.* DPTF 5, 77-97, 116-124.

116.   RRF valued the Tiger Securities and the shares it transferred to Jaguar and Ocelot at

$14.96 million, $14,432,707.47 for those transferred to RRF by Jaguar and $527,961.53

for those transferred to RRF by Ocelot.

JX-121; JX-139 at A1-000169, A1-000173.

117.   The transfer of the Tiger Securities by Jaguar and Ocelot to RRF is memorialized in a

Tiger e-mail, dated May 24, 1999, which stated as follows:

> [W]e sold all of our sept 2001 bonds (that we had on with deutsche bank) in
> return for equity in the russian recovery fund.the value of the equity at the time
> we received it was 14mm dollars. however, we plan to sell in equity in 2 weeks to
> hopefully receive cahs [sic].

DX-43; DX-204 at 128:20-130:11 and DX-204 depo. ex. 33 (TIGERPROD00000251),

DX-204 at 60:9-61:18 and DX-204 depo. ex. 9 (TIGERPROD00000185); DX-204 at

157:13-160:6 and errata at p. 4 and DX-depo. ex. 36 (TIGERPROD00000247, 249);

DX-205 at 20:2-17, 21:15-27:9, 44:12-45:15, 52:4-53:5, 55:18-57:22, 75:7-10 and

DX-205 depo. ex. 5 (TIGERPROD00000251).

118.   This e-mail, written at 10:08a.m. on May 24, 1999, memorialized in writing, Tiger's plan

to sell Jaguar's and Ocelot's shares in RRF within two weeks of acquisition for cash. Anu

Murgai, the author of the e-mail, did not make such plans for Tiger; she followed orders

and the plan in this e-mail was not hers but that of Tiger. Ms. Murgai did not make

investment decisions for Tiger. (Ms. Murgai was the execution trader who had

responsibility for executing the transfer of the Tiger Securities to RRF and the sale of

Tiger's RRF shares to FFIP).

DX-43; DX-204 at 128:20-130:11 and DX-204 depo. ex. 33 (TIGERPROD00000251),

DX-204 at 60:9-61:18 and DX-204 depo. ex. 9 (TIGERPROD00000185); DX-204 at

157:13-160:6 and errata at p. 4 and DX-204 depo. ex. 36 (TIGERPROD00000247, 249);

DX-205 at 20:2-17, 21:15-27:9, 44:12-45:15, 52:4-53:5, 55:18-57:22, 75:7-10 and

DX-205 depo. ex. 5 (TIGERPROD00000251); DX-205 at 129:19-132:15 with DX-204 at

105:5-106:18; DX-206 at 30:18-32:5.

119.   The next day, May 25, 1999, Tiger again memorialized in writing its plan and intent to

exit RRF. In its trade ticket for Jaguar's and Ocelot's acquisition of RRF shares, Tiger

wrote, "We hope to have private fund shares sold, vs. cash, in approximately two weeks,"

which meant that Jaguar and Ocelot hoped to sell their shares in RRF in approximately

two weeks for cash.

DX-46; DX-204 at 57:11-22, 60:9-65:12 and DX-204 depo. ex. 9

(TIGERPROD00000185).

120.   This trade ticket was routinely created in 1998 and 1999, and was necessary for

accountants auditing Tiger. The trade ticket is dated May 25, 1999, and has an effective

date of May 24, 1999, for Tiger's transfer of the Tiger Securities to RRF in exchange for

RRF's shares. In 1999, trade tickets were created as rapidly as possible after an effective

date of a trade.

DX-206 at 34:11-37:4 and DX-206 depo. ex. 6 (TIGERPROD00000185).

121.    Tiger's internal records reflect that, as of May 24, 1999, Jaguar and Ocelot continued to

hold the Tiger Securities - specifically, that Jaguar continued to hold 2,937,434,000 titles

and Ocelot continued to hold 107,454,000 titles.

DX-204 at 49:6-52:11 and errata at p. 2 and DX-204 depo. ex. 8

(TIGERPROD00000745) and DX-204 depo. ex. 7 (TIGERPROD00000002-5) at

TIGERPROD00000003, 5.

122.    Tiger's contemporaneous business records show that Jaguar and Ocelot acquired the RRF

shares on May 24, 1999. Specifically, the trade ticket for Jaguar's and Ocelot's transfer

of the Tiger Securities in exchange for RRF shares records the effective date of the

transfer as May 24, 1999. In addition, other of Tiger's internal documents, dated May 26,

1999, record the trade date and settlement date of Ocelot's and Jaguar's transfer into RRF

as May 24, 1999.

DX-46; DX-204 at 57:11-22, 60:9-65:12 and DX-204 depo. ex. 9

(TIGERPROD00000185); DX-204 depo. ex. 15 (TIGERPROD00000735-739).

123.    In addition, Tiger's trial testimony is that it has no reason to believe that its business

records are incorrect and thus it accepts that May 24, 1999 was Tiger's contemporaneous

belief at the time about the proper effective date for Jaguar's and Ocelot's transfers to

RRF and accompanying subscription agreements.

DX-204 at 65:13-79:9 and DX-204 depo. exs. 9, 10, 11, 12, 13, 14, e.g., at 78:24-79:6

("Again, I guess I understand that these have different dates listed and fax, fax time list

on them. I have no reason to believe that the date listed on the trade ticket as May 24 as

this being effective is not the date that Tiger would have considered this to be effective").

124. For Tiger, Jaguar's and Ocelot's transfer of the Tiger Securities to RRF was not a very

     important transaction.

     DX-204 at 105:5-106:18.

125. The reason Tiger intended to sell its RRF shares no later than the very same day it

     believed it had acquired them (i.e. May 24, 1999, the day Tiger believed Jaguar's and

     Ocelot's transfers to RRF in exchange for RRF shares were effective) was because Tiger

     wanted to receive cash for the Tiger Securities that Jaguar and Ocelot transferred to RRF

     on the quickest timetable available.

     DX-204 at 130:12-131:16.

**L.**     **RRF accepted Jaguar and Ocelot as shareholders on May 25,1999**

      **a)**     **Subscription Agreements**

126. RRF did not sign Jaguar and Ocelot's subscription agreements as accepted until May 25,

     1999.

     *See infra* DPTF 127-142.

127. RRF's representative Mr. DiBiase, who attended almost every deposition in this case and

     who sat through the entire trial, was unable to point to any document that shows that RRF

     signed Jaguar's and Ocelot's subscription agreements as accepted on any date prior to

     May 25, 1999.

     Tr. at 388:25-389:22.

128. On Friday, May 21, 1999, at 1:42p.m., Bracebridge Capital LLC's and RRF's attorney

     Margery Neale sent an e-mail to Gus Pope of Maples Calder (RRF's Cayman Islands

     counsel), with copies to others including Mr. DiBiase and a subject line of "Russian

Recovery Fund Limited", in which she explicitly acknowledged that Jaguar and Ocelot

had not yet been accepted as shareholders in RRF.

DX-39 and Tr. at 304:10-25, 444:1-447:9, 449:8-450:10.

129.   On May 20, 1999, Tiger sent incomplete subscription agreements to RRF's attorney

Margery Neale. They failed to fill out "Test #4" in the subscription agreement. On May

21, 1999, Tiger faxed to RRF's attorney and Jon Grenzke completed "Test #4" pages.

JX-58 incl. at H1 0000109 (missing test #4) and JX-65 incl. at A1-000517 and DX-38 at

TIGERPROD00000847 and Tr. at 330:1-333:24; JX-59 incl. at H1 0000156 (missing test

#4) and JX-66 incl. at A1-000576 and DX-38 at TIGERPROD00000846 and Tr. at

377:14-381:5.

130.   Ocelot's and Jaguar's fully executed subscription agreements are composite documents,

compiled from different sources.

JX-65 (including A1-000517, A1-000522) and Tr. at 322:1-326:24; JX-66 (including

A1-000576, A1-000582) and Tr. at 373:10-376:22.

131.   Ocelot's fully executed subscription agreement (a composite from different sources) and

Jaguar's fully executed subscription agreement (a composite from different sources)

provide:

> This subscription may be rejected by the Company [RRF] in whole or in
> part in the sole discretion of the Board of Directors of the Company at any
> time prior to acceptance thereof. The undersigned hereby agrees that by its
> execution of this Subscription Agreement and upon acceptance hereof by
> the Company, it shall become bound by the Company Documents. The
> undersigned understands that for the Company to consider its subscription,
> the undersigned must complete fully this Subscription Agreement and sign
> and date both copies and promptly return them to the address set forth on
> the prior page.

JX-65 at A1-000506 (emphasis added); JX-66 at A1-000565 (emphasis added).

132.   Each such subscription agreement includes an incomplete signature page that is signed by Ocelot and Jaguar but is not signed by RRF as "accepted", that bears a facsimile transmission date of May 21, 1999, showing facsimile transmission on that date from King and Spalding (Tiger's counsel) to RRF, and that states the undersigned has executed the subscription agreement on May 20, 1999.

JX-65 at A1-000522; JX-66 at A1-000581.

133.   One page after the incomplete signature page, each such subscription agreement also includes a fully executed signature page - this page is the same page that King and Spalding transmitted to RRF on May 21, 1999, except that it is signed for RRF as "accepted" by RRF's Cayman Islands administrator Citco and bears a facsimile transmission date of June 18, 1999 (for Ocelot's agreement) and a cutoff facsimile transmission date (for Jaguar's agreement), showing facsimile transmission from Citco to RRF. Comparison of JX-66 at A1-000582 and JX-65 at A1-000523 reveals that the cutoff facsimile transmission date on Jaguar's agreement is June 18, 1999.

JX-65 at A1-000522 - 523; JX-66 at A1-000581 - 582; Tr. at 375:16-376:8.

134.   On May 25, 1999, at approximately 1:00p.m. (i.e. 13:10:50), Francesco Piovanetti of Deutsche Bank sent an electronic reply to Jay Johnston of Deutsche Bank. The text of the reply is: "rrf is going to call citco in the c.i. to track down the signatures of the sub. agreement. after that we should be done with the paperwork."

DX-50 and Tr. 395:16-396:24.

135. On May 25, 1999, at approximately 3:40p.m. (i.e. 15:39), Jim DiBiase of Bracebridge Capital LLC sent a seven page facsimile to Laurel Fitzpatrick of Tiger. On the cover page, Mr. DiBiase wrote, among other things, "signed . . . Subs Agreement signature page" to Tiger.

JX-63 and Tr. at 385:23-389:5, 396:25-397:7.

136. This facsimile includes two fully executed subscription agreement signature pages (one for Ocelot's subscription agreement and one for Jaguar's subscription agreement) - the pages are the same pages that King and Spalding transmitted to RRF on May 21, 1999, except that they are signed for RRF as "accepted" by RRF's Cayman Islands administrator Citco and bear facsimile transmission dates of May 25, 1999, showing facsimile transmission from Citco to RRF, as well as facsimile transmission dates (on the bottom of the pages) of May 25, 1999, showing transmission from RRF to Tiger.

JX-63 and Tr. at 385:23-389:5, 396:25-397:7.

137. On May 25, 1999, at approximately 3:45p.m. (i.e. 15:42), Jim DiBiase of Bracebridge Capital LLC sent a seven page facsimile to Francesco Piovanetti of Deutsche Bank. On the cover page, Mr. DiBiase wrote, among other things, "signed . . . Subs Agreement signature page".

JX-64 and Tr. at 381:6-385:22, 397:8-15.

138. This facsimile includes two fully executed subscription agreement signature pages (one for Ocelot's subscription agreement and one for Jaguar's subscription agreement) - the pages are the same pages that King and Spalding transmitted to RRF on May 21, 1999, except that they are signed for RRF as "accepted" by RRF's Cayman Islands

administrator Citco and bear facsimile transmission dates of May 25, 1999, showing

facsimile transmission from Citco to RRF, as well as facsimile transmission dates (on the

bottom of the pages) of May 25, 1999, showing transmission from RRF to Deutsche

Bank.

JX-64 and Tr. at 381:6-385:22, 397:8-15.

139.   It was common with respect to subscription agreements that the signature of RRF's

Cayman Islands administrator would lag the date that the investor submitted the

subscription agreement for acceptance. It was quite common that Cayman Islands

administrators did not sign documents on the same day.

Tr. at 391:15-392:11; 394:15-23.

140.   In his deposition, Mr. DiBiase testified that it was generally business practice with

respect to subscription agreements that the Cayman signature would lag the date that the

investor submitted the subscription agreement for acceptance. He further testified in his

deposition that it would be a very unusual situation for the signatures by the investor and

the Cayman administrator to be done on the same day. At trial, Mr. DiBiase did not admit

to these portions of his deposition testimony and was impeached (without any objection)

with his deposition testimony.

Tr. at 392:6-395:15 (including 394:4-7 and 395:10-13).

141. In contemporaneous documents - an e-mail dated May 19, 1999 - RRF recognized that filling out and submitting subscription documents is not sufficient to become a shareholder in RRF and that a further necessary step was for RRF to accept the subscription.

DX-33.

142. Defendant's expert Dr. DeRosa, admitted as an expert on hedge funds as well as in other areas (DPTF 363), also confirmed based on his hedge fund experience that the subscription agreements for Jaguar and Ocelot were not effective and thus Jaguar and Ocelot not shareholders in RRF until all paperwork was properly filled out, including until RRF countersigned the subscription agreements as accepted. In fact, even when assets, including cash, are delivered to the Cayman Island administrator CITCO, they are held in a suspense account until all documentation is completed and the prospective shareholders are accepted into the fund.

Tr. at 2811:22-2824:6, 2872:11-2874:18 and JX-59 and JX-52 and DX-194 at ¶ 187 and fn. 82 and JX-65 at A1-000522-523.

b)   **Assignment and Assumption Agreements**

143. Deutsche Bank, Jaguar, Ocelot, and RRF entered assignment and assumption agreements to effect the transfer of the Tiger Securities to RRF in exchange for shares in RRF, 285.50 shares for Jaguar and 10.45 shares for Ocelot.

JX-52, JX-53, JX-54.

144. Under the assignment and assumption agreements, the transfer was not effective until both the agreement was signed and the shares were delivered to Tiger.

JX-52 at A1-000631 (first sentence of first paragraph) and A1-000634 (para. 9),

A1-000637 (first sentence of first paragraph) and A1-000640 (para 9); JX-53 at

A1-000553 (first sentence of first paragraph) and A1-000556 (para. 9); JX-54 at

A1-000558 (first sentence of first paragraph) and A1-000561 (para. 9).

145.   There is no evidence that the assignment and assumption agreements were fully signed

prior to May 21, 1999.

JX-52 at A1-000634 (incomplete), A1-000640 (complete with facsimile date May 21,

1999); JX-53 at A1-000556 (incomplete); JX-54 at A1-000561 (complete with facsimile

date May 21, 1999); Tr. at 453:17-458:3.

146.   Shares were not delivered to Tiger until May 25, 1999. Tiger believed it received shares

on May 24, 1999. RRF's representative, Mr. DiBiase, does not know when shares were

delivered to Ocelot and Jaguar.

*See supra* DPTF 117-142; Tr. at 458:9-18.

**c)    Side letters executed May 25, 1999**

147.   Also on May 25, 1999, RRF's Cayman Islands administrator Citco signed side letters

regarding Jaguar's and Ocelot's purchase of shares in RRF. In the letters, as noted above

(DPTF 108-111) RRF granted to Jaguar and Ocelot the right to redeem, at any time after

July 1, 1999, any or all of their RRF shares in exchange for cash or in-kind payments.

JX-67 at A1-000551; JX-68 at A1-000623 (note incomplete signature page on

A1-000624).

148.   The side letters were not signed before May 25, 1999. Indeed, Mr. DiBiase, who attended

almost every deposition in the case, was unable to point to any document that shows that

RRF signed the side agreements on May 20, 1999.

DX-37 and JX-63 at TIGERPROD00000642-645 and Tr. at 438:8-443:25; see also

JX-57; DX204 at 152:7-25 and DX-204 depo. ex. 34 (TIGERPROD00000554-556);

149.    The side letters also modified RRF's Offering Memorandum regarding asset-based fees.

The side letters stated that Tiger would not be required to pay an upfront cash fee equal to

2% of the value of the assets it transferred to RRF, but instead could pay a fee equal to

1% of the value of the assets it transferred on or before June 30, 1999.

JX-67 at A1-000551; JX-68 at A1-000623; Tr. 411:22-412:20

150.    The side letters also ensured that RRF could not receive any reputational benefits as a

result of the Tiger transfer of assets to RRF. They provided:

> The Fund further agrees that neither the Fund nor any of its affiliates,
> representatives or agents shall disclose by name that the Shareholder or its
> affiliates are proposing to invest, have invested or are investors in the
> Fund (any reference to the Shareholder or its affiliates shall only be to a
> "large" or "significant" investor or investors), unless otherwise required to
> do so by law . . . .

JX-67 at A1-000552; JX-68 at A1-000624;

**M.    Tiger absorbed a substantial loss on RRF share sale to FFIP to exit RRF
        early for cash**

151.    On Tuesday, June 1, 1999, James DiBiase of Bracebridge Capital LLC wrote a memo to

Files, with copies to Nancy Zimmerman of Bracebridge Capital LLC and Laurence

Schreiber of Deutsche Bank, regarding "Russian Recovery Fund Shares." The memo

includes the following paragraph:

> This morning I spoke with Laurence Schreiber of Deutsche Bank
> Securities. Mr. Schreiber informed me that two current holders of RRF
> shares (Jaguar and Ocelot Funds, hereafter the "Sellers") are offering their
> shares of RRF at a slight discount to their original subscription price

(roughly $14.09 million vs. $14.81 million). He asked if FFIP, L.P. ("FFIP"), one of the current shareholders of RRF, would be interested in purchasing these shares at this price level.

JX-73 and Tr. at 460:5-462:13; see also DX-54.

152.   On June 3-4, 1999, Nancy Zimmerman/Bracebridge caused a partner in RRF, FFIP, to purchase Jaguar's 285.50 shares in RRF for $13,591,219 and Ocelot's 10.45 shares in RRF for $496,950. FFIP purchased the shares at a discount, paying $14,088,169 or $47,555/share.

DX-204 at 96:15-100:22, 101:19-102:15, 103:10-24, 148:19-149:4 and DX-204 depo exs. 22 (TIGERPROD00000183), 23 (TIGERPROD00000740), 24 (TIGERPROD00000741), 27 (B6-000071-B6-000075), 28 (B6-000054-B6-000064); JX-76; DX-95; JX-77.

153.   Deutsche Bank was involved in the negotiation of the share price paid by FFIP for Tiger's RRF shares. It was atypical for Deutsche Bank to work on trades involving partnership shares.

JX-73; JX-76 and Tr. at 3328:19-3330:25; JX-77 and Tr. at 3331:2-3332:5.

154.   In order to finance the purchase of Jaguar's and Ocelot's shares in RRF, FFIP redeemed shares in FFI Fund Ltd. for cash. Both FFIP and FFI Fund Ltd. were controlled by Nancy Zimmerman in June of 1999 and all other relevant times.

Tr. at 464:8-465:24, 466:3-9, 297:3-298:6; DX-95 and Tr. at 1758:13-1760:7.

155.   Just prior to FFIP's purchase, Russian Recovery Fund had valued the shares on May 31, 1999, at $58,867.93/share, for a total value of $17,421,963.88. The person who performed the valuation was Charles Holden. His job was maintaining the accuracy of the

fund accounting records that were maintained for Bracebridge funds. He spent his entire

day making sure that the books and records of the funds were accurate. Part of his role

was to calculate the net asset value of shares in RRF and other Bracebridge funds.

JX-94 and Tr. at 485:4-488:2, 489:8-11.

156.   RRF, as well as other Bracebridge managed funds, calculated net-asset value of funds

shares on a monthly basis.

PX-39 and Tr. at 700:21-701:25.

157.   From May 20/24 to June 3/4 of 1999, the price of OFZ 25023s on MICEX was rising.

PX-63 Ex. 8 and Tr. at 1978:13-21.

**N.**   **Russian Recovery Fund erroneously claimed Tiger's cost ($230 million) as its tax basis in the Tiger Securities rather than the $14.96 value it assigned to the RRF shares issued to Jaguar and Ocelot in exchange for the securities**

158.   RRF valued the Tiger Securities and the shares it transferred to Jaguar and Ocelot at

$14.96 million, $14,432,707.47 for those transferred to RRF by Jaguar and $527,961.53

for those transferred to RRF by Ocelot.

JX-121; JX-139 at A1-000169, A1-000173.

159.   For the first time in this case and contrary to Mr. Grenzke's deposition, at trial plaintiff

claimed it had found a contemporaneous memorialization of Mr. Grenzke's valuation of

the Tiger Securities upon transfer to RRF. This so-called valuation is attached to an

e-mail dated May 26, 1999, and contains numbers that do not have any contemporaneous

support. As Dr. DeRosa explained, this valuation suffers from numerous defects and

ultimately is a "secret sauce" with no support.

JX-91, with plaintiff's late supplement and Tr. at 1602:24-1610:23; 1673:4-21, 1694:20-1697:6; DX-194 ¶¶ 191-195 and Tr. at 2531:19-2551:14.

160.   RRF claimed a carryover basis in the Tiger Securities of approximately $230 million. The tax basis amount claimed by RRF was based on documentation received from Tiger that showed Tiger had paid approximately $230 million for the Tiger Securities. This documentation was required by the subscription agreements for Jaguar and Ocelot. JX-65 at A1-000508 (paras. (k) and (l)), A1-000524; JX-66 at A1-000567 (paras. (k) and (l)), A1-000583.

161.   The May 14, 1999 and the May 26, 1999, offering memoranda that RRF provided to Jaguar and Ocelot included a section on elections to tax basis under § 754, that stated that RRF would not make a § 754 election, which would have reduced RRF's tax basis in the Tiger Securities to current fair market value. This was a change from the first offering memorandum, dated April 30, 1999, that RRF provided to Tiger. In that document, RRF stated only that it "may choose not to make the election." RRF made the change on May 13, 1999. JX-42 at TIGERPROD00000522-523; JX-71 at TIGERPROD00000637; JX-32 at TIGERPROD00000243; JX-39 at B2-001866-67 and Tr. at 437:10-23.

162.   Ocelot's fully executed subscription agreement (a composite from different sources) and Jaguar's fully executed subscription agreement (a composite from different sources) contained a representation about in-kind contributions, namely, that RRF had not and would not make an election pursuant to section 754 of the Internal Revenue Code. JX-65 at A1-000521; JX-66 at A1-000580.

163.    Jaguar and Ocelot were not United States taxpayers and thus had no tax basis for federal

income tax purposes, but the subscription agreements required a listing of "Tax Basis" as

if they were United States taxpayers.

JX-65 at A1-000508 (paras. (k) and (l)), A1-000524; JX-66 at A1-000567 (paras. (k) and

(l)), A1-000583; DX-204 at 39:4-20.

164.    In contrast, the April 30, 1999, subscription agreement that RRF first provided to Tiger

did not require such a listing, but only asked for "Cost Basis." The listing and related

representations were added to the subscription agreement by RRF on May 13, 1999.

JX-32 at TIGERPROD00000191 (missing what eventually becomes paras. (k) and (l) in

final subscription agreements), 204; JX-39 at B2-001812, 1826 and Tr. at 432:2-435:2;

DX-204 at 113:2-114:18, 117:1-8 and DX-204 depo. ex. 29 (TIGERPROD0000186-246)

at TIGERPROD00000191, 204.

165.    Ocelot's fully executed subscription agreement (a composite from different sources) and

Jaguar's fully executed subscription agreement (a composite from different sources)

contained a Schedule I titled "Assets Proposed to be Contributed" with three columns, the

first two of which were labeled "Description of Asset/Form of Ownership" and "Tax

Basis*". The following language is at the bottom of the schedule of Ocelot's agreement:

"*      This is what the tax basis of assets being contributed would be in the hands of

Ocelot (Cayman) Ltd. if Ocelot (Cayman) Ltd. were subject to U.S. taxation." The

following language is at the bottom of the schedule of Jaguar's agreement: "*      This is

what the tax basis of assets being contributed would be in the hands of The Jaguar Fund

N.V. if The Jaguar Fund N.V. were subject to U.S. taxation." Ocelot's fully executed

subscription agreement listed $8,152,989.77 as the "Tax Basis" for the contributed assets.

Jaguar's fully executed subscription agreement listed $223,603,340.04 as the "Tax Basis" for the contributed assets.

JX-65 at A1-000524; JX-66 at A1-000583.

166.   Ocelot's fully executed subscription agreement (a composite from different sources) and Jaguar's fully executed subscription agreement (a composite from different sources) contained the following provisions:

> (k)     if the undersigned has contributed assets in kind, the information provided on Schedule I including the amounts specified under the column headed "Tax Basis," is true and accurate for the purposes of U.S. Federal income tax;

> (l)     if the undersigned has contributed assets in kind, all trade confirmations and other documentation relating to the purchase, sale or other exchange of such assets, have been delivered to the Company;

JX-65 at A1-000508; JX-66 at A1-000567.

**O.     In June 1999, shortly after acquiring the Tiger Securities, RRF executed a Deutsche Bank registered tax shelter transaction which sent 77.18% of the Tiger Securities to General Cigar**

167.   General Cigar was a U.S. corporation that held interests in U.S. real estate, and tobacco related businesses.

Tr. at 1041:14-16.

168.   A press release dated March 26, 1999, publicly announced that Swedish Match intended to acquire the mass market business of General Cigar.

Tr. at 1065:13-1066:2.

169.   In early 1999, representatives of General Cigar and Deustche Bank had exchanged communications regarding possible transactions in Russian investments. For example,

Ms. Krajewski of General Cigar was in communication with Laurence Schreiber of

Deutsche Bank about investments in Russian bonds in March of 1999.

Tr. at 952:3-14, 953:13-16; Tr. at 974:21-975:13; Tr. at 3335:3-16, 3336:11-3337:7;

DX-23 and Tr. at 3340:10-14.

170.   Janet Krajewski graduated with a degree in accounting from Montclair State University

and then earned a master's degree from Bernard Baruch College. After working for

Arthur Anderson in public accounting, she stared working for a company called Culbro

Corporation in New York City in 1982. Culbro was a predecessor to General Cigar

Holdings, Inc. At Culbro, she stared in the internal audit group, then worked in corporate

accounting, and later worked in the tax department, where she began as a tax director and

ultimately became vice president of taxes. From 1993 to approximately 2003/2004, she

was vice president of taxes and, from approximately 2003/2004 until she retired from

General Cigar in 2008, she was senior vice president of taxes.

Tr. at 945:1-13, 949:1-950:25.

171.   Joseph Aird worked for General Cigar and its predecessor Culbro Corporation from 1981

through 2005/2006. Before that, he earned an undergraduate degree in finance and

accounting and worked for eight to nine years at Price Waterhouse, his last position with

that firm being an audit manager. He started at General Cigar as assistant controller, then

became controller, and then became CFO. In 1999, he was treasurer, controller, and CFO.

He was responsible for financial reporting, managing the company's cash flow, managing

the company's investments, analyzing financial transactions, and preparing reports to

management, as well as the board of directors. He also had tax-related responsibilities,

because Janet Krajewski, vice president of taxes, reported directly to Mr. Aird.

Tr. at 1042:1-1044:9.

172.    In 1999, General Cigar had subsidiaries for performing various operating and
        special-purpose functions. GCMM was a subsidiary whose principal asset was an office
        building that General Cigar owned in Manhattan. In 1999, the key decision makers of
        General Cigar were Edgar Cullman, Sr., chairman of the board, Edgar Cullman, Jr.,
        president of the company, and Ross Wollen, legal counsel.
        Tr. at 1044:12-1045:20.

173.    General Cigar was interested in buying Russian bonds because they offered attractive
        returns and included tax benefits.
        Tr. at 1056:10-19.

174.    In April of 1999, Laurence Schreiber of Deutsche Bank, who was meeting with General
        Cigar about Russian investments at this time, was not aware of any Russian assets that
        potentially were for sale in April of 1999, except those held by Tiger.
        Tr. at 3337:16-19; Tr. at 3335:3-16, 3336:11-3337:7.

175.    On April 5, 1999, Francesco Piovanetti of Deutsche Bank sent an e-mail to Nancy
        Zimmerman as follows: "nancy, as laurence mentioned to you this morning, we are going
        to have a conf. call on 4/7 at 10:30a.m. est. i will fax you the details to your fax as soon
        as they become available. regards. fp." Also on April 5, 1999, Ms. Zimmerman replied
        "GRAET".
        DX-14; DX-13.

176.    An internal Deutsche Bank communication dated April 7, 1999, reflects the

understanding of Deutsche Bank regarding General Cigar's interest in tax benefits. Deutsche Bank representatives Francesco Piovanetti and Jay Johnston stated that General Cigar was going to meet with Deutsche Bank to discuss the "russian trade," that General Cigar was "eager to learn about the product," and that they were "looking for 200mm in losses."

DX-17; DX-15; DX-16.

177.   It was Deutsche Bank that brought Russian bonds to General Cigar.

Tr. at 1078:13-21.

178.   No later than April 20, 1999, Ms. Zimmerman met with General Cigar regarding the RRF. General Cigar at the time was investigating opportunities to invest in Russia. It was Jay Johnston of Deutsche Bank that referred Ms. Zimmerman to General Cigar. It was a fairly long meeting and individuals from Deutsche Bank also attended. It was the first and only time that Mr. Aird met Ms. Zimmerman. The meeting expanded on information on opportunities for investing in Russian bonds. Ms. Zimmerman was not pitching an investment in RRF, but was pitching Russian bonds. Specifically, she was pitching her ability to manage investments in Russia. After this initial meeting, General Cigar did not have any follow-up conversations specifically regarding the investment.

JX-28 and Tr. at 1008:5-1009:4; Tr. at 692:22-694:16; Tr. at 950:16-951:25; DX-179 and Tr. at 970:14-20; Tr. at 1978:22-1081:12.

179.   General Cigar never considered making an investment in RRF as opposed to buying Russian bonds outright. General Cigar has no knowledge of RRF ever pitching to General Cigar an investment in RRF.

Tr. at 1056:2-9.

180.    Prior to April 30, 1999, General Cigar was anticipating the receipt of approximately $200

million from the sale of a portion of its cigar business. As reported at its board meeting

on April 20, 1999, and in the corresponding minutes, General Cigar considered and

adopted a proposal to invest approximately $25,000,000 of the proceeds anticipated from

the sale to Swedish Match into deep discount or high yield instruments, including

Russian bonds. This proposal referred to the fact that General Cigar was already looking

at potential investments in Russian bonds.

DX-20 at GCMM-0000029-30, 33-34 and Tr. at 961:4-963:23, 1061:11-1063:18,

1070:6-1071:1, 1071:21-1072:23; DX-56 and Tr. at 971:25-972:24.

181.    Of this $25 million, approximately $3 million were ultimately invested in June of 1999 in

Russian assets through a fund called "NCH Phoenix Fund L.P," and the remainder in

acquiring the 77.18% of the Tiger Securities from RRF.

DX-20 at GCMM-0000029-30, 33-34 and Tr. at 961:4-963:23, 1061:11-1063:18,

1070:6-1071:1, 1071:21-1072:23; DX-56 and Tr. at 971:25-972:24.

182.    As also reported at its board meeting on April 20, 1999, and in the corresponding

minutes, General Cigar was at this time considering various transactions which could

provide it with tax benefits. The reference in the minutes to "various transactions which

could provide the Company tax benefits" included reference to structuring the acquisition

of Russian bonds (including in connection with RRF) such that General Cigar would

acquire the high tax basis in them. It also referred to other solicitations for transactions

that would provide tax benefits in order to reduce or minimize the tax on the gain of the sale of the mass market business to Swedish Match.

DX-20 (incl. at GCMM-0000029, GCMM-0000030, and GCMM-0000033) and Tr. at 965:5-967:22, 998:1-999:4, 1006:10-1007:9, 1063:19-1064:7.

183.   An internal General Cigar memorandum titled "Meeting with George Rohrer" dated April 21, 1999, stated "We are considering making an investment in Russian bonds - specifically OFZ's, what is your assessment of the Russian investment environment and the prospect for Russian bonds?" (Mr. Cullman, Sr. had been advised to meet with Mr. Rohrer to discuss the Russian bond investment and to discuss Nancy Zimmerman in particular. And so Mr. Cullman, Sr. and Mr. Aird met with Mr. Rohrer. Mr. Rohrer indicated that at 7 cents to 10 to 11 cents on the dollar, an investment in OFZs was attractive.).

DX-21 and Tr. at 1117:4-1118:23.

184.   On April 27, 1999, Laurence Schreiber of Deutsche Bank sent Janet Krajewski a facsimile that included prices for various Russian bonds. Mr. Schreiber highlighted the bonds that he and Ms. Krajewski had been discussing, including OFZ 25023s, which were the type of Russian bonds Tiger would transfer to RRF.

DX-23 and Tr. at 3338:19-3340:7.

185.   On or about April 30, 1999, General Cigar and GCMM sold part of their cigar business to Swedish Match for approximately $200 to $220 million in cash. Swedish Match eventually acquired the entire General Cigar company in 2005.

Tr. at 950:1-15, 958:22-959:12, 1041:17-25, 1060:13-1061:4; DX-20 at GCMM-0000020, 0000033.

186.  On May 14, 1999, Laurence Schreiber sent a facsimile to Janet Krajewski, attaching MICEX prices for various Russian bonds, including OFZ 25023s, which were the types of bonds Tiger was seeking to transfer to RRF.

DX-31 and Tr. at 3342:24-3343:19; JX-34 and Tr. at 3312:11-3315:21.

187.  On June 4, 1999, Deutsche Bank sent a facsimile to General Cigar with MICEX prices for various Russian bonds. OFZ 25023s were circled.

JX-85 and Tr. at 3343:21-3344:16.

188.  On June 8, 1999, Deutsche Bank purchased an option from RRF, for $50,000, to find a buyer for 75-80% of the Tiger Securities that RRF had just acquired from Jaguar and Ocelot.

JX-87 (and JX-88).

189.  The Deutsche Bank option provided for a payment to RRF based on a percentage of $14.50 million, i.e., the percentage purchased (between 75-80%) multiplied by $14.50 million (as assumed maximum value of 100% of the Tiger Securities).

JX-87.

190.  The Deutsche Bank option also provided that any purchase price by the buyer in excess of the payment formula (75-80% multiplied by $14.50 million) would be kept by Deutsche Bank as a fee.

JX-87

191.   At the time Deutsche Bank purchased the option from RRF, the Russian market

conditions were very illiquid.

JX-87 and Tr. at 751:19-752:8.

192.   On June 8, 1999, Laurence Schreiber of Deutsche Bank sent a facsimile to Joseph Aird

and Janet Krajewski of General Cigar, stating that Deutsche Bank had received a mandate

from the holder of Russian assets (a reference to the option agreement entered with RRF)

and offering RUB 2.35 billion face value of OFZ 25023s (a reference to 77.18% of the

Tiger Securities) for a price of $21.15 million, payable in cash or cash and securities.

DX-62 and Tr. at 974:1-975:25, 1072:24-1074:6, 3357:8-3363:5; JX-87 (and JX-88);

DX-63 and Tr. 3350:12-3351:15.

193.   The $21.15 million price was negotiated between Deutsche Bank and General Cigar and

took into account a discount for the fact that the ruble was not freely convertible. On the

same day, Mr. Schreiber faxed updated MICEX prices with the listing for OFZ 25023s

circled.

DX-62 and Tr. at 974:1-975:25, 1072:24-1074:6, 3357:8-3363:5; JX-87 (and JX-88);

DX-63 and Tr. 3350:12-3351:15.

194.   General Cigar had enough cash to pay the entire $21.5 million purchase price in cash, but

paid some in cash and some in preferred stock.

Tr. at 981:10-23; DX-62 and Tr. at 1077:1-1078:12.

195.   Deutsche Bank had been marketing these OFZ 25023s to General Cigar even before it

received the option mandate. In fact, prior to obtaining the option mandate from RRF on

June 8, 1999, Deutsche Bank did not know of any OFZ 25023s that it could potentially

sell to General Cigar, other than the OFZ 25023s held by Tiger and transferred by Tiger to RRF.

*See supra* DPTF 169, 173-192; Tr. at 3347:7-19.

196.   The June 8 option in this case was unusual. Ordinarily, Deutsche Bank would not tell the seller of an asset that a real potential buyer was lined up. However, in this case, it was actually different. Ms. Zimmerman did not want to give Deutsche Bank an option for a long period of time because the market was moving rapidly in May and June of 1999. Thus, Ms. Zimmerman did not want to give Deutsche Bank an option unless Deutsche Bank told her that it had a real potential buyer.

Tr. at 3421:8-3422:7.

197.   On June 9, 1999, Laurence Schreiber of Deutsche Bank sent a facsimile to Janet Krajewski of General Cigar, in which he included a copy of Jaguar's (referred to as a "major contributor") not fully executed RRF subscription agreement (with Jaguar's and Tiger's identifying information redacted) and stated that the tax basis of the assets transferred by the major contributor to RRF was $223,603,340.

DX-121 at B5-001386-B5-001419 (when compared to JX-66 at A1-000563-581 and A1-000583-596, redactions of Jaguar's and Tiger's identifying information are revealed at B5-001402 (see A1-000578), B5-001405 (see A1-000581), B5-001408 (see A1-000585), B5-001410 (see A1-000587), B5-001413 (see A1-000590), B5-001415 (see A1-000592), B5-001417 (see A1-000594), B5-001418 (see A1-000595), B5-001419 (see A1-000596)); Tr. at 3364:13-3366:6.

198.   On June 16, 1999, Laurence Schreiber sent a facsimile to Janet Krajewski. The facsimile

confirmed the cost of Jaguar's portion of the Tiger Securities and computed the tax basis

in 80% of the that portion as $178,882,672, stating "As you intend to acquire

2,350,000,000 rubles face value of the assets contributed (80.00% of the total), on a

straight line basis the adjusted tax basis of the portion you acquire would be

$178,882,672." General Cigar had shown interest in the tax basis of the Russian bonds

and wanted to know what the tax basis was. (The Tiger and Jaguar names, however, were

not disclosed).

DX-68 and Tr. at 3363:6-3364:12.

199.   On a facsimile dated June 18, 1999, Ms. Krajeski of General Cigar computed the tax

basis in 80% of the Jaguar portion of the Tiger Securities as $177,879,718. (The Tiger

and Jaguar names, however, were not disclosed).

DX-70 (re 2,937,434,000) and Tr. at 990:21-991:13 and JX-87 at Confidential DB 00063

(Jaguar and 2,937,434,000).

200.   The tax basis and the embedded tax benefits were a purpose in General Cigar's ultimate

acquisition of the Russian bonds from RRF.

DX-115 and Tr. at 985:19-989:16, 1045:21-1050:9.

201.   Deutsche Bank identified General Cigar/GCMM as a buyer for the Tiger Securities and,

on June 22, 1999, exercised its option for 75-80% of the Tiger Securities.

JX-87; JX-92 and Tr. at 3369:25-3372:2; JX-93 and Tr. at 3367:14-3369:24; DX-82.

202.   Pursuant to the option, General Cigar did not acquire shares of RRF.

JX-87; JX-92; JX-93; DX-81.

203.   On June 23/24, 1999, RRF reduced its ownership of the Tiger Securities by 77.18%. JX-134; JX-135 and Tr. at 519:24-524:6; DX-121 (e.g. at B5-001267) and Tr. at 477:3-479:13, 480:11-481:4.

204.   [Intentionally Left Blank].

205.   That is, on June 23/24, 1999, General Cigar acquired 77.18% of the Tiger Securities. RRF received a combined net value of $11,191,100 after paying Deutsche Bank a fee of $9,993,000. General Cigar paid $17,950,000 in cash and 3,300 shares of dividend-paying preferred stock (with a stated value of $3,300,000 but valued at $3,234,000). JX-134; JX-135 and Tr. at 519:24-524:6; DX-121 (e.g. at B5-001267) and Tr. at 477:3-479:13, 480:11-481:4; JX-92; JX-93.

206.   RRF took a loss of approximately $355,000 on the 77.18% of the Tiger Securities that it transferred to General Cigar.

|   | | |
|---|---|---|
|   | $14,960,669 | RRF's valuation of the Tiger Securities at May 1999 |
| × | 77.18% | Percentage of Tiger Securities transferred to General Cigar |
| = | $11,546,644 | RRF's Cost attributable to Tiger Securities transferred to General Cigar |
|   | | |
|   | $11,546,644 | RRF's Cost attributable to Tiger Securities transferred to General Cigar |
| − | $11,191,100 | Combined value of General Cigar cash and preferred stock |
| = | $354,554 | Loss on transfer of Tiger Securities to General Cigar |

JX-87; JX-92; JX-93.

207.   Deutsche Bank received $9,993,000 of the total proceeds of $21,184,000. This fee was received by Deutsche Bank for two transactions: (1) the transfer of the Tiger Securities by Jaguar and Ocelot to RRF; and (2) the transfer of 77.18% of the Tiger Securities to

General Cigar. Had the option agreement and consummation of the RRF/General Cigar transaction not occurred, Deutsche Bank would not have generated any commission at all related to the Tiger Securities.

JX-92; JX-93; DX-80 at 3372:3-3373:20 (DX-80 was produced by plaintiff), 3423:5-17; DX-193 at p. 61 and fn. 173, p. 81 and fn. 208.

208.   If the fee of $9,993,000 does not include the transfer of the Tiger Securities by Jaguar and Ocelot to RRF, then Deutsche Bank did not get paid for Tiger's transfer to RRF. Indeed, Ms. Zimmerman testified that she does not know if Deutsche Bank received a fee in connection with the transfer of the Tiger Securities to RRF.

JX-52 and JX-53 and Tr. at 729:6-730:22; *see supra* DPTF 205, 207.

209.   RRF included the $9,993,000 fee to Deutsche Bank in the basis it claimed in the GCMM stock.

JX-135 at B3-000447 (listing Deutsche Bank fee of $9,992,900 as a "Selling costs" and including in basis claimed in GCMM).

210.   As part of this registered tax shelter transaction, RRF represented to General Cigar that it was acquiring 77.18% of the Tiger Securities with a tax basis of approximately $178 million (without accrued interest).

DX-121 at B5-001272 (Section 4.7(e)); see also 1523:20-1524:10.

211.   RRF further represented to General Cigar that it would not be making an election under § 754 of the Internal Revenue Code.

DX-121 at B5-001272 (Section 4.7(f)); see also DX-84 at B5-001905 and Tr. at 483:23-484:8.

212.     On June 24, 1999, Deutsche Bank sent a letter to General Cigar, stating that the IRS had

issued a tax shelter registration to Deutsche Bank titled Preferred Stock Financing

Transaction for General Cigar's acquisition of Russian bonds from RRF in exchange for

cash and preferred stock.

DX-121 at B5-001426; DX-11; DX-94.

213.     Also on June 24/25, 1999, Deutsche Bank sent General Cigar a letter, stating that

Deutsche Bank would make available an officer, or otherwise knowledgeable person, to

directly address any inquiry of the IRS regarding establishing the cost basis of the

"Original Investor" (i.e. Tiger) in the Russian securities (i.e. the 77.18% of the Tiger

Securities) that General Cigar obtained from RRF.

DX-121 at B5-001428 and Tr. at 3366:7-3367:13.

214.     On August 5, 1999, General Cigar entered into an agreement pursuant to which RRA

furnished investment management services to General Cigar in connection with the

77.18% of the Tiger Securities that General Cigar had acquired from RRF. The

agreement required General Cigar to pay an Incentive Fee equal to 20% of the value

exceeding $21,250,000 (i.e. the amount General Cigar paid for 77.18% of the Tiger

Securities). This Incentive Fee mirrors the Incentive Fee that General Cigar would have

had to pay had it simply invested $21,250,000 in RRF itself. The agreement also required

General Cigar to pay an Interest Repatriation Fee equal to 20% of the U.S. dollars

received from converting interest paid on the Russian assets in General Cigar's account

and converted into U.S. dollars.

DX-114 (incl. at GCMM-0000168 and GCMM-0000173); JX-25 at GCMM-0000202.

215.   On August 9, 1999, Joseph Aird of General Cigar prepared a memorandum for Edgar M.

Cullman, chairman of the board of General Cigar, and Edgar M. Cullman, Jr., president

of General Cigar, regarding "Purchase of Russian Bonds." In the memorandum, he stated

that the "tax basis" of the 77.18% of the Tiger Securities General Cigar acquired was

"approximately $178 million" and that the "embedded tax benefit is approximately $60

million ($178 - $21 x 38%)." The 38% in the parenthesis referred to the combined federal

and state corporate tax rate for General Cigar. The tax benefit was important to GCMM

because General Cigar had the potential to use the tax benefits to offset income. The tax

benefits came with the transaction and were a purpose in General Cigar's acquisition of

the Russian bonds from RRF.

DX-115 and Tr. at 985:19-989:16, 1045:21-1050:9.

216.   The Deutsche Bank option and General Cigar's transaction with RRF was a tax shelter

transaction previously registered with the Internal Revenue Service in March of 1999.

DX-94; DX-121 (e.g. at B5-001426-1427) and Tr. at 481:21-483:12; JX-87; JX-92;

JX-93. DX-11.

217.   RRF knew that the General Cigar transaction was a registered tax shelter transaction.

DX-121 (e.g. at B5-001426-1427) and Tr. at 481:21-483:12; DX-11.

218.   General Cigar was a sophisticated entity in business matters.

Tr. at 1099:11-1100:2, 1106:16-1107:18, 1109:3-1110:12, 3416:9-3417:15; DX-56;

DX-21.

219.   According to its offering memoranda, RRF's intention to concentrate its investment

activity in Russian securities and other Russian assets would enable it to achieve

"economies of scale," that, in turn, "'[would] be essential for exploring and accessing the[] potential opportunities' that existed for increasing the value of Russian debt assets." DX-148 at ¶ 5.

220.   RRF's transfer of 77.18% of the Tiger Securities to General Cigar was inconsistent with achieving the "economies of scale" that RRF's offering memoranda claimed "'[would] be essential for exploring and accessing the[] potential opportunities' that existed for increasing the value of Russian debt assets."

Compare Tr. 2230:21-22:31:17 ("[T]he notion that they [RRF] landed a great big, you know, Russian asset and then sold most of it is not consistent with their statement that economies of scale are important to—important to the overall management of the strategy."), to DX-148 at ¶ 5 (indicating that RRF's intention to concentrate its investment activity in Russian securities and other Russian assets would enable it to achieve "economies of scale," that, in turn, "'[would] be essential for exploring and accessing the[] potential opportunities' that existed for increasing the value of Russian debt assets.").

## P.   Summary of RRF's disposition of Tiger Securities and tax loss claims

221.   RRF claims that it realized tax losses through its sales of 22.82% of the Tiger Securities in 2000 and its redemption of its GCMM preferred stock in 2004. RRF claimed $7,470,066 million of economic gain on its sales of the Tiger Securities in 2000. JX-134; JX-135 and Tr. at 519:24-524:6; DX-140 and Tr. at 1091:19-1092:5; DX-141.

222.   RRF's internal documents purport to reflect how RRF disposed of the Tiger Securities. RRF transferred approximately 77.18% of the Tiger Securities to GCMM on June 24,

1999, in exchange for GCMM preferred stock and cash. On four separate dates in 2000, RRF sold the remaining 22.82% of the Tiger Securities. RRF claimed a tax loss from the four sales in the amount of $49,786,826 and claimed an economic profit (i.e. the appreciation in value from the time the Tiger Securities were transferred to RRF in May 1999 through the dates of the four sales in 2000) of $7,470,066. (This latter figure - $7,470,066 - is based on a cost basis ("book cost") in excess of $3 million and sales proceeds of approximately $11 million).

JX-134; JX-135 and Tr. at 519:24-524:6; JX-133 at B00106 and JX-149 and Tr. at 516:16-519:23.

223.   This claimed tax loss of $49,786,826 was passed to FFIP in net numbers and distributed by FFIP to U.S. taxpayers.

DX-138; DX-148 at p. 10 (para. 14); Tr. 127:8-128:12, 137:1-14, 147:23-148:14, 149:8-152:19.

224.   RRF claimed a tax basis in the 77.18% of the Tiger Securities it transferred to GCMM on June 24, 1999, of $178,866,144. RRF claimed a carryover basis in the GCMM preferred stock before adjustments for "cash received" and "selling costs" of $178,886,144, and, after such adjustments, of $170,909,044. The "selling costs" were the $9,993,000 fee paid to Deutsche Bank and RRF claimed that this fee increased basis.

JX-134; JX-135 and Tr. at 519:24-524:6.

225.   In 2004, RRF had its GCMM stock redeemed and claimed a loss on its 2004 partnership return in the amount of its claimed basis in the stock - i.e. $170,909,044. This loss came from the losses Tiger suffered on the Tiger Securities prior to transferring them to RRF and the fee that RRF paid to Deutsche Bank for sourcing the Tiger Securities from Tiger

to RRF and then disposing of 77.17% of them to General Cigar.

JX-140 at A1-000453 and Tr. at 538:8-541:9; JX-135 and Tr. at 519:24-524:6; DX-140 and Tr. at 1091:19-1092:5; DX-141; JX-135 at B3-000447 (including fee to Deutsche Bank in basis computation).

226.    Because RRF deducted the approximately $10 million fee it paid to Deutsche Bank, ultimately U.S. taxpayers paid a substantial portion of Deutsche Bank's fee - i.e. RRF's capital gain tax rate multiplied by $10 million fee. In this way, Deutsche Bank shared in the purported tax benefits (built-in losses) of the Tiger Securities.

JX-140 at A1-000453 and Tr. at 538:8-541:9; JX-135 and Tr. at 519:24-524:6; DX-140 and Tr. at 1091:19-1092:5; DX-141; JX-135 at B3-000447 (including fee to Deutsche Bank in basis computation).

## II.    RRF HAS NO VALID DEFENSES TO THE FPAA PENALTY DETERMINATIONS

### A.    The IRS penalty determinations for 2000

227.    On October 14, 2005, the IRS issued a FPAA disallowing approximately $50 million in losses claimed by RRF on its 2000 partnership return from selling 22.82% of the Tiger Securities.

Compl. (doc. #1), Ex. A.

228.    In addition to disallowing the losses, the FPAA made several determinations about penalties. Specifically, the FPAA determined, among other things, that: (1) the loss disallowance and corresponding increase to income were attributable to a tax shelter within the meaning of § 6662(d)(2)(C)(ii), that RRF and its members had, as a

significant purpose, the avoidance or evasion of federal income tax, that they lacked substantial authority for the positions taken, and that they did not have a reasonable belief that those positions were more likely than not the correct treatment of such items; (2) that all underpayments resulting from the loss disallowance and corresponding increase to income were attributable to (a) a substantial understatement, (b) a gross valuation misstatement, or (c) negligence or disregard of rules and regulations; (3) RRF and its partners did not have reasonable cause and good faith for any of the resulting underpayments; and (4) accuracy related penalties under § 6662 apply to all underpayments of tax attributable to the loss disallowance and corresponding increase to income, namely, a 40 percent gross valuation misstatement penalty pursuant to § § 6662(a), (b)(3), (e), and (h), a 20 percent negligence / disregard of rules or regulations penalty pursuant to § § 6662(a), (b)(1), (c), a 20 percent substantial understatement of income tax penalty pursuant to § § 6662(a), (b)(2), and 6662(d), and a 20 percent substantial valuation misstatement penalty pursuant to § § 6662(a), (b)(3), and (e).

Compl. (doc. #1), Ex. A.

**B.** **Plaintiff failed to obtain any written opinion to justify the tax losses claimed**

229.   Neither Russian Recovery Fund, Russian Recovery Advisers, nor any individual with an ownership interest in RRF, obtained a written opinion from any attorney or any accountant (individual or firm), prior to the filing of its 2000 tax return, explaining or justifying (1) RRF's using a carryover basis for the Tiger Securities or (2) for RRF's claiming losses upon their sale or exchange in 1999, 2000 or 2004.

Tr. at 495:15-17, 1480:3-13; Entire Trial Record.

230.  RRF asserts a reasonable cause and good faith defense to these penalties based on

unwritten and non-specific advice purportedly received from Ernst & Young with respect

to claiming tax losses on its federal income tax return from the sale of 22.82% of the

Tiger Securities in 2000, which supposedly is "embedded" in the return itself, but is not

set forth in any "statement" attached to the return.

Compl. ¶ 24; JX-133; JX-139; DX-148 at p.10 (para. 14); Tr. at 1338:8-15, 1339:17-20,

1346:21-1348:4, 1447:8-1448:19, 1474:12-20, 1479:13-25; *see also* JX-149 and Tr. at

516:16-519:23, 1162:22-1163:25; JX-148.

231.  Russian Recovery Fund, Russian Recovery Advisers, and the individuals with an

ownership interests in RRF were well represented by established law firms with tax

practices during the negotiations with Tiger Management and Deutsche Bank to obtain

the Tiger Securities but no such law firms provided any written opinion(s) explaining or

justifying (1) RRF's using a carryover basis for the Tiger Securities or (2) for RRF's

claiming losses upon their sale or exchange in 1999, 2000 or 2004.

JX-109; JX-118 and Tr. at 501:2-505:19 and Tr. at 506:3-507:6; DX-209 and Tr.

802:21-803:21; DX-210; DX-211; DX-212; JX-118 and Tr. at 1383:16-1399:8;

1297:16-1298:3, 502:1-3; JX-118 at H2 0000019-20 and Tr. at 1404:22-1415:22;

DX-112 and DX-113 at B3-002138 and Tr. at 542:19-544:7.

232.  Margery Neale was a partner at Swidler, Berlin, who did a lot of work for Bracebridge

and its funds. She oversaw the process of forming RRF. She was hired to help launch

RRF, to draft documents for setting up the fund.

Tr. 161:20-162:4, 405:17-406:2.

233.    RRF used a Cayman firm called Maples & Calder to address Cayman law issues. Gus

Pope was a lawyer at Maples Calder.

Tr. 162:5-8, 444:18-445:4.

234.    CITCO was a Cayman Islands administrator who provided administrative services and

shareholder services (e.g. keeping a share registry) to RRF. They saw and signed off on

all subscription agreements. CITCO also provided directors to RRF. William Keunen

worked for CITCO.

Tr. at 162:23-164:5, 391:15-25, 445:7-22.

235.    Ropes & Gray was rendering legal services to Bracebridge in October of 1998 and had

been doing so for some period of time prior. Ropes & Gray, including tax attorney Steven

Shay, performed and billed for legal services rendered to RRF during the period

beginning May 1, 1999, and ending July 31, 1999.

DX-112 and DX-113 at B3-002138 and Tr. at 542:19-544:7.

236.    Ernst & Young never provided a written opinion regarding the tax losses RRF claims

from the dispositions of the Tiger Securities.

Tr. at 495:15-17.

237.    Mr. Connelly did not consider providing a written tax opinion for RRF in connection

with the Defendant Exhibit 148 Determinations, because Mr. Connelly was not asked to

do that. RRF never asked Ernst & Young for a written opinion.

Tr. at 1480:3-13.

238.   In order to have issued a written opinion in this case, Ernst & Young would have had to

ask for more documents and more information than it received. It would want all of the

information and documents surrounding the transaction.

Tr. at 1509:4-24

239.   At the time it signed the 1999 and 2000 RRF returns, Ernst & Young would not have

been able to give a tax opinion and would have said that it needed to do a lot of additional

work in order to write an opinion. For example, Ernst & Young would probably have

talked with Tiger Management.

Tr. at 1509:25-1510:13.

240.   RRF, its partners and indirect partners received legal advice from attorneys and law firms

in connection with Tiger and General Cigar, including Tiger's sale of RRF shares to

FFIP, but RRF does not rely on any such advice as a defense to penalties in this action.

JX-109; JX-118; DX-209; DX-210; DX-211; DX-212; Pl.'s Pre-Trial Mem. (doc. #290)

at 37-40.

241.   In June of 1999, RRF and Nancy Zimmerman sought and obtained tax advice from tax

lawyer Jim Nix related to / about Tiger's sale of shares to FFIP. In addition, in June and

November of 1999, RRF and Nancy Zimmerman sought tax advice from Jim Nix about

other tax matters, including allocating losses from the Tiger Securities to FFIP and

reporting the transaction with General Cigar as an exchange under Section 351 of the

Internal Revenue Code.

DX-210 (e-mail chain dated June 16 and 17, 1999); DX-209 and Tr. 802:21-803:21;

JX-109; see also DX-211.

242.   Mr. DiBiase's memory and knowledge about tax advice in connection with the Tiger

Securities is not reliable. For example, he did not recall speaking with tax lawyer Mr. Nix

about tax matters related to Tiger, even though contemporaneous documents prove that

he did. Similarly, he was unaware of the role of tax lawyer Mr. Shay, even though

contemporaneous documents demonstrate that Mr. Shay played a role. Similarly, he did

not know if Dominic LaValla had any role in rendering tax advice on Tiger's transfer of

assets to RRF and FFIP's purchase of Tiger's shares in RRF, even though Mr. LaValla

had final say on Ernst & Young's purported determinations (regarding using a carryover

basis and allocating losses to FFIP).

JX-109 and JX-118 and Tr. at 501:2-505:19; Tr. at 506:3-507:6; DX-148 at p. 10

(para. 14) and Tr. at 1343:11-1344:13.

C.   **Ernst & Young prepared RRF's tax returns and financial statements but did not issue any written opinions explaining or justifying (1) RRF's using a carryover basis for the Tiger Securities or (2) for RRF's claiming losses upon their sale or exchange in 1999, 2000 or 2004**

243.   Bracebridge Capital, LLC (the entity used by Nancy Zimmerman to manage all of her

investment funds) had engaged the accounting firm Ernst & Young ("E&Y") to provide

audit review and tax services for RRF. In particular, E&Y was engaged as tax return

preparer for RRF's 1999 and 2000 returns.

JX-60 at A1-000861 and Tr. at 234:16-235:13; Tr. 140:12-141:4, 142:17-21, 292:9-21,

1248:20-1249:16, 1254:7-1255:24.

244.   At Ernst and Young, a tax partner generally has specific clients that are assigned to that

tax partner. And an engagement partner has overall responsibility for providing tax

services to a client and there is at least one engagement partner assigned to each client.

The engagement partner for RRF (its client account) during the 1999 to 2001 time frame was Dominic LaValla, and, after Henry Connelly became a tax partner in July 2001, he and Mr. LaValla jointly shared responsibility for RRF's client account. (Plaintiff never sought to call Mr. LaValla as a witness).

Tr. at 1257:6-8, 1327:11-20; JX-108 and Tr. at 1369:20-1372:1; see also Tr. at 506:3-11.

245. Henry Connelly performed tax return preparation for RRF from 1999 to 2004, first in the position of senior tax manager and, sometime after July 2001, in the position of engagement partner. Tax return preparation was the primary work that Mr. Connelly performed for RRF. In addition to tax return preparation, Mr. Connelly periodically answered tax questions posed by Mr. DiBiase.

Tr. at 1328:12-1330:13.

246. Mr. Connelly was responsible for the preparation of tax returns for Bracebridge, both before and after Mr. DiBiase started at Bracebridge.

Tr. at 1250:14-21.

247. Mr. Connelly signed RRF's 2000 partnership return. For both of RRF's 1999 and 2000 partnership returns, Mr. Connelly was responsible for the review and coordination and overall production of the tax returns. Mr. Bianco was also involved in the preparation of RRF's 1999 and 2000 returns. After Mr. Connelly signed the 2000 tax return on June 27, 2001, Ernst & Young had no further involvement with RRF's 2000 tax return. The only requirement that Ernst & Young had in place in June of 2001 with respect to signing tax returns was that the person who signed had to be a manager and a CPA.

JX-139 and JX-133 and Tr. at 1254:7-1255:24, 1256:20-25; JX-133 and 139 and Tr. at 882:14-883:25; Tr. at 1167:20-24; Tr. at 1323:11-22; JX-133 and Tr. at 1345:2-1346:20.

248. During the 1999 to 2004 time frame, Jim DiBiase was the contact at Russian Recovery Fund for its client account with Ernst & Young.

Tr. 140:12-141:4, 142:17-21, 292:9-21, 293:7-22, 880:2-6, 1167:25-1168:4, 1249:17-1250:3, 1330:14-17.

249. Mr. DiBiase's primary points of contact at Ernst & Young were Joseph Bianco and Henry Connelly. They were the only people with whom Mr. DiBiase recalled speaking.

Tr. at 495:18-20, 506:12-17.

250. To a limited degree, Mr. DiBiase was familiar with partnership tax provisions in 1999.

Tr. at 1265:12-15.

251. Mr. Connelly was a well-qualified senior tax manager at Ernst & Young in 2001 who could have prepared a separate, written opinion explaining or justifying (1) RRF's using a carryover basis for the Tiger Securities or (2) for RRF's claiming losses upon their sale or exchange in 1999, 2000 or 2004 but did not.

Tr. at 1302:21-1317:1.

252. Ernst & Young's Audit Group had more face time with RRF than Mr. Connelly's tax return preparation group but the Audit Group did not issue tax opinions. They did more fieldwork, more testing of transactions and valuation, evidence, existence and valuation of assets, of contributions, than the Tax Group. They were at the client and had more

investigatory time in the details than the Tax Group, which generally worked on a more

remote basis.

Tr. at 1168:12-1169:8.

**D.**   **Ernst & Young's purported "advice" is unsubstantiated by any written workpapers or analysis, factual or legal, and could not have been based on all pertinent facts and circumstances as Ernst & Young was not aware of key facts and unreasonably relied on RRF's representations**

253.   Ernst & Young's purported "advice" is nothing more than after-the-fact conclusions that

are alleged to be implied in RRF's 2000 tax return, i.e., (1) Jaguar and Ocelot were

partners of RRF; (2) RRF claimed a "carryover" basis in the Tiger Securities; and (3) the

tax losses claimed were allocated on the tax return to FFIP.

JX-133; *e.g.* Tr. at 1479:13-25 and DX-148 at p.10 (para. 14); Tr. at 1447:8-1448:19.

254.   In plaintiff's responses to the United States' contention interrogatories, there was no

assertion that Ernst & Young opined in any manner that Jaguar and Ocelot were partners,

as a matter of tax law, in RRF. Plaintiff's interrogatory responses only contended that two

determinations were made: "Ernst & Young . . . determined that the correct return

position was to use a carryover basis in the contributed assets from the Tiger entities and

to allocate the $49,786,826 loss at issue in this case to FFIP."

DX-148 at p. 10 (para. 14).

255.   At trial, the two alleged determinations of the interrogatory responses (carryover basis

and loss allocation to FFIP) were referred to during the examination of Henry Connelly

as the "Defendant Exhibit 148 Determinations." At the prior deposition of Mr. Connelly,

they were referred to as the "Exhibit 1 Determinations."

DX-148 at p. 10 (para. 14) and Tr. at 1331:7-1333:18, 1340:11-1343:9, 1347:10-18,

1441:17-1442:20.

256. E&Y does not know when it made the alleged determinations to use a carryover basis for the Tiger Securities and to allocate the $49,786,826 loss at issue to FFIP.

DX-148 at p. 10 (para. 14) and Tr. at 1182:13-1185:2, 1334:7-1335:6, 1340:11-16, 1356:15-21.

257. E&Y also does not know exactly when it allegedly communicated the determinations to use a carryover basis for the Tiger Securities and to allocate the $49,786,826 loss at issue to FFIP to RRF. The only communication of the determinations to use a carryover basis for the Tiger Securities and to allocate the $49,786,826 loss at issue to FFIP that Ernst & Young can point is the provision of the tax return itself.

DX-148 at p. 10 (para. 14) and Tr. at 1338:8-15, 1339:17-20, 1474:12-20.

258. The determinations to use a carryover basis for the Tiger Securities and to allocate the $49,786,826 loss at issue to FFIP are not memorialized in writing anywhere as a final conclusion. Ernst & Young believes those determinations are implied and embedded in numerical calculations on the tax return. RRF's 1999 and 2000 returns nowhere state this purported advice of Ernst & Young. They also nowhere include any analysis of facts. They also nowhere include any analysis of law that is related to those facts.

DX-148 at p. 10 (para. 14) and Tr. at 1479:13-25 and JX-133 and JX-139; JX-139 and Tr. at 1447:8-1448:19.

259. The only factual information on which the Tax Group at Ernst & Young relied in making the determinations to use a carryover basis for the Tiger Securities and to allocate the $49,786,826 loss at issue to FFIP was supplied by Mr. DiBiase. The Tax Group at Ernst

& Young accepted information that was supplied by Mr. DiBiase as correct and did not

do any independent investigation into the factual accuracy of the information that Mr.

DiBiase supplied.

DX-148 at p. 10 (para. 14) and Tr. at 1472:2-1473:4.

260.   Ernst & Young did not know that RRF had granted special redemption rights to Ocelot

and Jaguar and did not know how long after joining RRF an investor would have to wait

before it could redeem or dispose of its shares in RRF.

DX-148 at p. 10 (para. 14); Tr. at 1198:3-16; JX-68 and Tr. at 1465:16-1466:4; JX-57

and Tr. at 1466:19-1467:6.

261.   Mr. Bianco did not see DX-88, the document in which RRF, RRA, FFIP, and

Bracebridge Capital made covenants to Deutsche Bank in order that Deutsche Bank

would not register the sale of RRF shares from Jaguar and Ocelot to FFIP as a tax shelter

with the IRS.

DX-148 at p. 10 (para. 14) and DX-88 and Tr. at 1205:21-1209:4.

262.   At trial, Mr. DiBiase did not testify that Ernst & Young advised that the Tiger Entities

were partners of RRF.

DX-148 at p. 8 and Tr. at 493:4-494:7.

263.   RRF does not know the timing of any purported advice from Ernst & Young, and cannot

point to any written documentation of the advice.

DX-148 at p. 8 and Tr. at 493:4-495:9; Tr. at 256:9-21.

264.   In fact, RRF's 2000 1065 partnership return nowhere sets forth any advice or opinions

from Ernst & Young to use a carryover basis for the Tiger Securities and to allocate the
$49,786,826 loss at issue to FFIP. On a Schedule K-1 for FFIP, RRF reported FFIP's
shares of RRF's net section 988 losses as $46,424,782. This is a net number that includes
the $49,786,826 of losses RRF claims were generated by its sales of the Tiger Securities
in 2000. Similarly, RRF reported negative (-) $-18,414,817 in Section 988 losses. This
also is a net number that includes the $49,786,826 of losses RRF claims were generated
by its sales of the Tiger Securities in 2000. Nowhere does the return include any analysis
of facts. Nowhere does the return include any analysis of law that is related to those facts.
JX-133 at B00106 and Tr. at 1346:21-1348:4; JX-133 at B00106 and JX-149 and Tr. at
516:16-519:23; JX-133 at B00075 and JX-148; Tr. at. 1162:22-1163:25; DX-148 at p. 10
(para. 14).

265.   Ernst and Young's purported determinations to use a carryover basis for the Tiger
       Securities and to allocate the $49,786,826 loss at issue to FFIP do not claim that
       Ernst & Young specifically determined that Jaguar and Ocelot were bona fide partners in
       RRF. Instead, they take the bona fide status as a foregone conclusion.
       DX-148 at p. 10 (para. 14).

266.   Mr. Connelly does not know if he did any sham partnership or sham partner analysis.
       DX-148 at p. 10 (para. 14) and Tr. at 1483:3-17.

267.   Mr. Connelly claims that he considered whether Ocelot was a bona fide partner. His
       claimed analysis considered only two things: (1) that Ocelot transferred securities to
       RRF; and (2) that Ocelot had economic risk in RRF for a period of time. He did not write
       this purported analysis down and doubts he spent more than ten hours on it; he believes

it's possible he spent more than five. This claimed analysis includes no analysis of law.

DX-148 at p. 10 (para. 14) and Tr. at 1483:19-1484:19.

268.   Mr. DiBiase admits that he does not recall whether the issue of Jaguar and Ocelot being

partners was part of any dialogue with Ernst & Young.

Tr. at 249:19-251:10.

269.   Mr. Connelly did not recall any discussions with Mr. DiBiase about whether Tiger

intended to remain a partner in RRF.

Tr. at 1488:9-12.

270.   Mr. Bianco testified (to the legal conclusion) that Jaguar and Ocelot were partners,

simply because they received a Schedule K-1.

Tr. at 897:25-898:4.

271.   Mr. Connelly claims that he made a general consideration of the step-transaction

doctrine. His claimed consideration was: (1) Tiger made a transfer of assets to RRF; (2)

Tiger had economic risk; (3) independent of that transfer of assets, Tiger made the

decision at a future time to sell its shares in RRF; and (4) he assumed the transfer and

subsequent sale by Tiger were independent based on Mr. DiBiase's representation. Mr.

Connelly did not write down his purported analysis and he does not know how much time

he spent on it.

DX-148 at p.10 (para. 14) and Tr. at 1484:20-1485:21.

E.   **Ernst & Young did not conduct an independent review of RRF's transaction**

272.   On October 5, 1999, Henry Connelly wrote a note to the files and copied and forwarded

the note to Joseph Bianco and Moira Dolan (both of whom were tax managers at the time). (The note is located at JX-101 at EY-RRF-EM-JBIA 000054). All of the information in the note came from discussion and/or e-mails from Mr. DiBiase. Mr. Connelly copied Mr. Bianco and Ms. Dolan on the note to provide information for tax return preparation. Mr. Connelly has no recollection of learning of transactions identified in the note (Tiger's transfer of assets to RRF, a transfer of securities to General Cigar, and FFIP's purchase of Tiger's RRF shares) prior to October of 1999. Mr. Connelly testified that this note (and exhibit JX-101) played a role in forming Ernst & Young's purported advice. However, at the time of this note - October 5, 1999 - Ernst & Young had not yet made any determinations about RRF's using a carryover basis for the Tiger Securities or for RRF's claiming losses upon their disposition and allocating them to FFIP. Further, JX-101 contains no analysis of law, including no analysis of law as it relates to the information set forth in the note.

JX-101 and Tr. at 1348:5-1356:4; DX-148 at p.10 (para. 14).

273. On November 2, 1999, Mr. Connelly forwarded an e-mail to Joseph Bianco. The forwarded e-mail was from Mr. DiBiase to Mr. Connelly and contained a two-page attachment titled "Russian Recovery Fund Chronology." All of the information in the two-page attachment came from Mr. DiBiase. Next to certain enumerated items in the attachment "chronology" were bolded statements such as "Non taxable (721(a))". These bolded statements reflected Ernst & Young's tentative views. They were not final determinations. The attachment (and JX-104) did not play a role forming Ernst & Young's purported advice. In fact, as of November 2, 1999, the Ernst & Young's purported advice had not been made.

JX-104 and Tr. at 260:7-24, 1262:24-1264:13, 1356:22-1359:2, 1360:4-13, 1477:21-1479:12.

274.  On November 9, 1999, Jim DiBiase sent an e-mail to Henry Connelly of Ernst & Young and to tax lawyer Jim Nix of Swidler Berlin, with a copy to Jon Grenzke and with a subject line "Russian tax losses." Mr. DiBiase intended "to put some specific questions to you all to determine if some trades we are contemplating are effective mechanisms to realize tax losses imbedded in Russian assets currently held in RRF." Mr. DiBiase issued a challenge to Mr. Connelly and to Mr. Nix to find a way to get the "tax losses" from the Tiger Securities allocated to FFIP, because plaintiff "[did not] want any of such losses to be allocated to other entities which will get no benefit from them." Mr. Connelly forwarded the e-mail to Mr. Bianco. The e-mail contains six enumerated paragraphs of "Facts". Mr. Connelly did not know where the information for these paragraphs came from. He received them from Mr. DiBiase, who was the sole source of the information. In sum, there is no evidence in the record that explains what role, if any, JX-109 had in forming Ernst & Young's purported advice. JX-109 further contains no factual or legal analysis of Ernst & Young regarding Ernst & Young's purported advice.
JX-109 and Tr. at 1367:11-1370:4; 497:17-501:1; JX-108 and Tr. at 1369:20-1371:2.

275.  Ernst and Young produced a document - JX-110 - dated November 10, 1999. It actually contains two documents, one at EYT-RRF 000911- 932 and another at EYT-RRF 000933-953. Mr. Connelly does not recall the first document and does not recall whether the first document had any role in the Defendant Exhibit 148 Determinations. The first document has handwriting on page 913 in connection with a paragraph labelled "Tiered partnerships." There are no markings on that same page in connection with a paragraph

labelled "Transfers of a partnership interest." Mr. Connelly did not recall ever seeing the

second document (ending in page 953). Mr. Bianco initially testified that this JX-110 was

research the Ernst & Young team did in preparation of the 2000 tax return. When he saw

the date on the document (November 10, 1999), he changed his testimony and said it

"presumably would have been research that we did for the 1999 tax return, as well as the

2000 return." In sum, there is no evidence in the record that connects this document to

Ernst & Young's purported advice or that explains what role, if any, it had in such

purported advice. The document further contains no factual or legal analysis of Ernst &

Young regarding the purported advice.

JX-110 and Tr. at 1374:5-1376:19, 1139:10-1140:22.

276.   On December 17, 1999, Jonathan Ansbacher, the lead audit partner at Ernst & Young on

the RRF client account at this time, forwarded an e-mail to Henry Connelly. (Mr.

Ansbacher had ultimate audit responsibility for RRF). The e-mail was written to Jonathan

Ansbacher, David Gross (of Ernst & Young's audit group), and Andrew Rabinowitz (also

of Ernst & Young's audit group), and copied to Thomas Morin. The e-mail attached a

memorandum about RRF with issues that came to the Audit Group's attention through

discussion with Mr. DiBiase. The memorandum was prepared by the Audit team while it

did a walk-through of RRF. The authors of the memorandum were Thomas Morin and

Jeff Pauker, both of whom worked in Ernst & Young's audit group. Mr. Connelly

recalled the memorandum and recalled reading it.

JX-116 and Tr. at 1377:18-1383:15, 1156:18-1157:12, 1174:4-6, 1176:16-1177:25.

277.   The memorandum states, among other things:

> Tiger withdrew on June 4th, and 80% of the securities that they had contributed were purchased by General Cigar, a US corporation. This trade was tax driven, and structured in such a way that General Cigar was able to take advantage of the tax losses generated by the purchase of the Russian Securities.

On December 19, 1999, Henry Connelly forwarded the e-mail to Joseph Bianco and Moira Dolan, the tax group members that Mr. Connelly supervised and that were assigned to the RRF client account, and told them that the attached memorandum "may help with the mechanics." Mr. Connelly was referring to understanding the facts of what occurred with regard to RRF. Mr. Connelly was trying to make sure that he had a good understanding of the facts for the purpose of preparing RRF's 1999 tax return.

However, Mr. Connelly testified that, because this was an audit memorandum to audit files, it really would not have any ultimate role in the tax determination, that he does not know whether JX-116 played any role in forming Ernst & Young's purported advice, and that he does not recall whether he used JX-116 in making Ernst & Young's purported advice. JX-116 further contains no legal analysis of Ernst & Young regarding Ernst & Young's purported advice.

JX-116 and Tr. at 1377:18-1383:15, 1156:18-1157:12, 1174:4-6, 1176:16-1177:25.

278.   On February 1, 2000, Henry Connelly sent an 8-page facsimile to Steven Shay, a tax lawyer and partner who worked at Ropes & Gray. On the first page (JX-118 at H2 0000014), Mr. Connelly wrote "Steve: Sorry that this is more of a hodgepodge of notes rather than a coherent memo, but I wanted to share with you as much information as I could. Regards, Hank".

JX-118 and Tr. at 1383:16-1399:8; 1297:16-1298:3, 502:1-3.

279.    The next two pages (H2 0000015-16) are the November 9, 1999, e-mail in JX-109 from

Mr. DiBiase to Mr. Nix and Mr. Connelly, with Mr. Connelly's handwritten notes on it.

In questioning on these pages, Mr. Connelly remembers very little about what his notes

referenced. He further provided answers that contradicted earlier answers provided in his

deposition. With respect to enumerated paragraphs 2, 3, 4 in the "Facts" section of the

e-mail regarding FFIP, Tiger, RRF, and General Cigar, Ernst & Young got the

information only from Mr. DiBiase and accepted it as correct without any independent

investigation to determine the facts in those paragraphs were accurate.

JX-118 and Tr. at 1383:16-1399:8; 1297:16-1298:3, 502:1-3.

280.    Mr. Connelly does not know what role the e-mail on these pages (H2 0000015-16) played

in forming Ernst & Young's purported advice. He also does not know whether Ernst &

Young relied on the e-mail in these pages in forming Ernst & Young's purported advice.

In sum, there is no evidence in the record that explains what role, if any, JX-109 had in

Ernst & Young's purported advice JX-109 further contains no factual or legal analysis

(or, at best, no understandable factual or legal analysis) of Ernst & Young regarding Ernst

& Young's purported advice JX-118 and Tr. at 1383:16-1399:8; 1297:16-1298:3,

502:1-3.

281.    The fourth page (H2 0000017) of the February 1, 2000, facsimile (JX-118), contains Mr.

Connelly's notes - next to three bullet points - of a discussion between Henry Connelly,

Mr. DiBiase, and tax lawyer James Nix. The conversation occurred sometime around

February 1, 2000. Mr. Connelly does not recall having the discussion. Mr. Connelly has

no recall about the first bullet point, other than it probably referred to the General Cigar

transaction. Mr. Connelly does not recall the details of the third bullet point about section 351(g).

JX-118 at H2 0000017 and Tr. at 1399:9-1403:11; Tr. at 1297:16-1302:19.

282.   At the second bullet point, Mr. Connelly wrote "Play to Tiger was it got some cash whereas it would not have been able to receive any value." The information in this second bullet point came from Mr. DiBiase or Mr. Nix, but Mr. Connelly does not know which one. Here, Mr. Connelly might have referenced only (1) that it would be difficult for Tiger to make a sale of its assets directly; and (2) that by contributing the assets to RRF and having them managed by RRF, Tiger would be able to recoup some cash at some point in time. In his deposition, however, he three times denied any recollection of this second bullet point. In addition, the statement was written around February 2000 and in the past tense - "[Tiger] got cash" - which occurred in June 1999.

JX-118 at H2 0000017 and Tr. at 1399:9-1403:11; Tr. at 1297:16-1302:19.

283.   Mr. Connelly does not know if the notes on H2 0000017 played any role in forming Ernst & Young's purported advice He also does not know if he relied on H2 0000017 in making Ernst & Young's purported advice. In sum, there is no evidence in the record that explains what role, if any, H2 0000017 had in Ernst & Young's purported advice. H2 0000017 further contains no factual or legal analysis of Ernst & Young regarding Ernst & Young's purported advice.

JX-118 at H2 0000017 and Tr. at 1399:9-1403:11; Tr. at 1297:16-1302:19.

284.   The fifth page (H2 0000018) of the February 1, 2000, facsimile (JX-118), contains the first page of the memo written by Thomas Morin and Jeff Pauker (both of Ernst & Young's audit group) and contained in JX-116. Mr. Connelly reviewed the page, and

changed the phrase "purchased by" to "transferred to", because he thought "purchased by" was factually incorrect. He did not make any other corrections, including the statement that "This trade was tax driven . . . ."

JX-118 at H2 0000017 and Tr. 1403:12-1404:21.

285.   The sixth and seventh pages (H2 0000019-20) of the February 1, 2000, facsimile (JX-118), contain Mr. Connelly's note to the file dated October 5, 1999, that has some similarities, but many differences, with the note to file in JX-101, which note is also dated October 5, 1999. For example, the former contains a bullet point "Presumed not to be a prearranged transaction" that does not appear in the latter. Mr. Connelly does not recall amending or adding to H2 0000019.

JX-118 at H2 0000019-20 and Tr. at 1404:22-1415:22.

286.   H2 0000019 also contains Mr. Connelly's handwriting. For example, Mr. Connelly made a note that tax lawyer Steven Shay had a concern about a Tax Court case called ACM. Mr. Connelly, however, does not recall what the concern was. Mr. Shay had no role in Ernst & Young's purported advice. Mr. Connelly does not recall speaking with Mr. Shay in connection with Ernst & Young's purported advice.

JX-118 at H2 0000019-20 and Tr. at 1404:22-1415:22.

287.   H2 0000019 has a bullet point that reads, "A U.S. (General Cigar) Corp. wanted to buy securities that Tiger contributed, securities were exchanged (Mr. Connelly's edit) (80% of what Tiger contributed). Ernst & Young did not do any factual investigation to determine the accuracy of that statement. It received that representation from Mr. DiBiase.

JX-118 at H2 0000019-20 and Tr. at 1404:22-1415:22.

288.   H2 0000019 also contains a bullet point that reads, "Presumed not to be a prearranged transaction." That representation was received from Mr. DiBiase. Mr. Connelly did not do any independent investigation to determine the factual accuracy of this representation. In fact, all of the information on H2 0000019 and H2 0000020 was just received from Mr. DiBiase.

JX-118 at H2 0000019-20 and Tr. at 1404:22-1415:22.

289.   In sum, there is no evidence in the record that explains what role, if any, H2 0000019-20 had in Ernst & Young's purported advice. H2 0000019-20 further contains no legal analysis of Ernst & Young regarding Ernst & Young's purported advice. The pages further contain no substantive factual analysis regarding Ernst & Young's purported advice.

JX-118 at H2 0000019-20 and Tr. at 1404:22-1415:22.

290.   In September 2000, Mr. DiBiase provided a draft memorandum to Mr. Connelly. In the e-mail, Mr. DiBiase stated "A draft - let me know your thoughts. I need to check a few facts as well." On September 19, 2000, Mr. Connelly forwarded the draft to Mr. LaValla and Mr. Bianco, stating:

> Here is a draft of a brief memo that Jim finally put together that we had insisted we would need to get (back in March) before we give a final sign-off on RRF. This memo goes to supporting the substance of Jaguar entering the fund and then selling its interest with huge 704(c) losses etc.

In his deposition, Mr. Connelly testified that Ernst & Young's purported advice was made by the date of this e-mail - September 2000. At trial, he changed his answer to the

speculation that "I would say that the determinations really hadn't been made at this point in time."

JX-124 and Tr. at 505:20-508:24, 1423:1-1434:5.

291.    Mr. Connelly's reference to "huge 704(c) losses" was to the approximately $49 million loss allocation referred to Ernst & Young's purported advice.

Ernst & Young did not do any investigation to determine the factual accuracy of any facts in Mr. DiBiase's draft memorandum in JX-124. It just received the facts from Mr. DiBiase.

JX-124 and Tr. at 505:20-508:24, 1423:1-1434:5.

292.    In September 2000, Ernst and Young did not know how soon after Tiger transferred its assets to RRF that Tiger approached Bracebridge about selling the shares in RRF it had received in exchange for the transfer.

JX-124 and Tr. at 505:20-508:24, 1423:1-1434:5.

293.    JX-124 contains no legal analysis of Ernst & Young regarding Ernst & Young's purported advice. It contains no analysis of the law as it relates to the facts set forth in Mr. DiBiase's draft memorandum. It also does not contain Ernst & Young's purported factual analysis, only a draft of Mr. DiBiase's.

JX-124 and Tr. at 505:20-508:24, 1423:1-1434:5.

294.    On November 30, 2000, Mr. DiBiase wrote an e-mail to Henry Connelly, Joseph Bianco, and Moira Dolan, stating that the $50 million of built-in losses allegedly generated by RRF's sales of portions of the Tiger Securities in 2000 were "huge built in losses."

JX-127 and Tr. at 508:25-511:10.

295.   On March 14, 2001, Mr. Connelly and Mr. Bianco wrote an e-mail to Mr. DiBiase, in

which they stated that:

> The 48M BIL makes sense because last year's book gain appear to have
> been caught up in last year's wash sale. However, the gross BIL of 49.7
> should go to FFIP, while 1M of book gain should go to all. Making this
> change would help FFIP (a little).

This paragraph has no relation to the substance of Ernst & Young's purported advice. It

relates only to mechanics.

JX-131 and Tr. at 1498:15-1500:3.

296.   JX-138 lists the purchase price ($14,088,169) paid by FFIP for Tiger's shares in RRF.

JX-138 does not relate to the Ernst & Young's purported advice.

JX-138 and Tr. at 1417:19-1422:18.

297.   JX-125 did not play a role in the Ernst & Young's purported advice. JX-125 contains no

factual or legal analysis of Ernst & Young regarding the Defendant Exhibit 148

Determinations.

JX-125 and Tr. at 1435:6-1436:20.

298.   JX-126 did not play a role in the Ernst & Young's purported advice. JX-126 contains no

factual or legal analysis of Ernst & Young regarding the Defendant Exhibit 148

Determinations.

JX-126 and Tr. at 1448:21-1449:14.

299.   Ernst & Young did not rely on JX-127 in forming its purported advice. JX-127 contains

no factual or legal analysis of Ernst & Young Ernst & Young's purported advice.

JX-127 and Tr. at 1450:15-1451:5.

300.   JX-128 did not play any role in Ernst & Young's purported advice.

JX-128 and Tr. at 1452:1-13.

301.   JX-157 contains no factual or legal analysis of Ernst & Young regarding Ernst & Young's purported advice.

JX-157.

302.   JX-117 contains some undated notes (at page EYT-RRF 000795) that Mr. Connelly wrote down from conversations with Mr. DiBiase. Mr. Connelly's notes were just taking things down; he was not making his own judgments. He does not remember when he wrote the notes. The notes do not reflect his advice.

The notes on pages EYT-RRF 000796-798 of JX-117 did not play a role in the Ernst & Young's purported advice. The form on pages EYT-RRF 000799-821 of JX-117 did not play a role in the Ernst & Young's purported advice.

JX-117 and Tr. at 1452:14-1457:24, 1459:23-1461:1.

303.   JX-145 and JX-144 helped with calculations but played no role in the substance of making Ernst & Young's purported advice. JX-145 and JX-144 contain no factual or legal analysis of Ernst & Young regarding Ernst & Young's purported advice.

JX-145 and Tr. at 1490:19-1493:12; JX-144 and Tr. at 1493:24-1498:14.

304.   JX-121 and PX-290 played no role in forming Ernst & Young's purported advice. JX-121 contains no factual or legal analysis of Ernst & Young regarding the purported advice.

JX-121 and Tr. at 1493:13-21; PX-290.

305.  Ernst & Young understood that Tiger sold its shares in RRF because Tiger viewed the

sale as an attractive monetization (meaning to get cash) of the Russian assets via their

interest in RRF. Ernst & Young had that understanding based on a discussion with Mr.

DiBiase.

Tr. at 1487:21-1488:8.

306.  Mr. Connelly did not know that Tiger acquired RRF's shares with the intent to liquidate

the Russian assets and exit RRF as quickly as possible for cash.

Tr. at 1488:13-1489:6.

307.  Mr. Connelly had never seen Tiger's e-mail dated May 24, 1999, in which Tiger's plan

was memorialized in writing as:

>   we sold all of our sep 2001 bonds (that we had on with deutsche
>   bank) in return for equity in the russian recovery fund. the value of the
>   equity at the time we received it was 14mm dollars. however, we plan to
>   sell in equity in 2 weeks to hopefully receive cahs.

DX-42 and Tr. at 1489:8-18.

308.  Mr. Connelly had never seen Tiger's trade ticket dated May 25, 1999, in which Tiger's

plan was memorialized in writing - "We hope to have private fund shares sold, vs. cash,

in approximately two weeks."

DX-46 and Tr. at 1489:19-1490:18.

309.  In preparing its purported advice, Ernst and Young did not independently contact

representatives of Tiger, Jaguar, Ocelot, Deutsche Bank, or General Cigar.

DX-148 at p. 10 (para. 14) and Tr. at 1202:21-24; Tr. at 1206:2-3; Tr. at 1458:1-1459:22.

310.  Mr. Connelly did not know what role Deutsche Bank had in connection with Tiger's transfer of assets to RRF. Mr. Connelly did not know what role, other than as a broker, that Deutsche Bank had in connection with Tiger's sale of its RRF shares to FFIP.
JX-117 and Tr. at 1452:14-1457:1

311.  Mr. DiBiase does not know what research Ernst & Young did in preparing RRF's 1999 and 2000 partnership returns.
Tr. at 512:17-20.

312.  Mr. DiBiase did not discuss any case law with Ernst & Young during the 1998 to 2007 time frame.
Tr. at 295:7-13.

313.  Mr. Bianco testified that Ernst & Young considered sections 721 and 704(c) of the Internal Revenue Code. He testified that Ernst & Young "essentially" did consider economic substance doctrine. He also testified that Ernst & Young considered the step transaction doctrine, but referenced other answers for the substance of this analysis. He confirmed that Ernst & Young did not specifically consider the anti-abuse regulation in Treas. Reg. § 1.701-2. He testified that the "ultimate documentation" of Ernst & Young's alleged conclusions were the positions on the tax return itself.
Tr. at 1158:21-22, 1159:12-13, 1159:22-1161:13.

314.  Mr. Connelly claims that he looked at sections 704(c) and 721 and probably 351 of the Internal Revenue Code. He does not recall looking at any regulations or case law, including that he does not know whether he considered the anti-abuse regulations.
DX-148 at p. 10 (para. 14) and Tr. at 1480:14-1481:8, 1485:22-1486:9.

315.  In preparing its purported advice, Ernst & Young, including Mr. LaValla, Mr. Connelly,

and Mr. Bianco did not look at or research any case law.

DX-148 at p.10 (para. 14) and Tr. at 1205:6-20; Tr. at 1293:25-1294:4, 1294:14-17,

1481:5-1482:25; DPTF 311-314.

316.  Mr. Connelly does not know how much total time he spent doing legal analysis while

working on RRF's tax returns. He believes that preparing a tax return generally does not

constitute legal analysis.

DX-148 at p.10 (para. 14) and Tr. at 1486:21-1487:16.

317.  Mr. Bianco's testimony was replete with speculation. He repeatedly testified not about

facts (e.g. what happened or what he did), but about what he imagines "would have"

been. Such testimony cannot provide a basis for a fact finding and, in any event, should

be given no weight.

*See, e.g.*, Tr. at 870:15 ("would have"), 870:21 ("would be"), 875:1 ("would have talked

to each other"); 875:13-14 ("we still would have interacted with each other"); 901:8

("would have affected"); 901:8-9 ("would have influenced"); 902:22 ("would need to

know"); 904:17 ("we would have been").

318.  Further, Mr. Bianco's memory was faulty. He testified that the handwriting in JX-106

was that of Hank Connelly and suggested that it was prepared by Ernst & Young with

respect to the 1999 tax return of RRF. In fact, JX-106 does not contain Mr. Connelly's

handwriting. It is that of Mr. DiBiase.

JX-106 and Tr. at 1127:12-25.

319.  There is no evidence that the Audit Group of Ernst & Young actually received and

reviewed any of the relevant transactional documents, for example, Tiger's subscription agreements and special redemption rights agreements. There is similarly no evidence that, if they did receive those documents, they shared them with the Tax Group. There is also no evidence that any person in the Tax Group (Dominic LaValla, Henry Connelly, and Joseph Bianco) ever saw a transactional document, much less that one played a role in forming Ernst & Young's purported advice. Further, Ernst & Young was and remains plaintiff's agent, yet plaintiff did not subpoena (or, to defendant's knowledge, ever seek) any documents from Ernst & Young. Testimony on these topics is vague, conclusory, and/or about a general situation that is not specific to RRF. It thus does not constitute a proper basis for a fact finding or, alternatively, should be given no weight. *See, e.g.*, Tr. at 237:20-22 ("You know, I don't know if I actually witnessed them look at it, but I'm sure they looked at them. It was standard practice.").

320.   Mr. DiBiase did not provide Henry Connelly or Joseph Bianco with the subscription agreements of Ocelot and Jaguar.

Tr. at 495:21-496:4.

321.   Mr. DiBiase claimed that it "would be standard procedure" to provide subscription agreements to Ernst & Young's Audit Group. Yet Mr. DiBiase does not know what the Audit Group reviewed. Mr. DiBiase further does not know what, if anything, the Audit Group shared with Tax Group.

Tr. at 495:21-496:11.

322.   Mr. DiBiase did not provide Joseph Bianco or Henry Connelly with the side letter agreements that granted special redemption rights to Ocelot and Jaguar.

Tr. at 496:20-23.

323.    In sum, Mr. DiBiase did not provide Joseph Bianco or Henry Connelly with any

transactional documents related to Tiger's transfer of assets to RRF.

Tr. at 496:24-497:3.

324.    Mr. DiBiase did not provide Henry Connelly or Joseph Bianco with any transactional

documents related to the General Cigar transaction.

Tr. at 497:4-8.

325.    Mr. DiBiase did not discuss transactional documents with Joseph Bianco or Henry

Connelly.

Tr. at 497:9-13.

326.    Mr. DiBiase does not know if Joseph Bianco or Henry Connelly ever looked at a

transactional document.

Tr. at 497:14-16.

327.    Mr. Bianco did not see subscription agreements or other transactional documents when

Ernst & Young formed its purported advice. For example, he did not see Ocelot's

subscription agreement, Jaguar's subscription agreement, General Cigar transactional

documents (including Closing Set), Ocelot's side letter agreement, Jaguar's side letter

agreement, draft subscription agreements of RRF, and draft offering memoranda of RRF.

DX-148 at p. 10 (para. 14) and Tr. at 1188:17-25;  JX-65 and Tr. at 1193:20-1194:23;

JX-66 and Tr. at 1195:15-24;  DX-75 and Tr. at 1197:12-19;  JX-67 and Tr. at

1196:9-1197:2;  JX-68 and Tr. at 1198:18-1199:2;  JX-39 and Tr. at 1199:8-1200:7;

DX-121 and Tr. at 1200:18-1202:20.

328.   Mr. Connelly did not see subscription agreements or other transactional documents when

Ernst & Young formed its purported advice. For example, he did not see Ocelot's

subscription agreement, the subscription agreement and offering memorandum sent to

Tiger on April 30, 1999, Ocelot's and Jaguar's share purchase agreements, General Cigar

transactional documents (including Closing Set), Ocelot's side letter agreement, Jaguar's

side letter agreement, disclaimer letter between RRF and Deutsche Bank, and the June 8,

1999, option agreement between Deutsche Bank and RRF.

JX-32 and Tr. at 1461:2-1462:2;  JX-65 and Tr. at 1462:3-1463:6; DX-148 at p. 10

(para. 14) and JX-81 and Tr. at 1463:7-1465:3;  DX-75 and Tr. at 1465:4-15;   JX-68 and

Tr. at 1465:16-1466:4;  JX-57 and Tr. at 1466:19-1467:6;  DX-47 and Tr. at 1470:7-9;

and JX-88 and Tr. at 1471:15-1472:1.

329.   Mr. Bianco does not know whether anyone, including the Audit Group, at Ernst & Young

saw Ocelot's subscription agreement or other transactional documents.

DX-148 at p. 10 (para. 14) and JX-65 and Tr. at 1194:17-23; Tr. at 1209:20-1210:7.

330.   Ernst & Young produced a RRF Offering Memorandum in response to defendant's

subpoena for documents. Mr. Connelly does not recall reading the document. He does not

know whether it played any role in Ernst & Young forming its purported advice. JX-147

contains no factual or legal analysis of Ernst & Young regarding its purported advice.

JX-147 (with Ernst & Young's bates stamp range) and Tr. at 1500:4-1500:20.

F.    **Covenants with Deutsche Bank indicate a lack of good faith and reasonable cause**

331.   On June 24, 1999, RRF, Russian Recovery Advisers, FFIP, and Bracebridge Capital made covenants to Deutsche Bank in order that Deutsche Bank would not register the sale of RRF shares from Jaguar and Ocelot to FFIP as a tax shelter with the IRS. The text of the letter in which RRF made the covenants includes the following:

>    Tiger Management L.L.C. ("Tiger") on behalf of The Jaguar Fund N.V. ("Jaguar") and Ocelot (Cayman) Ltd. ("Ocelot") and FFIP LP ("FFIP") have had discussions regarding the sale by Jaguar and Ocelot of all of their participating shares (the "Shares") in the Russia Recovery Fund Limited (the "Fund"). We understand that the acquisition of the Shares directly or indirectly by U.S. taxpayers could in certain circumstances be regarded as a tax shelter under the Internal Revenue Code of 1986, as amended (the "Code"), due to potential tax-advantages associated with the ownership of the Shares. If a transfer of the Shares to FFIP (the "Sale Transaction"), or the transfer of the Shares from FFIP to a subsequent acquirer (a "Subsequent Transaction") (collectively, the "Transaction"), is required to be registered as a tax shelter under the Code, all participants in the Transaction could be jointly and severally liable for significant penalties in the event that the relevant tax shelter registration requirements under the Code are not satisfied with respect to the Transaction.

>    As you know, Deutsche Bank Securities Inc. ("DBSI") may act as a placement agent or advisor with respect to the Sale Transaction and has agreed not to register the Transaction. In consideration for DBSI's acting as placement agent and advisor with respect to the Sale Transaction, and agreeing not to register the Transaction as a tax shelter, you hereby covenant to us that:

>    (A)

>        (i)    the Fund will not permit FFIP or any subsequent transferees of the Shares to take any action, including the contribution of cash and/or property to the Fund, that would have the effect of increasing the tax basis in the Fund of FFIP or any subsequent transferees of the Shares by more than an amount equal to 20 percent of the aggregate value of the  property contributed by Jaguar and Ocelot to the Fund (determined at the time of contribution) in exchange for the Shares, with such amount to prorated to the extent the Shares are transferred to multiple transferees; and

>     (ii)     you will not offer or market the Shares or interest in
> FFIP to any person based upon representations (including both explicit
> written or oral representations, and implicit representations that could be
> reasonably inferred based on the relevant     facts and circumstances) as to
> the existence of potential tax benefits associated with direct or indirect
> ownership of the Shares; or
>
>          . . .

DX-88, DX-87, and Tr. at 467:21-470:23.

332.   The June 24, 1999, covenants were the subject of negotiation between Deutsche Bank

and RRF in mid-June of 1999. Nancy Zimmerman did not want to follow the initial

indemnification approach (whatever it might have been), but was willing to make the

covenants expressed in the final agreement, including the 20% cap related to FFIP's basis

in RRF (or any other holder of Tiger's RRF shares), the representation that the Tiger

shares would not be offered to a third party based on representations regarding tax

benefits, and an indemnification of Deutsche Bank for any breach of the covenants.

Nancy Zimmerman negotiated this agreement through tax lawyer Jim Nix of Swidler,

Berlin.

DX-66 and Tr. at 474:12-477:1; DX-210 (e-mail chain dated June 16 and 17, 1999).

333.   The e-mail dated June 16, 1999, and labelled as DX-210 (which Ms. Zimmerman

forwarded to Mr. Grenzke on June 17, 1999) has as a subject line "RRF - - db 351 and

indemnification issues." As shown in the body of the e-mail, this refers to two subjects:

(1) the transaction between RRF and General Cigar that both claim was pursuant to

Section 351 of the Internal Revenue Code; and (2) an indemnification agreement in

connection with Tiger's sale of its RRF shares to FFIP.

DX-210; DX-88; DX-87; DX-66.

**G.** **Penalties are appropriate when taxpayers claim huge tax losses unrelated to economic losses**

334.    RRF and its partners and employees knew or should have known that claiming another person's $220 million of economic losses as RRF's tax losses, where RRF did not sustain a single penny of economic loss, was too good to be true.

DX-204 at 36:13-38:19, 39:4-20, 40:17-44:3, 44:13-46:5, 48:9-49:5, 52:12-54:15 and errata at p. 2 and DX-204 depo. ex. 7 (TIGERPROD00000002-5); Compl. (doc. #1) ¶ 8.a.; JX-121; JX-139 at A1-000169, A1-000173.

335.    The divergence between zero economic losses and the claiming of $220 million in tax losses should have alerted sophisticated RRF and its sophisticated employees (Ms. Zimmerman, Mr. Grenzke, and Mr. DiBiase) to the abusive and illegitimate nature of claiming tax losses from the Tiger Securities transaction.

DX-204 at 36:13-38:19, 39:4-20, 40:17-44:3, 44:13-46:5, 48:9-49:5, 52:12-54:15 and errata at p. 2 and DX-204 depo. ex. 7 (TIGERPROD00000002-5); Compl. (doc. #1) ¶ 8.a.; JX-121; JX-139 at A1-000169, A1-000173.

**H.** **Mr. DiBiase, Ms. Zimmerman, and Mr. Grenzke occupy the highest level of taxpayer sophistication, including Mr. DiBiase's extensive experience, savvy, and expertise in the area of taxation**

336.    Mr. DiBiase graduated from Boston College in 1982 with a bachelor of arts in economics. He then graduated from Northeastern University in 1984 with a masters in accounting. Mr. DiBiase became a licensed CPA in 1986 and maintained his license until approximately 1998, 1999.

Tr. at 103:11-16; 268:4-269:1.

337.    Mr. DiBiase worked at from 1983 until 1990. He progressed through various

– 104 –

positions - paraprofessional, intern, staff accountant, senior staff accountant, and

manager. He engaged in all aspects of tax return preparation, including supervisory roles

of reviewing other accountants' work and training other accountants in tax return

preparation. He also was involved in the tax planning process, such as speaking with

clients about the potential tax implications of transactions that clients were

contemplating.

Tr. at 269:2-280:6.

338.   Also at, Mr. DiBiase also performed tax research. From time to time, issues arose that

needed to be researched in the course of preparing tax returns and a tax manager assigned

research projects to Mr. DiBiase, for example, how to report a particular transaction on a

tax return and a more basic question of what the proper tax treatment was for a particular

transaction that occurred during the year. As part of his professional development, he

began to work through those kind of research projects. His research entailed reading

sections of the Internal Revenue Code and, to a lesser degree, reading related Treasury

Regulations.

Tr. at 269:2-280:6.

339.   Mr. DiBiase worked from 1990 to 1998 at Scudder, Stevens & Clark ("Scudder"). That

firm was an investment manager who, among other things, ran mutual funds. He was the

first tax-related person hired in the mutual fund business at Scudder and was hired as tax

manager. Mr. DiBiase was responsible for attending to all income tax-related issues,

including filing requirements for Scudder's funds and overseeing the preparation of tax

returns by external accountants and ultimately for preparing returns in-house. He dealt

with issues related to things that appear in specialized sections of the Internal Revenue

Code that apply only to mutual funds. In approximately 1993 or 1994, he took on the added responsibility for financial reporting - i.e. preparation of financial statements for Scudder's mutual funds. At that point, his title changed from tax manager to something along the lines of director of tax and financial reporting.

Tr. at 106:21-107:25; 280:7-284:14.

340.    On October 1, 1998, Mr. DiBiase started at what is now called Bracebridge Capital, LLC. He was Bracebridge's CFO and COO from October 1998 until 2007. During that period, he did not do any tax research and did not read any case law. Ernst & Young, however, did tax research for Bracebridge-managed funds. In connection with Ernst & Young's research, Mr. DiBiase provided information and discussed the results of the research with Ernst & Young. Specifically, Mr. DiBiase discussed sections of the Internal Revenue Code that Ernst & Young felt were pertinent. Mr. DiBiase turned to the relevant pages in the Internal Revenue Code or regulations to which Ernst & Young pointed and read them while Ernst & Young described or explained issues to him.

Tr. at 284:15-288:4, 293:23-295:6.

341.    Ms. Zimmerman is a highly sophisticated individual. She graduated from Brown University in 1985 with a concentration in economics and in the practice and production of art. Her experience reflects a high degree of sophistication in the financial world, including working at O'Connor and Associates, Goldman Sachs, trading financial instruments, managing investments, emerging markets, and foreign exchange trades. Further, since March 1994, she has run hedge fund/s, including managing investments and investment staff, engaging in risk management, analyzing investments, engaging in investor relationships, and creating and executing a fund's investment strategy.

Tr. at 568:14-592:8, 595:16-602:19, 605:13-606:5, 612:5-615:17, 616:7-617:5, 833:1-22.

342.    Ms. Zimmerman has a direct financial stake in this litigation of at least $8,555,578.

DX-199 and Tr. at 782:21-783:7; DX-200; DX-201.

343.    Ms. Zimmerman called Ms. Murgai to discuss this case while this case was pending in

the last couple of years. Ms. Zimmerman does not recall speaking to Ms. Murgai at any

time. Ms. Zimmerman does not recall speaking to Mr. Goodell of Tiger Management in

1999.

Tr. at 847:21-848:23; DX-205 at 85:21-86:9, 87:12-89:3.

344.    On her individual 2001 income tax return, Ms. Zimmerman used over $20 million of

Tiger's economic losses to eliminate millions of dollars of income tax liability and to

generate a loss carryback. She used the 2001 loss carryback to eliminate millions of

dollars of income tax liability on amended individual income tax returns for 1999 and

2000. All told, Ms. Zimmerman used over $20 million of another entity's losses to

eliminate at least $8,555,578 of her own income tax liability. Ms. Zimmerman is

extremely sophisticated in finance and economics and should have known that claiming a

tax-indifferent foreign entities economic loss (where she suffered no loss) in order to

eliminate many millions of her tax liability was too good to be true.

DX-199 (incl. at pp. 3-4); DX-203; DX-159 at e.g. B00320, B00321, B00328, B00329,

B00330, B00331, B00333, B00334; DX-160 (incl. at B00365); DX-161 (incl. at

B00380).

345.    Mr. Grenzke is a highly sophisticated individual. He graduated from Harvard University

in 1998 where he studied applied math and economics, as well as some computer science.

He also interned at the Harvard-Smithsonian Center for Astrophysics. After graduation,

he joined Bracebridge full-time as an analyst. Initially, he worked on models and

analytics, and then, after the Russian default, he started working and looking more at

some of the securities and pricing analytics for Russian markets. Mr. Grenzke is currently

a partner at Bracebridge.

Tr. at 1536:16-1538:12, 1629:16-1630:3.

346.   Mr. Grenzke engaged in year-end tax planning in December 2000, in particular, in

ascertaining whether there were sufficient realized losses in RRF to offset income. Mr.

DiBiase's response cited to the built-in losses in the Tiger Securities that RRF alleges to

have realized in 2000.

JX-129 and Tr. at 1623:25-1625:11.

347.   Earlier, in October of 1999, Mr. Grenzke checked in with Mr. DiBiase regarding whether

Mr. Nix and Ernst & Young had responded on "tax stuff" related to OFZ 25023s. And

later, in February 2000, Mr. Grenzke continued to communicate with Mr. DiBiase

regarding whether certain transactions were taxable events.

DX-211; DX-212.

I.   **RRF failed to file a Sec. 351 disclosure statement with its 1999 tax return**

348.   With its 1999 Form 1065 partnership return, RRF was required but failed to file a

disclosure statement pursuant to 26 U.S.C. § 351 and Treas. Reg. § 1.351-3(a). The

statement would have disclosed to the IRS the basis ($178,866,144) that RRF claimed in

the portion of the Tiger Securities that it transferred to General Cigar and the amount of

cash and stock (approximately $21 million) that RRF received in exchange for the

transfer, as well as the portion (approximately $10 million) of the amount received that

was paid to Deutsche Bank. RRF was alerted to this requirement in June 1999 by Section

5.5 of the Contribution Agreement it signed for the transaction with General Cigar, yet

RRF still failed to file the disclosure with its 1999 return.

JX-139 and Tr. at 514:14-16, 1520:3-1521:2, 1525:22-1526:9; DX-177 and Tr. at

514:21-516:15; DX-121 at B5-001275 (Section 5.5) and Tr. at 481:5-20; see also DX-84

at B5-001907 and Tr. at 483:23-484:8.


III.   **PROPOSED FINDINGS ON EXPERTS**

A.   **Plaintiff's Expert Dr. Hanke was not credible**

349.   Dr. Hanke's testimony is not credible, because he was revealed to be an advocate when

faced with Tiger's internal documents and deposition testimony that Dr. Hanke had

considered when writing his report. Those documents and testimony prove that Tiger

planned to sell Jaguar's and Ocelot's shares in RRF within two weeks of acquisition for

cash. Yet Dr. Hanke testified that he did not view the evidence as showing that Tiger did

so or evaded questions on the subject matter with non-responsive answers.

Tr. at 1964:16-1977:7 and DX-46 and DX-42 and DX-204 at 129-135.


350.   To the same effect, Dr. Hanke considered evidence when writing his report that showed

that the Tiger Securities had lost approximately $215 million of value before Tiger

transferred them to RRF, that RRF ascribed a value to Tiger's RRF shares of $14.9

million, that days later Tiger offered the shares for sale at $14.1 million at an additional

absolute dollar loss of $800,000, and that, during the time Tiger held RRF shares, the

MICEX prices for the assets held in RRF were rising. Yet, in light of this revealed

preference of Tiger to voluntarily sustain loss when its assets were becoming more

valuable - demonstrating that it did not care about loss or risk of loss, Dr. Hanke

continued to testify that Tiger cared about risk of loss.

Tr. at 1977:8-1983:15; see also prices of OFZ 25023s on DX-31 and JX-85.

351.   While holding Russian assets before transferring them to RRF, Jaguar and Ocelot were

subject to risk, to potential gains and losses based on fluctuations in the price of the OFZ

25023s, and to ruble exchange rate risk.

Tr. at 1960:21-1961:12.

352.   The only real possible way for an investor to make a return on the Russian investments

relevant to this case was to have purchased them after the August 17, 1998, default. For

example, the OFZs Tiger purchased prior to the default for approximately $230 million

ultimately returned to par value after the default. Tiger transferred those OFZs to RRF

and got out of Russia. If Tiger had not gotten out of Russia but held the OFZs until they

returned to par value after the default, then (according to plaintiff's own expert) Tiger

still would have lost 65-70% of the approximately $230 million. The best a person in

Tiger's position could do, according to Dr. Hanke, was not make a return, but only to

recoup some of its loss.

Tr. at 1894:7-1896:7.

353.   Dr. Hanke's rebuttal report opines that the Tiger entities' "investment" in RRF and sale

of their RRF shares to FFIP was consistent with the objectives of "generating returns"

and "reclaiming stranded Russian capital." However, as Dr. Hanke notes elsewhere in his

rebuttal report, the Tiger entities were credited with $15 million in RRF shares and sold

them at a loss of hundreds of thousands of dollars. Thus, according to Dr. Hanke's own report, the Tiger entities' "investment" and subsequent sale were not consistent with generating a return if return means profit, but with voluntarily sustaining a substantial loss or getting a return if return means cash. At trial, Dr. Hanke evaded questions on this topic by attempting to suggest that it was a hindsight analysis to consider that the sale to FFIP was at a loss. But Dr. Hanke's own report establishes the ex-ante forecasting points as the "investment" and sale. (It should be noted that the law requires inquiry into all facts and circumstances, including those that occur after the event in question). PX-64 at pp. 16, 18 and Tr. at 1989:8-1993:10.

354.    Dr. Hanke opines that the Tiger entities' transfer of assets to RRF had the potential to benefit both Tiger and RRF. Dr. Hanke identified two potential benefits to Tiger: (1) RRF's expertise in the Russian market; and (2) Diversification. Dr. Hanke identified three potential benefits for RRF: (1) Increase in RRF's assets under management; (2) immediate exposure to Russian debt market; and (3) reputational benefit of having Tiger as an investor. None of these opinions are credible. More fundamentally, Dr. Hanke's "potential" analysis is completely hypothetical - there is no evidence in the record that Tiger considered any of these purported benefits. PX-63 at pp. 38-39; *see infra* DPTF 355-359.

355.    Dr. Hanke's opinion on RRF's expertise in the Russian market is not credible. Tiger did not need any expertise. It was one of the most sophisticated hedge funds in the world and had plenty of Russian expertise. Further, the terms of its CLN contracts were already established in 1998. Further, it had already done its due diligence of the Russian market in 1998. Most importantly, an analysis of all facts and circumstances, including the facts

and circumstances after Tiger obtained shares in RRF (an inquiry the Supreme Court requires, but Dr. Hanke refers to as "ex-post"), shows that there is no factual basis for Dr. Hanke's claims - there is no evidence that Tiger ever considered RRF's purported expertise in the Russian market, including CLN contracts and there were no benefits whatsoever that Tiger could have reasonably expected to experience in the very few days it was a shareholder in RRF.

Tr. at 2530:14-2531:14; DX-195 at ¶¶ 23-30 and Tr. at 2573:13-2576:2.

356. Dr. Hanke's opinion on diversification is not credible, because it does take into account all the facts and circumstances (an inquiry that is required by law). Dr. Hanke's own exhibit 10 shows that, after Tiger transferred the Tiger Securities to RRF, the Tiger Securities comprised greater than 92 percent of RRF's entire portfolio and close to 100 percent of that portfolio was the same kind of Russian asset as the Tiger Securities (i.e. OFZs). Further, as a factual matter, there is no evidence that Tiger considered diversification at all when it transferred the Tiger Securities to RRF. Further, Dr. Hanke's opinion fails to take into account that, when Tiger exited RRF for a discount almost immediately after joining RRF, RRF's portfolio had not changed from when Tiger acquired shares in RRF. Further, had Julian Robertson wanted diversification, he could have gone out and bought some more Russian securities himself, without the help of RRF; indeed, in 1998, he had bought the Tiger Securities for a quarter of a billion dollars. In sum, taking into account all facts and circumstances, Tiger neither sought diversification nor ever obtained any. Dr. DeRosa further explained that, contrary to Dr. Hanke's analysis, the Tiger entities did not enjoy any diversification benefit from joining RRF.

PX-63 at pp. 32 (para. 88), 39 (para. 106) and Tr. at 1984:14-1988:15; DX-195 at

¶¶ 31-36 and Tr. at 2576:4-2578:19.

357.   Dr. Hanke's opinion on RRF increasing its Russian assets and gaining immediate

exposure to the Russian market is not credible, because it does not take into account all

the facts and circumstances (an inquiry that is required by law). Within weeks of

acquiring the Tiger securities, RRF disposed of 77.17 percent of them. Increasing

Russian assets and gaining immediate exposure was therefore not a potential benefit to

RRF.

PX-63 at p. 39 (para. 107) and Tr. at 1994:25-1995:16.

358.   Dr. Hanke's opinion on reputational benefits is not credible, because it does not take into

account all the facts and circumstances (an inquiry that is required by law). Jaguar's and

Ocelot's side letter agreements prohibited RRF from disclosing anything about Tiger's

investment. Further, documents given to General Cigar had the names of Tiger, Jaguar,

and Ocelot, redacted out of them. Similarly, Deutsche Bank was prohibited from

disclosing Tiger's investments to anyone; Deutsche Bank had a confidentiality agreement

with Tiger that prohibited the release of Tiger's name for any reason. Finally, Tiger was

notoriously secret about their investments and did not want anyone in the market to know

what they were buying or selling. Tiger was adamant on this issue in everything they

did—they did not permit the use or disclosure of their name and they required

counterparties to sign confidentiality agreements not to use their name. Thus, there was

never any reputational benefit or even the possibility of one.

PX-63 at p. 39 (para. 108) and Tr. at 1995:20-1999:14 and JX-67 and JX-57 and

DPTF 197 and Tr. at 3284:17-22; JX-57 at H10000076 and Tr. at 3319:21-3320:17.

359.   Deutsche Bank and other banks never disclosed the identities of their investors.

Tr. at 1559:8-20.

360.   Dr. Hanke did not do an independent valuation of the Tiger Securities. No expert for

either side did such an evaluation.

Tr. at 1869:9-18.

361.   When Dr. Hanke issued his original report, he had not seen any contemporaneous

documents memorializing the work that Ms. Zimmerman and Mr. Grenzke claim to have

done in valuing the Tiger Securities.

Tr. at 1983:25-1984:13.

362.   Dr. Hanke's only experience with in-kind contributions stems from his experience with

Toronto Trust Argentina, in which the total number of in-kind investors he recalled was

all of two. Indeed, the majority of contributions accepted by Toronto Trust Argentina

were cash contributions.

Tr. at 1801:6-1803:2, 1983:16-24.

**B.      Dr. DeRosa testimony was valuable and insightful**

363.   After hearing Dr. DeRosa's qualifications - including his experience in capital markets,

as a derivatives portfolio manager, as a currency trader, as a hedge fund trader, in starting

his own company DeRosa Research and Trading, Inc., as an expert witness, as an adjunct

teaching in universities, in being on the board of eight hedge fund groups, in derivatives

and options, with statistics, and as an author of books; and his education, including his

Ph.D. from the business school of the University of Chicago in economics and

finance - the Court admitted Dr. DeRosa as an expert in six areas: (1) economics; (2)

finance; (3) capital markets; (4) hedge funds; (5) statistics, including Monte Carlo

simulations; and (6) emerging markets, including Russian markets in the 1990s.

DX-194 (incl. ¶¶ 4-10 and Appendix 1) and Tr. at 2454:22-2484:9.

364.   Dr. DeRosa was asked (1) to provide a general discussion of the financial situation in

Russian leading up to and beyond its 1998 debt default, generally referred to as the

Russian Financial Crisis or the 1998 Russian Crisis; (2) to review certain transactions

between Jaguar and Ocelot and RRF and to opine whether those Tiger entities'

investment in RRF was consistent with an investor who was making a long-term

investment and whether there would have been advantages to Tiger had it sold the

positions in a cash sale; and (3) to review the report of Dr. Hanke, dated December 4,

2013.

DX-194 at ¶¶ 1-2; DX-195 at ¶ 1; DX-196; and Tr. at 2454:22-2457:8.

365.   Dr. DeRosa's affirmative report and testimony address several areas that serve as

background to his analysis of the transactions between Jaguar, Ocelot, and RRF,

including Overview of the Foreign Exchange Market (including Market Conventions and

the Russian Ruble and Spot and Forward Foreign Exchanges Deals), Overview of Bond

Investments (including Bond Basics, International Bond Investments, Risks of Investing

in Emerging Markets, and Capital Controls), The Russian Economy (including Transition

to a Market Economy: Privatization, The Russian Ruble, The Central Bank of Russia,

Moscow Interbank Currency Exchange (MICEX), Foreign Lending to Russia (including

IMF Loans to Russia, The Russian Domestic Debt Market, and Russian International

Debt), Russian Issuance of Eurodollar Bonds, 1996-1998, Soviet-Era Legacy Debt,

Foreign Perceptions of Russia's Investment Risk, and The Ruble Carry Trade), Outline of

the Russian Financial Crisis (including The State of the Russian Economy Entering 1998,

The July Loan Package, The August 17, 1998 Joint Statement, The Immediate Aftermath:

the economic and political situation between August 17, 1998 and September 4, 1998,

The GKO/OFZ Restructuring), Overview of the Hedge Fund Industry (including

Structure, Domicile, Directors and Service Providers, Raising Funds, the Due Diligence

Process, and Asset Valuation).

DX-194 at ¶¶ 14-175 and Tr. at 2485:10-2519:7.

366.   Dr. DeRosa's opinions address the Tiger entities' (1) transfer of assets to RRF on May

25, 1999, in exchange for shares in RRF; and (2) subsequent sale of the RRF shares to

FFIP on June 4, 1999. If the date of the initial transfer were found to be May 20, 1999,

that finding would have no effect on Dr. DeRosa's opinions.

DX-194 at ¶¶ 176-188 and Tr. at 2519:7-2524:10, 2589:25-2590:12.

367.   Dr. DeRosa opined that the Tiger Entities did not enter into the transactions at issue with

the intention of holding their interests in RRF as long-term investments; Tiger and its

entities did not view an investment in RRF as a long-term investment vehicle. As Dr.

DeRosa testified, the facts (including negotiation of the side letter and sale of shares in

RRF just after acquiring the shares and Tiger's own documentation stating an intent to

get quick cash) demonstrate that this was a transaction to get out of Russian bonds, not to

make an investment in RRF. It was not a real investment, but a disposition of bonds to

get cash as fast as possible. Tiger was a "transactor" going "through this dance", not a

true long-term investor. Tiger's actions were consistent with a seller of the Tiger

Securities, not with a bona fide investor. In fact, as Dr. DeRosa opined, Jaguar's and

Ocelot's transfers to RRF were a sale. Further, Dr. DeRosa opined that a direct cash

would have been more desirable to the Tiger entities

DX-194 ¶¶ 3, 189-208 and Tr. at 2484:11-2485:9, 2524:11-2586:9, 2661:13-2663:18, 2811:12-17, 2868:12-17.

368.   Dr. DeRosa explained how RRF's valuation of the Tiger Securities was problematic if Tiger was in fact contemplating a long-term investment in RRF and supports the conclusion that Tiger's transfer of assets to RRF was not a real investment, but a plan to sell securities as fast as possible. Dr. DeRosa also addressed the brand new claim of plaintiff, raised mid-trial, that a contemporaneous memorialization of Mr. Grenzke's purported valuation of the Tiger Securities exists. Dr. DeRosa explained that this purported valuation is a "secret sauce", because it contains a "secret, unknown, unknowable sauce", namely, the offshore/onshore conversion number of 37.5. This number, as well as others, state no source and otherwise provide no information as to their origin or derivation. Dr. DeRosa also pointed out other defects with the purported valuation, including that it had no date.

DX-194 ¶¶ 191-195 and Tr. at 2531:19-2551:14.

369.   Dr. DeRosa explained that Tiger did not perform the reasonable due diligence of a person who was contemplating a long-term investment in RRF. He found no memorialization of any and did not think they really did any. Instead, Tiger's due diligence reflected the desire to use RRF as a way to liquidate Russian assets. Tiger saw RRF as a conduit for getting out of Russia. Julian Robertson was careful about his investments and the lack of due diligence reflects that Tiger was just planning on getting in and out quickly. Dr. DeRosa further explained that Mr. Metzger's critiques of the issue of due diligence are off the mark. In this regard, Dr. DeRosa explained that, if Julian Robertson intended

to be a permanent investor in RRF, he would have done substantial due diligence, but that the same is not true if he just sought to recoup $15 million from an investment that had already lost a massive amount of money.

DX-194 ¶¶ 196-200 and Tr. at 2551:15-2555:4; PX-66 at pp. 38-40 and Tr. at 2636:5-2646:25.

370.   Dr. DeRosa explained that, if Tiger was making a true investment in RRF, then Tiger's investors were subjecting themselves to paying fees on top of fees for any investment in RRF - fees to Tiger and fees charged to Tiger by RRF - and shareholders would not take kindly to a second layer of fees. On the other hand, shareholders would not be concerned with fees on top of fees if it was just a matter of getting into and out of RRF quickly as the best way to exit Russian investment. In sum, the fact that a Tiger investment in RRF required adding an additional layer of fees (an automatic additional layer of management fees and a possible additional layer of incentive frees) to Tiger's shareholders supports the conclusion that Tiger viewed RRF as a liquidating vehicle and was not a real investor in RRF.

DX-194 ¶¶ 201-202 and Tr. at 2555:5-2557:5, 2788:21-2789:5.

371.   Dr. DeRosa explained that in fact no benefits from economies of scale for Tiger. Dr. DeRosa explained that ninety percent of RRF was the Tiger Securities, that RRF did not grow, and that Tiger did not perform any due diligence to determine if there would be other major investments of assets into RRF (which Tiger would have done if it was a serious investor and not a seller of assets). Thus, by holding its own assets, Tiger had essentially the same economies of scale that RRF had. In addition, Tiger did not require

RRF, but was savvy enough on its own to participate in ruble auctions; indeed, it could have hired Ms. Zimmerman as a consultant if Tiger wished to do so.

DX-194 ¶¶ 203-204 and Tr. at 2557:6-2559:21.

372.   Dr. DeRosa explained that granting special redemption rights to Tiger permitting withdraw from RRF on July 1, 1999, whereas other shareholders in RRF were locked up for three years, supported the conclusion that Tiger was not a long-term investor, but only sought to use RRF to get cash within two weeks, an intent made explicit in Tiger's contemporaneous documents.

DX-194 ¶¶ 205-208 and Tr. at 2559:22-2561:22.

373.   Dr. DeRosa also opined that a direct cash sale between the Tiger entities and any purchaser (including RRF or FFIP) would have been a more desirable transaction, because it would have avoided the valuation issues, obviated the need for extensive due diligence, and avoided an extra layer of fees. In addition, Dr. DeRosa explained that the Tiger entities' willingness to sell their shares at a discount, voluntarily absorbing additional loss, is puzzling in light of the special redemption right that Tiger possessed and that the size of the discount highlights the valuation issues that would have been avoided with a direct cash sale.

DX-194 ¶¶ 209-214 and Tr. at 2561:23-2563:15.

374.   Dr. DeRosa's rebuttal report and testimony addressed Dr. Hanke's opinions regarding the Russian Foreign Exchange Market, Dr. Hanke's Discussion of the Investment Opportunities of Investing in Russia, Dr. Hanke's classification of RRF as a "global macro" hedge fund, .

DX-195 ¶¶ 5-18 and Tr. at 2563:16-2570:21; DX-195 ¶¶ 19-22 and Tr. at 2571:20-2573:11.

375.    Dr. DeRosa also addressed Dr. Hanke's testimony about something economists refer to as "revealed preference." As Dr. DeRosa explained, "revealed preference" is a very old doctrine in economic theory that looks at what a person does to understand where that person wants to be. Dr. DeRosa did not endorse application of "revealed preference" to this case, but testified that, if "revealed preference" applies, then it is clear that Tiger's revealed preference was to get out of RRF and Russia.
Tr. at 2570:22-2571:19.

376.    Dr. DeRosa explained that, contrary to Dr. Hanke's claims, RRF did not offer benefits to investors in the area of CLN contracts. Dr. DeRosa points out that there is no factual basis for Dr. Hanke's claims (e.g. no evidence that Tiger ever considered RRF's purported expertise in CLN contracts), and that there were no benefits whatsoever that Tiger could have reasonably expected to experience in the very few days it was a shareholder in RRF. For example, Dr. DeRosa demonstrated that any expertise RRF had with respect to the variety of CLN contracts in the market would have been of no benefits to Tiger in light of its quick exit from RRF and in light of the fact that Tiger's CLNs were entered long before any dealings with RRF; indeed, when Tiger bought the CLNs, it knew all about them. Finally, Dr. DeRosa notes that Tiger was sophisticated and did not need any outside fund to manage its investments.
DX-195 at ¶¶ 23-30 and Tr. at 2573:13-2576:2; see also PX-66 at pp. 39-40 and Tr. at 2643:9-2645:19.

377.    Dr. DeRosa explained that, contrary to Dr. Hanke's analysis, the Tiger entities did not

enjoy any diversification benefit from joining RRF. As Dr. DeRosa explained, in fact

there were no substantial diversification benefits to Tiger from participation in RRF,

because the Tiger Securities comprised the vast majority of RRF's portfolio (92% of the

portfolio with regards to non-cash holdings and 87% of the portfolio taking into account

cash holdings) and because the Tiger entities sold their shares in RRF at a discount

almost immediately after joining RRF. Further, had Julian Robertson wanted

diversification, he could have gone out and bought some more Russian securities himself,

without the help of RRF; indeed, in 1998, he had bought the Tiger Securities for a quarter

of a billion dollars.

DX-195 at ¶¶ 31-36 and Tr. at 2576:4-2578:19.

378.    Dr. DeRosa further explained that, contrary to Dr. Hanke's opinions, hedge funds do not

prefer in-king contributions, including because of problematic valuation issues. Those

valuation issues cause hedge funds to document valuation and use outside advisors,

particularly in light of potential lawsuits from other investors. Further, under the actual

facts of what occurred, there were not any benefits to Tiger from an in-kind

contribution - rather, Tiger subjected itself to fees by joining RRF and suffered additional

losses shortly thereafter when it sold its shares. As Dr. DeRosa points out, Tiger's

behavior is consistent with that of a seller of the Tiger Securities, not a long-term

investor.

DX-195 at ¶¶ 37-51 and Tr. at 2578:20-2586:9.

379.    Dr. DeRosa explained that Dr. Hanke's acceptance of RRF's valuation of the Tiger

Securities is without any factual basis and that the valuation had no substantive relation to

the actual value of the Tiger Securities.

DX-195 at ¶¶ 52-59 and Tr. at 2587:14-2595:1.

380. Dr. DeRosa explained that Dr. Hanke's opinions on risk and return were off the mark. Dr. DeRosa notes that Tiger's exposure to potential gains and losses based on fluctuations in the price of the Tiger Securities and the ruble exchange rate existed before it transferred those securities to RRF, as well as after.

DX-195 at ¶¶ 60-63 and Tr. at 2595:2-2597:8.

381. Dr. DeRosa also explained why Exhibit 6 of Dr. Hanke's original report is misleading. The exhibit suggests that, between March 18, 1998 and December 31, 2000, the Tiger Securities increased in value. However, that is not correct, because the ruble declined massively during that time period against all major currencies. Thus, a foreign investor (e.g. Tiger) who held the Tiger Securities from the beginning of that period would have suffered massive losses in terms of its home currency.

DX-195 at ¶¶ 85-87 and Tr. at 2629:3-2632:17, 2874:19-2875:13.

382. Dr. DeRosa explained that RRF should have known that Tiger's objective for participating in RRF was to get cash, as RRF had a three-year lock up, but Tiger demanded the ability to get out in five to six weeks.

PX-64 at pp. 17-18 and n. 65 and Tr. at 2634:18-2636:4.

C.   **Dr. DeRosa demonstrated the uselessness of Dr. Hanke's simulation**

383. Dr. Hanke's original report, issued on December 4, 2013, contains a simulation.

PX-63 paras. 112-116 and Ex. 11.

384.    The simulation purported to analyze the performance of a portfolio comprising all of the

Russian securities held by RRF on May 20, 1999, which Dr. Hanke assumed included the

Tiger Securities, by considering one-week and two-week investing horizons.

PX-63 paras. 112-116 and Ex. 11 and Tr. at 1947:21-1948:21.

385.    The simulation forecast from May 20, 1999, that RRF's portfolio of Russian securities,

which Dr. Hanke assumed included the Tiger Securities, had a one-week expected return

of 3.0% and two-week expected return of 6.2%.

PX-63 Ex. 11 and Tr. at 1947:21-1948:21.

386.    Dr. Hanke's simulation suffered from a basic computational error. This error was brought

to Dr. Hanke's attention by defendant's expert Dr. DeRosa. Specifically, Dr. Hanke

realized the error when he read paragraphs 72-75 and the simulation boxes on pp. 19-20

of Dr. DeRosa's rebuttal expert report (which was issued on January 24, 2014). Agreeing

with Dr. DeRosa, Dr. Hanke revised Table 1 and Exhibit 11 of his original report and the

revised versions were provided to defendant's counsel on February 10, 2014, the day

before Dr. Hanke's deposition.

DX-195 at ¶¶ 72-75 and Tr. at 2609:21-2610:17; PX-63, Ex. 11, Revised Ex. 11 and Tr.

at 1876:1-7, 1879:23-1880:16, 1948:22-1952:8, 1961:13-1962:6 and DX-195 paras.

72-75 and three simulation boxes on pp. 19-20.

387.    Dr. Hanke endorsed Dr. DeRosa's book "In Defense of Free Capital Markets", stating:

"Much of what is written by the mandarins of the new international financial architecture

is disconnected from reality, nothing more than propaganda. There is no better antidote

than David DeRosa's enlightening tour de force, In Defense of Free Capital Markets."

DX-197 and Tr. at 1993:12-1994:8.

388.   The revised simulation forecast from May 20, 1999, that RRF's portfolio of Russian securities, which Dr. Hanke assumed included the Tiger Securities, had a one-week expected return of 2.7% and two-week expected return of 5.6%.

PX-63 and Revised Ex. 11 and Tr. at 1948:22-1952:8 and DX-195 at ¶¶ 72-75 (and three simulation boxes on pp. 19-20) and Tr. at 2609:21-2610:17.

389.   The expected return forecasts in Dr. Hanke's revised simulation do not take into account fees that Tiger would have had to pay to RRF, specifically, a 20% incentive fee on any return and a 1% annual management fee. Twenty-percent of 2.7% is .54 and twenty-percent of 5.6% is 1.12. Thus, if Dr. Hanke had taken into account just the incentive fee that RRF actually was charging in 1999, his simulation would yield a one-week expected return of 2.2% and a two-week expected return of 4.4%.

DX-195 at ¶¶ 79-80 and Tr. at 2612:6-21, 2615:2-13; DX-196 at ¶ 4; PX-63 and Revised Ex. 11 and Tr. at 1952:9-1954:18.

390.   In footnote 121 or his original report, Dr. Hanke noted that he also purported to analyze the performance of the Tiger Securities alone (apart from the other assets in RRF's portfolio), as well as the performance of RRF's entire portfolio when converting the portfolio's value to U.S. dollars at the spot ruble-dollar exchange rate. Dr. Hanke did not include the results of any of these simulations in his original or revised report. At trial, he claimed that he could not remember the results of his simulation of the Tiger Securities alone.

PX-63 at p. 41 fn. 121 and Tr. at 1954:19-1956:10 and DX-196.

391.   At trial, Dr. DeRosa ran Dr. Hanke's simulation of the Tiger Securities alone. Dr.

DeRosa used a wireless keyboard and Dr. Hanke's spreadsheet (DX-198, part 3) and

showed that the results Dr. Hanke did not put in his report were a one-week expected

return of 3.1% and a two-week expected return of 6.4%. Dr. DeRosa also ran his own

simulation of the Tiger Securities alone, using Dr. Hanke's methodology and data, and

that simulation likewise computed a one-week expected return of 3.1% and 6.4%. At

trial, Dr. Hanke was given the opportunity, but refused to dispute Dr. DeRosa's

simulation with Dr. Hanke's methodology and data.

PX-63 at p. 41 fn. 121 and Tr. at 1954:19-1958:25 and DX-196 (and DX-195 at ¶¶ 83-84)

and Tr. at 2617:17-2626:24 and DX-198, part 3.

392.   In summary, Dr. Hanke's simulation of RRF's portfolio (which he put into his report), if

incentive fees had been taken into account, yielded the following expected returns:

One-week 2.2%

Two-week 4.4%

But Dr. Hanke's simulation of the Tiger Securities alone (which he did not put into his

report), yielded the following expected returns (fees are not taken into account because,

in this scenario, Tiger holds its assets and does not subject itself to fees):

One-week 3.1%

Two-week 6.4%

DX-196 (and DX-195 at ¶¶ 83-84) and Tr. at 2617:17-2626:24 and DPTF 383-386, 388-

391.

393.   At trial, Dr. Hanke testified that the expected return column in his simulation is irrelevant

to his opinion. The "expected return" column is the first column with data set forth in Dr.

Hanke's simulation. In the paragraphs of his report describing his simulation, Dr. Hanke repeatedly invoked returns, expected returns, and similar terminology as central to his opinion: (1) "expected return" (para. 112); (2) "asset's returns" and "possible returns" and "individual asset returns" (para. 113); (3) "hypothetical returns" and "hypothetical total return" and "compounded returns" (para. 113 fn. 118); (4) "hypothetical investment outcomes" (which included expected returns) and "hypothetical investing horizons of one or two weeks" (which included expected returns) (para. 114); and (5) "Exhibit 11 summarizes my findings" (expected return is the first substantive column in Ex. 11) and "I have also provided an excerpt of my findings below as Table 1" (expected return is the first substantive column in Table 1) (para. 115).

PX-63 paras. 112-116 and Table 1 and Ex. 11 and Rev. Table 1 and Rev. Ex. 11 and Tr. at 1943:20-1947:20, 1961:13-1964:15.

394.   Dr. Hanke's testimony about his simulation is therefore not credible. He emphasized expected return until he was faced with the fact that, under his simulation, Tiger was better off from the standpoint of an investor seeking expected returns by holding its assets and not transferring them for RRF shares. After that, he jettisoned expected return and thereby multiple portions of the paragraphs, tables, and exhibits that make up his simulation.

*See supra* DPTF 383-393.

395.   But, as Dr. DeRosa explained, expected rate of return is a key part of all investment decision making. In fact, RRF and other Bracebridge managed funds regularly tracked returns to investors. Finally, Ms. Zimmerman herself testified that returns are all that investors care about.

Tr. at 2600:5-2601:3; Tr. at 702:24-703:6.

396.   Dr. DeRosa also showed that Dr. Hanke's monte carlo simulation is fatally flawed.
DX-195 at ¶¶ 64-84 and Tr. at 2597:9-2598:3.

397.   Dr. DeRosa explained that Dr. Hanke's methodology for his simulation was based on a
miniscule set of data points and on a short time period with 20/20 hindsight when prices
were rising. Thus, performing 100,000 trials is of limited value, because there are so few
actual observations. In addition, over the very short period of time upon which Dr. Hanke
based his analysis, the price of the underlying Russian securities rose significantly. For
example, the Tiger Securities rose in price from 29.40 on 3/17/99 to 33.00 on 5/19/99.
Thus, Dr. Hanke's methodology guarantees a significant, positive return, because it
selected returns from a period during which the securities increased significantly in value.
DX-195 at ¶¶ 66-71 and Tr. at 2598:5-2609:20.

398.   Dr. DeRosa explained and Dr. Hanke admitted that Dr. Hanke's simulation is completely
hypothetical. The Tiger entities did not perform the simulation set forth in Exhibit 11 of
Dr. Hanke's original report or revised report or anything like it, for example, an analysis
of expected return or loss in connection with acquiring RRF shares.
DX-195 at ¶¶ 66-71 and Tr. at 2609:6-20; PX-63 at p. 41 and Ex. 11 and Rev. Ex. 11 and
DX-196 and Tr. at 1959:8-1960:12.

399.   Dr. DeRosa explained that Dr. Hanke's simulation ignores the issue of currency
conversion. Because the Tiger entities were dollar investors and not ruble based, an
adjustment for the ruble exchange rate should have been included. This would cause any
expected return from the simulation to go down. In fact, Dr. Hanke ran an analysis that

included an adjustment for the USD/RUB exchange rate and that analysis arrived at an expected return that was lower than the expected return Dr. Hanke reported in his original and revised simulation; Dr. Hanke did not include this analysis with an adjustment for the ruble rate in any of his reports.

DX-195 at ¶¶ 76-78 and Tr. at 2610:25-2612:5, 2614:12-2615:1, 2632:23-2634:17; PX-63 at p. 41 fn. 121.

400. Dr. Hanke's simulation similarly did not take into account any marketability discount. Since Tiger accepted a discount of approximately $800,000 when it sold its RRF shares to FFIP, there is no convincing case that can be made by Dr. Hanke's analysis for Tiger having had a positive expected rate of return.

DX-195 at ¶¶ 80-81 and Tr. at 2612:21-2614:9, 2615:14-2616:22.

401. Dr. Hanke's simulation also did not take into account transaction costs.

Tr. at 1886:3-25.

**D.    Mr. Lucas demonstrated that the Deutsche Bank option was undervalued**

402. RRF was a long-only market beta fund, meaning that its returns reflected the performance of the Russian market. In 1998-1999, RRF was the only long-only or market beta fund that Bracebridge managed.

Tr. at 1682:9-1683:17.

403. The market value of the Tiger Securities, OFZ 25023, appreciated after May 24, 1999. RRF valued the Series B shares, which it initially issued to Jaguar and Ocelot for the Tiger Securities, at $52,800.07 on May 31, 1999, and at $57,848.73 on June 30, 1999.

Tr. at 2141:21–2142:3; DX-193 Report at 58.

404.    The purported exchange between RRF, on the one hand, and Jaguar and Ocelot on the

        other hand, was principally executed with the intent to preserve tax benefits; and was not

        executed because Jaguar or Ocelot intended to hold equity in RRF.

        DX-193 Letter at p.3 ¶ 1.

405.    Bracebridge had the ability, through the funds that it managed, to produce enough cash

        for RRF to acquire the Tiger Securities from Jaguar and Ocelot using a direct cash

        purchase.

        DX-193 Report at 53.

406.    RRF sold the "call" option to Deutsche Bank for a price that was grossly below its market

        value.

        Tr. at 2113:25–2114:13 and DX-193 Letter at 3–4 ¶ 2.

407.    The price at which RRF sold the "call" option to Deutsche Bank was $50,000. The

        intrinsic value of that option, however, was in the range of $4,751,586 to $5,068,358 on

        the June 8, 1999, date of sale.

        DX-193 Report at 57–61.

408.    RRF's sale of the "call" option to Deutsche Bank for $50,000 was not profit maximizing

        for RRF and its investors; and it represented a conflict of interest with the Yale

        Endowment Fund, which was the only non-Bracebridge investor that RRF had at the time

        of the option sale.

        DX-193 Report at 61.

409.    The price at which RRF sold the call option to Deutsche Bank represented,

        approximately, a $5 million discount to the option's intrinsic value; and indicated that

        RRF and/or Bracebridge had limited interest in the economic value of the positions in the

Tiger Securities that RRF had acquired from Jaguar and Ocelot.

DX-193 Letter at 3 ¶ 2.

410.   Plaintiff's call-option sale to Deutsche Bank, and its transfer of nearly 80 percent of the

Tiger Securities to General Cigar/GCMM was inconsistent with the "Investment

Objectives and Policies" stated in its offering materials, *e.g.*, JX-60 at A1-000824, which

informed potential investors that "[RRF's] investment objective is to maximize the value

of the restructured assets of the Russian Federation and to capture opportunities that

could arise from the fluid economic and political environment in the Russian Federation,"

and that the fund would seek "economies of scale" that, in turn, "'[would] be essential for

exploring and accessing the[] potential opportunities' that existed for increasing the value

of Russian debt assets."

DX-193 Report at 57–61, 62–63, 82–83; *see also* Tr. at 2168:14–2172:15.

411.   During May and June 1999, the Russian market was improving, as was the market for

Russian sovereign-debt instruments, and the Tiger Securities were appreciating in value.

Tr. at 2141:21–2142:3; DX-193 Report at 58 (explaining that the market value for

Russian OFZ 25023s appreciated between May 24, 1999, and June 8, 1999).

412.   Jaguar and Ocelot sold their shares in RRF to FFIP at a 9.9% discount to RRF's May 31,

1999 net asset value.

See DX-193 Report at 50, 54.

413.   The Tiger's primary goal was to sell Jaguar's and Ocelot's OFZ 25023 interests for

cash—it had no interest in having Jaguar or Ocelot invest in or receive shares from RRF.

Tiger transacted with RRF, FFIP, and Bracebridge on behalf of Jaguar and Ocelot with

the goal of liquidating Jaguar's and Ocelot's OFZ 25023 interests for cash. The May

1999 transaction wherein Jaguar and Ocelot conveyed their interests in OFZ 25023s to

RRF was merely a transitory, intermediate step in reaching that goal.

DX-193 Letter at 3 ¶1, and Report at 48–56, 81–82.

414.   The May 1999 and June 1999 transactions between Jaguar and Ocelot, on the one hand,

and RRF/FFIP, on the other hand, effected (in substance) an asset sale of Jaguar's and

Ocelot's positions in the Tiger Securities for cash.

Tr. 2112:14–2115:2; DX-193 Letter at 3 ¶ 1, and Report at 48–56, 81–82.

415.   In 1999, the Russian ruble was not freely convertible. That made investments

denominated in rubles almost impossible to hedge properly.

DX-193 Report at 37.

416.   The market value for Russian OFZs, series 25023, appreciated between May 24, 1999,

and June 8, 1999.

Tr. at 2141:21–2142:3; DX-193 Report at 58.

417.   RRF calculated its portfolio of assets at mid-market. Meaning that, for example, in a

market with a 20-point bid-ask spread, where the "bid" (offer to buy an asset) is 20 cents

on the dollar and the "ask" (offer to sell an asset) is 40 cents on the dollar, RRF would

value the asset at 30 cents on the dollar.

Tr. at 2240:18–2241:11

418.   RRF would also value in-kind contributions of assets at mid-market.

Tr. at 2240:18–2241:11, 2244:17–2245:21.

419.   In an illiquid market, acquiring assets in-kind did not reduce the transaction costs

associated with the bid-ask spread for RRF and its investors; because RRF would simply

"split" the transaction costs associated with the bid-ask spread with the asset transferor.

Tr. at 2240:18–2241:11, 2244:17–2245:21.

420.    Acquiring assets with cash, on the other hand, would reduce the transaction costs

associated with the bid-ask spread for RRF and its investors; because cash would make it

possible for RRF to acquire the same asset closer to the "bid" (offer to buy the asset)

price, than simply "splitting the difference" of the bid-ask spread could.

Tr. at 2240:18–2241:11, 2244:17–2245:21; DX-193 at 53.

421.    Acquiring the Tiger Securities from Jaguar and Ocelot through a purported in-kind

contribution did not eliminate, for RRF and its investors, all transaction costs associated

with acquiring those securities.

Tr. at 3194:7–18.

422.    Indeed, acquiring the Tiger Securities from Jaguar and Ocelot through the form of the

putative in-kind contribution meant that RRF paid more for the Tiger Securities than it

would have, had RRF paid Jaguar and Ocelot with cash, which would have enabled RRF

to acquire the Tiger Securities from Jaguar and Ocelot near the low end of the bid-ask

spread.

Tr. at 2240:18–2241:11, 2244:17–2245:21; see also Tr. at 3193:19–3194:3; DX-193 at 53

(explaining that, had Bracebridge/RRF/FFIP acquired the Tiger Securities from Jaguar

and Ocelot for cash instead of shares in RRF, the "legal costs associated with the

transaction could have been reduced and the assets [the Tiger Securities] may have been

purchased at a lower cost. This would also have enabled Bracebridge to avoid the

distraction of a second transaction to acquire or redeem the shares of [Jaguar and Ocelot]

who clearly did not want to be [shareholders] in the first place.").

423.    Compared to directly purchasing the Tiger Securities from Jaguar and Ocelot for cash,

RRF could not avoid bid-ask-spread transaction costs by acquiring the Tiger Securities from Jaguar and Ocelot through the form of an in-kind contribution instead.

See DX-193 at 74–77.

424.   Assigning a lower valuation/incoming price to the Tiger Securities meant that RRA could earn more in incentive fees. It was to RRA's advantage, therefore, for the valuation of the Tiger Securities to be lower, rather than higher.

Tr. at 1699:8–22.

425.   Tiger Management conducted little, if any, due diligence of RRF.

DX-193 Report at 56.

426.   The value of the unrestricted ruble remained fairly constant during the period of May 24, 1999, through June 8, 1999, and showed little observable volatility. During this period, the Tiger Securities (OFZ 25023) and the unrestricted ruble were stable or appreciating, and the discount at which restricted rubles traded relative to unrestricted rubles was stable or decreasing—meaning that the value of restricted rubles was constant, or appreciating, at this time.

Tr. at 2146:10–2149:2 and DX-193 Report at 57 (Figure 12) and 58 (explanation).

427.   It was reasonable for Mr. Lucas to use the restricted ruble rate that was observable from the date of RRF's acquisition of the Tiger Securities in evaluating the June 8, 1999 price at which RRF sold the call option to Deutsche Bank. Mr. Lucas reasonably calculated that the appropriate rate was approximately 70 rubles to the dollar. The rate, and time periods, that Mr. Lucas employed in making his calculation appropriately accounted for the type of assets underlying the call option.

Tr. at 2152:1–2153:20, 2263:4–2267:1; DX-193 Report at 58–59 (Step 1).

428.   It was appropriate for Mr. Lucas to use the intrinsic value pricing model for evaluating the call option that RRF sold to Deutsche Bank.

Tr. at 2267:7–2279:22.

429.   There was no market for the call option that RRF sold to Deutsche Bank.

Tr. at 2271:9–15.

430.   Dr. Nathalie Moyen's critique of Mr. Lucas's work is flawed, and so is her valuation of the call option that RRF sold to Deutsche Bank.

Tr. at 2267:7–2279:22.

431.   Dr. Moyen's binomial tree valuation is unreasonable. Her volatility calculation of the Tiger Securities is flawed, because she disregarded RRF's valuation methodologies and contemporaneous records. Instead of following the mark-to-market month-end valuations that RRF itself used, Dr. Moyen started with the price that FFIP paid Jaguar and Ocelot on June 4, 1999 for their *shares* in RRF; she then "reverse-engineered" that price into a ruble rate of 105 rubles to the dollar for June 4, 1999; which rate she then used to value the underlying *assets*, namely, the Tiger Securities, as of June 8, 1999. Her valuation also incorrectly assumes that a market existed for the call option, when one did not exist.

Tr. at 2274:23–2279:23.

432.   It was not appropriate for Dr. Moyen to value the call option using the binomial tree pricing model.

Tr. at 2267:7–2279:22.

433.   Mr. Leon Metzger's critique of Mr. Lucas's work is flawed. Mr. Metzger's work viewed RRF as pursuing a "global macro" investment strategy. According to its written offering materials, however, RRF instead pursued an "emerging markets" strategy.

Tr. at 2280:4–2284:9.

**E.    Dr. Nathalie Moyen's valuation of the call option that RRF sold to Deutsche Bank is flawed, and therefore lacks credibility.**

434.    Dr. Moyen's valuation of the call that option that RRF sold to Deutsche Bank (JX-88) relies on the June 4, 1999 price at which FFIP purchased Jaguar's and Ocelot's shares in RRF. Her valuation, however, is flawed. The call option that RRF sold to Deutsche Bank did not involve finding a buyer for RRF's *shares*. Rather, the option involved finding a buyer for a portion of RRF's *assets*—namely, the Tiger Securities.

JX-88 at B5-001244; Tr. 2991:7–2992:25.

435.    Dr. Moyen's valuation also assumes that the June 4, 1999 price that FFIP paid to Jaguar and Ocelot for their shares in RRF was the market price for RRF shares between a willing buyer and a willing seller. Her valuation is flawed. Her market-price analysis assumes that Jaguar and Ocelot were not distressed sellers. Her market-price assumption also does not account for the fact that shares in RRF were sold "in a private placement," that "[t]here is no public market for the Shares [of RRF] and none is likely to develop" (*see, e.g.*, JX-60 at A1-000821); nor does it account for the transfer restrictions that RRF imposed on its shares, which would prevent even willing buyers and willing sellers from joining (*see, e.g.*, JX-60 at A1-000851–000852 ("Participating Share may be transferred *only* with the consent of the Board of Directors, and the Fund will not register a transfer of Participating Shares to a transferee not approved by the Board of Directors in its sole discretion.")).

Tr. 3002:8–3004:8.

436.    Dr. Moyen's volatility estimate is also flawed. Dr. Moyen's volatility figure is based on *unrestricted* ruble exchange rates only. The assets underlying the call option, namely the

Tiger Securities, however, were denominated in *restricted* rubles.

Tr. 3045:19–24.

437.   Dr. Moyen's volatility figure also fails to utilize sufficient data. Her base volatility

estimate uses only 9 data points, and her sensitivity analysis uses data only from the

beginning of May to June 7, 1999, despite additional days of data being available.

Tr. at 3047:22–3048:6, 3056:7–17, 3057:2–4, 3058:18–21, 3060:18–22.

438.   Dr. Moyen conceded that the authoritative textbook she cited in her report advised using

more data observations than she used for her valuation, but claimed that the MICEX was

moving too much to use more data. As the Court recognized during Dr. Moyen's

testimony, however, that was the very purpose of the volatility calculation: to measure

the volatility in the data. By subjectively limiting the data she relied on, Dr. Moyen's

volatility figure understated market volatility.

Tr. 3053:18–3055:5.

**F.   Apart from confirming that the market for the Tiger Securities was highly-illiquid in May 1999, and that such assets usually sold at "fire sale" prices, Mr. Metzger's opinions and testimony were uninformative.**

439.   Mr. Metzger agreed that the Tiger Securities were illiquid securities; that, in May 1999,

Jaguar and Ocelot had held the Tiger Securities at distressed prices; and that May 1999

was a difficult market environment for holders of Russian assets like the Tiger Securities.

Tr. 3200:22–3202:4.

440.   Mr. Metzger agreed that, as illiquid assets, the Tiger Securities were hard to sell, and that

it would be hard to find a willing buyer and a willing seller for holders of them who

would transact at arm's-length price. He further testified that such assets usually sold at

"fire sale" prices.

Tr. 3202:25–3203:18.

441.  Mr. Metzger had no opinion on whether tax considerations motivated any part of the
      May 1999 transactions between RRF, on the one hand, and Jaguar and Ocelot, on the
      other hand.

      Tr. 3166:2–7.

442.  Mr. Metzger had no opinion on whether tax considerations motivated any part of the
      June 1999 share transactions between Jaguar and Ocelot, on the one hand, and FFIP, on
      the other hand.

      Tr. 3166:18–3167:1.

443.  Mr. Metzger had no opinion on whether tax considerations motivated any part of the
      June 1999 transactions involving RRF, Deutsche Bank, and General Cigar.

      Tr. 3167:2–9.

444.  Mr. Metzger had no opinion on whether it was typical or atypical for tax considerations
      to motivate in-kind transfers/contributions to hedge funds.

      Tr. 3167:10–14.

445.  Mr. Metzger had no opinion on whether it was typical or atypical for hedge funds to be
      motivated by tax considerations in taking in-kind transfers/contributions.

      Tr. 3167:15–19.

446.  Mr. Metzger's report compared RRF against a variety of hedge funds that operated in the
      late 1990s. He compared hedge funds in the "general population," which included hedge
      funds that engaged in arbitrage strategies, long-only strategies, global-macro strategies,
      and emerging-markets strategies. He failed, however, to compare RRF against only hedge
      funds that had Russian assets as their focus.

Tr. 3168:11–3169:9.

447.    Although Mr. Metzger compared RRF, whose investment strategy was market-beta or
        long-only, to hedge funds in the general population that engaged in arbitrage strategies,
        he acknowledged that an absolute return strategy is different from a long-only strategy.
        Tr. 3170:7–3172:1.

448.    Other than RRF, Mr. Metzger could not provide the names of five fully-running hedge
        funds from the late 1990s that focused on investing in Russian assets.
        Tr. 3172:5–3173:13.

449.    Mr. Metzger relied a great deal on his experience with Paloma in forming his opinions in
        the case. Mr. Metzger, however, never traded for Paloma, and he never had any
        experience with in-kind contributions while he was with Paloma.
        Tr. 3191:15–3192:16.

450.    Mr. Metzger agreed that hedge funds would still incur transaction costs with in-kind
        contributions.
        Tr. 3193:19–18.

Respectfully Submitted,

s/Robert J. Higgins
ROBERT J. HIGGINS
Attorney of Record
U.S. Department of Justice – Tax Division
Court of Federal Claims Section
Post Office Box 26, Ben Franklin Station
Washington, D.C. 20044
(202) 307-6580
(202) 514-9440 (facsimile)
robert.j.higgins@usdoj.gov

CAROLINE D. CIRAOLO
 Acting Assistant Attorney General
DAVID I. PINCUS
 Chief, Court of Federal Claims Section
BART D. JEFFRESS
 Trial Attorney
PAUL G. GALINDO
 Trial Attorney

s/David I. Pincus
Of Counsel
Attorneys for Defendant

May 27, 2015